# 21-400

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

ALEX CANTERO, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

—against—

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

MARK W. MOSIER
ANDREW SOUKUP
LAURA DOLBOW
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

—and—

THOMAS M. HEFFERON
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(617) 570-1000

*Attorneys for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Bank of America, N.A. states that it is a direct, wholly owned subsidiary of BAC North America Holding Company. BAC North America Holding Company is a direct, wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct, wholly owned subsidiary of Bank of America Corporation. Bank of America Corporation is a publicly held company whose shares are traded on the New York Stock Exchange and has no parent corporation. Based on the U.S. Securities and Exchange Commission Rules regarding beneficial ownership, Berkshire Hathaway Inc., 3555 Farnam Street, Omaha, Nebraska 68131, beneficially owns greater than 10% of Bank of America Corporation's outstanding common stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................................ v

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF THE CASE ............................................................................ 4

    A.    Statutory and Regulatory Background .................................................... 4

        1.    The National Bank Act established a dual banking
            system under which national banks generally are subject
            only to federal oversight. ............................................................ 4

        2.    Congress has granted national banks broad power to
            make real estate loans, without conditioning the exercise
            of that power on compliance with state law. ............................. 7

        3.    The OCC has issued regulations preempting state-law
            limitations on escrow accounts. .................................................. 8

        4.    Federal and state law impose different requirements
            regarding interest on mortgage escrow accounts. ..................... 10

    B.    Facts and Procedural History ............................................................ 13

        1.    Despite being told that he would not receive interest on
            his mortgage escrow account, Plaintiff filed suit seeking
            payment of interest. .................................................................. 13

        2.    The district court rejected Bank of America's preemption
            defense and certified its order for interlocutory appeal. .......... 14

SUMMARY OF ARGUMENT ............................................................................ 17

STANDARD OF REVIEW ................................................................................. 20

ARGUMENT ...................................................................................................... 21

I.     State Interest-on-Escrow Laws Prevent or Significantly Interfere with National Banks' Exercise of Federal Banking Powers. .............................. 21

       A.     Federal Law Authorizes National Banks to Establish the Terms and Conditions of Mortgage Loans, Including Escrow Accounts. .... 21

       B.     State Laws May Prevent or Significantly Interfere with the Exercise of National Bank Powers Even When They Impose Only Narrow Limitations on Those Powers.................................................. 23

             1.     The Supreme Court has applied the National Bank Act to preempt narrow state-law limitations. ..................................... 24

             2.     Courts have recognized that the level of interference necessary for preemption is not very high. .............................. 29

       C.     New York's Interest-on-Escrow Law Prevents or Significantly Interferes with Bank of America's Exercise of its Federal Powers... 34

       D.     The OCC Regulations Confirm That New York's Interest-on-Escrow Law Is Preempted................................................................. 40

II.     Congress Has Not Expressly Made National Banks Subject to State Interest-on-Escrow Laws. ............................................................................... 46

       A.     The National Bank Act Does Not Require National Banks to Comply with State Interest-on-Escrow Laws. .................................. 47

       B.     The Dodd-Frank Act Does Not Require National Banks to Comply with State Interest-on-Escrow Laws. .................................. 49

             1.     Dodd-Frank lacks an explicit statement that national banks are subject to state interest-on-escrow laws. ................. 49

             2.     The district court incorrectly relied on statutory silence to infer congressional intent regarding preemption. .................... 53

       C.     At a Minimum, Dodd-Frank Cannot Help Plaintiff Because It Does Not Apply to His Escrow Account. .......................................... 57

CONCLUSION ................................................................................................... 58

CERTIFICATE OF COMPLIANCE ....................................................................... 60

# TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Am. Bankers Ass'n v. Lockyer*,
    239 F. Supp. 2d 1000 (E.D. Cal. 2002) ....................................30, 33

*Anderson Nat'l Bank v. Luckett*,
    321 U.S. 233 (1944)....................................................24, 28, 29, 35

*Bank of Am. v. City & County of S.F.*,
    309 F.3d 551 (9th Cir. 2002) ......................................................32, 56

*Bank One, Utah v. Guttau*,
    190 F.3d 844 (8th Cir. 1999) ............................................................56

*Baptista v. JPMorgan Chase Bank, N.A.*,
    640 F.3d 1194 (11th Cir. 2011) ..................................................30, 33

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
    517 U.S. 25 (1996).................................................................*passim*

*Cohen v. Capital One Funding, LLC*,
    489 F. Supp. 3d 33, 50 (E.D.N.Y. 2020) ........................................32

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)....................................................................42, 50

*Flagg v. Yonkers Sav. & Loan Ass'n, FA*,
    396 F.3d 178 (2d Cir. 2005) .......................................................45, 55

*Franklin Nat'l Bank of Franklin Square v. People*,
    347 U.S. 373 (1954)................................................................*passim*

*Fultz v. World Sav. & Loan Ass'n*,
    2008 WL 4131512 (W.D. Wash. Aug. 18, 2008).............................45

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) ...............................................30, 33, 35

*Indep. Bankers Ass'n of Am. v. Heimann*,
    613 F.2d 1164 (D.C. Cir. 1979)..........................................................9

*Lacewell v. OCC*,
   __ F.3d __, 2021 WL 2232109 (2d Cir. Jun. 3, 2021) ........................................5

*Lusnak v. Bank of America*,
   883 F.3d 1185 (9th Cir. 2018) .....................................................................37, 39

*Macpherson v. JPMorgan Chase Bank, N.A.*,
   665 F.3d 45 (2d Cir. 2011) ...............................................................................20

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
   439 U.S. 299 (1978)..........................................................................................4, 5

*Martinez v. Wells Fargo Home Mortg., Inc.*,
   598 F.3d 549 (9th Cir. 2010) ............................................................................44

*Mobil Cerro Negro, Ltd. v. Bolivian Republic of Venezuela*,
   863 F.3d 96 (2d Cir. 2017) ...............................................................................55

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
   589 F.3d 274 (6th Cir. 2009) ............................................................................29

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
   513 U.S. 251 (1995)...........................................................................................41

*Parks v. MBNA Am. Bank, N.A.*,
   54 Cal. 4th 376 (2012) ..........................................................................31, 33, 35

*People v. Franklin Nat'l Bank of Franklin Square*,
   305 N.Y. 453 (1953). ........................................................................................27

*Powell v. Huntington National Bank*,
   226 F. Supp. 3d 625, 639-42 (S.D. W.Va. 2016) .............................................44

*Rai v. WB Imico Lexington Fee, LLC*,
   802 F.3d 353 (2d Cir. 2015) .............................................................................38

*Ransom v. FIA Card Servs., N.A.*,
   562 U.S. 61 (2011).............................................................................................53

*Rose v. Chase Bank USA, N.A.*,
   513 F.3d 1032 (9th Cir. 2008) ....................................................................31, 33

*Smith v. Wells Fargo & Co.*,
    2008 WL 11404524 (S.D.N.Y. Apr. 2, 2008) ....................................44

*Smith v. Wells Fargo Bank, N.A.*,
    158 F. Supp. 3d 91 (D. Conn.)..........................................................32

*SPGGC, LLC v. Ayotte*,
    488 F.3d 525 (1st Cir. 2007).......................................................32, 33

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007) .............................................................38

*Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*,
    742 F.3d 37 (2d Cir. 2014) ...............................................................22

*Tiffany v. Nat'l Bank of Mo.*,
    85 U.S. 409 (1873).............................................................................5

*United States v. Locke*,
    529 U.S. 89 (2000).............................................................................56

*United States v. Madigan*,
    300 U.S. 500 (1937)...........................................................................55

*United States v. Wilson*,
    503 U.S. 329 (1992)...........................................................................56

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) .....................................................*passim*

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007).....................................................................*passim*

*Wells Fargo Bank of Tex. NA v. James*,
    321 F.3d 488 (5th Cir. 2003) ............................................................31

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..........................................................17, 41, 42

*Zlotnik v. U.S. Bancorp*,
    2009 WL 5178030 (N.D. Cal. Dec. 22, 2009)...................................45

STATUTES

12 U.S.C. § 24 .................................................................*passim*

12 U.S.C. § 25b(b) ..............................................2, 9, 36, 44

12 U.S.C. § 35 .........................................................................5

12 U.S.C. § 36(c) ................................................................47

12 U.S.C. § 85 .....................................................................47

12 U.S.C. § 90 .....................................................................47

12 U.S.C. § 92a(a) .............................................................47

12 U.S.C. § 371 ..........................................................*passim*

12 U.S.C. § 5514(c) ..........................................................50

15 U.S.C. § 1639d ....................................................*passim*

15 U.S.C. § 1828(*o*) ........................................................48

28 U.S.C. § 1292(b) ....................................................3, 16

28 U.S.C. § 1332(d) ............................................................3

Conn. Gen. Stat. § 49-2a ...............................................11

Iowa Code § 524.905(2) .................................................11

Md. Code Ann. Com. Law § 12-109 .....................10, 52

ME Rev. Stat. tit. 33, § 504...........................................10

New York General Obligations Law § 5-601 ......*passim*

Pub. L. No. 93-383, 88 Stat. 633 (1974)......................49

Pub. L. No. 111-203, 124 Stat. 1376, §§ 1041-48 (2010) ......................................51

Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ..................*passim*

38 Stat. 273 (1913)............................................................48

44 Stat. 1233 (1927).............................................................48

**OTHER AUTHORITIES**

12 C.F.R. § 7.4001(a)...........................................................22

12 C.F.R. § 34.4 ...........................................................*passim*

12 C.F.R. § 560.2 .........................................................45, 55

Office of Thrift Supervision and Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549 (July 21, 2011) .........................................*passim*

Fed. R. App. P. 5 .................................................................4

Fed. R. App. P. 26 ...............................................................4

Fed. R. App. P. 35 ..............................................................39

H.R. 9989 ............................................................................12

H.R. Rep. No. 93-1113 (1974)............................................49, 55

H.R. Rep. No. 93-1526 (1974).................................................12

H.R. Rep. No. 93-1177 ..........................................................12

*Lusnak v. Bank of America*, OCC Amicus Brief, No. 14-56755 (filed Apr. 23, 2018), 2018 WL 3702582 ............................*passim*

OCC, Corporate Decision No. 99-06, 1999 WL 74103, at *2 (Jan. 29, 1999) ....................................................................................23

OCC Interp. Ltr. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005).........................8

OCC, *National Banks and the Dual Banking System* (Sept. 2003) .......................4, 5

S. Rep. No. 93-866, 1974 U.S.C.C.A.N 6546 .........................................10

Webster's II New College Dictionary (1999)............................................50

# INTRODUCTION

The National Bank Act establishes a system of federally chartered national banks that derive their banking powers from federal law and are extensively regulated by federal banking authorities, primarily the Office of the Comptroller of the Currency ("OCC").  As a national bank chartered under the National Bank Act, Defendant Bank of America, N.A. has broad authority under federal law to make mortgage loans and to provide escrow account services in connection with those loans.  Pursuant to these federal banking powers, Bank of America has established escrow accounts for mortgage loan customers, including Plaintiff, from which it makes tax, insurance, and other required payments for the property.

Plaintiff filed this lawsuit contending that Bank of America must comply with a New York law requiring payment of at least 2 percent interest on funds held in mortgage escrow accounts.  Bank of America moved to dismiss the lawsuit on the ground that federal law preempts application of this state law to national banks.  The district court rejected Bank of America's preemption defense and held that states (and, by extension, local governments) may directly regulate national banks' mortgage lending activity by requiring the payment of interest on mortgage escrow accounts and by specifying a minimum interest rate.  If affirmed by this Court, the district court's ruling will permit exactly the type of duplicative regulation the National Bank Act is designed to avoid.

The decision should not stand because it conflicts with Supreme Court precedent and OCC regulations, which establish that federal law preempts state interest-on-escrow laws. Indeed, the OCC has issued regulations that expressly preempt state-law limitations on escrow accounts, and it has filed multiple amicus briefs—including in this case—expressing the agency's expert view that federal law preempts state interest-on-escrow laws.

The National Bank Act preempts any state law that "prevents or significantly interferes" with a national bank's exercise of its federal banking powers. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996); *see also* 12 U.S.C. § 25b(b)(1)(B) (codifying this standard). Under this standard, state laws are "ordinarily" preempted, *Barnett Bank*, 517 U.S. at 32, and New York's interest-on-escrow law is no exception. That state law is preempted because it prevents national banks from exercising their federal authority to offer escrow accounts unless they first comply with state law requiring the payment of at least 2 percent interest on escrow account balances. The law also significantly interferes with national banks' federal power to set the terms of mortgage loans because it prohibits them from offering escrow accounts unless they pay interest on those accounts as required by state law. The district court reached a contrary conclusion by limiting national bank preemption to state laws that amount to a "practical abrogation" of a federal banking power. That conclusion not only misconstrues the *Barnett Bank* standard, but would permit

a host of state regulations of national banks, leading to precisely the state-by-state compliance issues that the National Bank Act protects against.

National banks are also subject to state law when Congress expressly states that they must comply with state law. *Barnett Bank*, 517 U.S. at 34. Congress has not done that here. The National Bank Act grants broad real-estate lending powers to national banks without expressly requiring compliance with state interest-on-escrow laws. Plaintiff argued that a provision in the Dodd-Frank Act requires national banks to comply with state interest-on-escrow laws, but the district court correctly concluded that the provision "was not intended to impact … preemption one way or another." Joint Appendix ("JA") 83.

Federal law thus preempts state interest-on-escrow laws as applied to national banks. Because Plaintiff's claims all depend on the allegation that Bank of America violated New York's interest-on-escrow law, the claims fail as a matter of law and should be dismissed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d). The district court entered an order certifying that the motion-to-dismiss order satisfies the requirements of 28 U.S.C. § 1292(b) on October 7, 2020. Bank of America filed a timely petition for interlocutory review. *See* 28 U.S.C. § 1292(b); Fed. R. App. P.

5(a), 26(a)(1)(C).  This Court granted Bank of America's petition on February 19, 2021.  JA142.

## STATEMENT OF THE ISSUE

Whether the National Bank Act and its implementing regulations preempt New York General Obligations Law § 5-601 and similar state statutes that purport to require national banks to pay interest on mortgage escrow accounts.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

*1.    The National Bank Act established a dual banking system under which national banks generally are subject only to federal oversight.*

Congress enacted the National Bank Act over 150 years ago to create a "national banking system."  *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978) (internal quotation marks and citation omitted).  "Congress did not abolish state banking, but it did include explicit protections in the new framework so that national banks would be governed by Federal standards administered by a new Federal agency—the [OCC]—and not by state authority."  Office of Thrift Supervision and Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,554 (July 21, 2011).

By creating a national banking system without replacing the state system, Congress established a "dual banking system."  OCC, *National Banks and the Dual Banking System*, at 3 (Sept.  2003).  As the OCC has explained, "[t]he state system

4

is characterized by state chartering, bank powers established under state law, and operation under state standards, subject to state supervision." *Id.* By contrast, "[t]he federal system is based on a federal bank charter, powers defined under federal law, operation under federal standards, and oversight by a federal supervisor." *Id.*; *see also Lacewell v. OCC*, __ F.3d __, 2021 WL 2232109, at *2 (2d Cir. Jun. 3, 2021) (discussing "dual banking system" and noting that "banks with national banking charters are primarily supervised by federal regulators"). A bank may choose to be chartered at either the state or federal level. 12 U.S.C. § 35.

National banks, in contrast to state-chartered banks, are "instrumentalit[ies] of the federal government, created for a public purpose, and … subject to the paramount authority of the United States." *Marquette,* 439 U.S. at 308. By creating a system of national banks that derive their banking powers from federal law, Congress aimed to "protect [national banks] against possible unfriendly State legislation," *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 412 (1873), and to prevent the "[d]iverse and duplicative" regulation of national banks that would occur if their banking activities were subject to multiple states' laws, *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13-14 (2007). In short, as the Supreme Court has observed, states "can exercise no control" over national banks, "nor in any wise affect their operation, except in so far as Congress may see proper to permit." *Id.* at 11.

To ensure that national banks are primarily regulated by federal law, the Supreme Court has interpreted the National Bank Act to broadly preempt state law. The Supreme Court provided a comprehensive overview of National Bank Act preemption in *Barnett Bank*. 517 U.S. at 32-34. The Court observed that some provisions of the National Bank Act "accompany a grant of an explicit power with an explicit statement that the exercise of that power is subject to state law." *Id.* at 34. When Congress has expressly required compliance with state law, the Supreme Court "has interpreted those explicit provisions to mean what they say." *Id.* But "where Congress has *not* expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." *Id.*(emphasis added). That is because "Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.* at 33. Thus, absent a provision of federal law expressly permitting states to regulate national banks, such regulation is permitted only where "doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.*

The National Bank Act "ordinarily pre-empt[s] … contrary state law," *Barnett Bank*, 517 U.S. at 32 (quotation marks omitted), but it does not preempt all state laws. As the OCC has explained, "states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." JA122. These laws do not generally

interfere with national banks' exercise of their federal powers; they "establish the legal infrastructure that surrounds and supports national banks' ability to do business." *Id.*

The dual banking system established by the National Bank Act has provided significant benefits to the U.S. economy. Permitting national banks "to operate under uniform national rules across state lines, has helped to foster the growth of national products and services and multi-state markets." 76 Fed. Reg. at 43,554. That benefit is especially important today when "the Internet and the advent of technological innovations in the creation and delivery of financial products and services has accentuated the geographic seamlessness of financial services markets." *Id.*

> 2. *Congress has granted national banks broad power to make real estate loans, without conditioning the exercise of that power on compliance with state law.*

National banks may exercise only those powers granted to them by federal law. As relevant here, the National Bank Act provides that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to section 1828(*o*) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." 12 U.S.C. § 371(a). This broad grant of real-estate lending

power requires national banks to comply with federal regulations, but it does not mention compliance with state laws.

The National Bank Act also empowers banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." *Id.* § 24 (Seventh). For nearly half a century, the OCC has recognized that national banks may "[p]rovid[e] escrow services in a variety of contexts." OCC Interp. Ltr. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005) (citing Interp. Ltr. (May 13, 1975)). In an escrow account like Plaintiff's, the bank collects money from the borrower to pay taxes and insurance bills. JA11. Providing this service is a necessary part of the business of banking because it reduces the risk of loss to the property securing the loans from tax liens or property damage, and it provides a benefit to borrowers because the escrow account "relieves them of the tasks of paying such regular tax and insurance obligations in a lump sum." OCC, Conditional Approval No. 276, 1998 WL 363812, at *9 (May 8, 1998).

> 3. *The OCC has issued regulations preempting state-law limitations on escrow accounts.*

National banks' general exemption from complying with state law does not mean that their operations are not regulated. "National banks are subject to extensive regulation at the Federal level … and to regular, and in some cases, continuous examination of their operations." 76 Fed. Reg. at 43,554. The OCC has issued extensive regulations governing virtually "[e]very aspect" of national banks' affairs.

*Indep. Bankers Ass'n of Am. v. Heimann*, 613 F.2d 1164, 1168 (D.C. Cir. 1979) ("National banks are perhaps as meticulously regulated as any industry.").

As part of these regulations, the OCC has addressed when national banks must comply with state laws in exercising their real-estate lending powers. *See, e.g.*, 12 C.F.R. § 34.4. These regulations permit national banks to make real estate loans "without regard to state law limitations concerning … [e]scrow accounts, impound accounts, and similar accounts." *Id.* § 34.4(a)(6). They also permit national banks to make real estate loans "without regard to state law limitations concerning … "[t]he ability of a creditor to require or obtain … risk mitigants" and "[t]he terms of credit." *Id.* § 34.4(a)(2), (a)(4). An escrow account is both a "term of credit" and a "risk mitigant" because it affects the payments due by a borrower each month and reduces the risk of loss to the security the borrower has given to the bank. The regulations are "based on the OCC's experience with the potential impact of such laws on national bank powers and operations." 76 Fed. Reg. at 43,557.

The OCC reexamined its regulations after Congress enacted the Dodd-Frank Act, which codified the *Barnett Bank* preemption standard for state laws that regulate national banks. *See* 12 U.S.C. § 25b(b)(1)(B). The OCC's review of its regulations "confirm[ed] that the specific types of state laws cited in the rules are consistent with the standard for conflict preemption in the Supreme Court's *Barnett* decision." 76 Fed. Reg. at 43,557. The OCC explained:

state laws that would affect the ability of national banks to underwrite and mitigate credit risk, manage credit risk exposures, and manage loan-related assets, such as laws concerning … risk mitigation … [and] escrow standards …  would meaningfully interfere with fundamental and substantial elements of the business of national banks and with their responsibilities to manage that business and those risks.

*Id.*  The OCC regulations thus preempt state-law limitations on "risk mitigants," "terms of credit," and "[e]scrow accounts, impound accounts, and similar accounts." 12 C.F.R. § 34.4(a)(2), (a)(4), (a)(6).

### 4.    *Federal and state law impose different requirements regarding interest on mortgage escrow accounts.*

In the 1970s, some lenders were accused of requiring borrowers to maintain higher balances in their mortgage escrow accounts than was necessary to pay their tax and insurance liabilities.  *See* S. Rep. No. 93-866, 1974 U.S.C.C.A.N 6546, 6548; JA46.  As contemplated by the dual banking system, states took varied approaches to address this concern, while Congress offered a different response.

Thirteen states enacted laws requiring lenders to pay interest on mortgage escrow accounts.  JA47.  These states did not adopt a uniform approach to requiring payment of interest.  Some states impose a fixed interest rate. *See, e.g.*, N.Y. G.O.L. § 5-601.  Others apply a variable rate pegged to market rates, but use different methods for calculating the rate. *See, e.g.*, ME Rev. Stat.  tit.  33, § 504; Md. Code. Ann. Com. Law  § 12-109; Mass.  Gen.  L.  ch.  183, § 61.  Still others require the bank

to pay the same interest rate on escrow accounts that it pays on savings accounts. *See, e.g.*, Conn. Gen. Stat. § 49-2a; Iowa Code § 524.905(2).

New York law has traditionally followed the fixed-rate approach. Enacted in 1974, the law states that "mortgage investing institutions" that maintain escrow accounts must pay at least 2 percent interest on those accounts. N.Y. G.O.L. § 5-601. But as of 2018, state-chartered banks may pay interest on escrow accounts at the lesser of the 2 percent statutory rate or "the six-month yield on United States Treasury securities." N.Y. Dep't of Financial Services, "Order Issued under Section 12-A of the New York Banking Law," (Jan. 19, 2018), https://www.dfs.ny.gov/system/files/documents/2020/03/wild_20180119_mortgage-escrow_order.pdf. New York's Superintendent of Financial Services justified this change by acknowledging that national banks are not subject to New York's interest-on-escrow law because the OCC regulations preempt it. *Id.* (citing 12 C.F.R. § 34.4(6)). The rule was thus necessary, in the Superintendent's view, to promote "parity" between state-chartered banks and federal-chartered banks. *Id.*[1]

Congress took a different approach in responding to escrow accounts carrying large balances. In 1974, Congress enacted the Real Estate Settlement Procedures

---

[1] If the district court's ruling stands, this state rule will have the perverse effect of requiring *only* national banks to pay the higher statutory rate. *See infra* p. 35.

Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, which limits the amount lenders may require in escrow accounts for federally insured, guaranteed, or owned mortgages. Lenders can now demand only as much as is necessary to guarantee timely payment of taxes and insurance premiums. 12 U.S.C. § 2609; *see id.* § 2601(a). In adopting this approach, Congress specifically considered requiring national banks to pay interest on escrow accounts, and it rejected that option. When Congress passed RESPA, the House bill included a provision directing the Board of Governors of the Federal Reserve System to conduct a study of the feasibility of requiring lenders to pay interest on escrow accounts. *See* H.R. 9989; H.R. Rep. No. 93-1526, at 14 (1974); H.R. Rep. No. 93-1177, at 10. But the Senate bill did not contain that provision, and the conference report did not recommend including it. H.R. Rep. No. 93-1526, at 14.

More recently, Congress addressed mortgage escrow accounts when it enacted the Dodd-Frank Act. As part of this statute, Congress amended the Truth-in-Lending Act ("TILA") to require lenders to establish mortgage escrow accounts in certain circumstances. 15 U.S.C. § 1639d. Congress also specified certain rules for "[a]dministration" of these "mandatory" escrow accounts. *Id.* § 1639d(g). The relevant provision here states: "If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust,

or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." *Id.* § 1639d(g)(3).

## B. Facts and Procedural History

### 1. *Despite being told that he would not receive interest on his mortgage escrow account, Plaintiff filed suit seeking payment of interest.*

Plaintiff is a New York resident who obtained a mortgage from Bank of America in August 2010. JA12, JA15. In addition to his monthly principal and interest payments, Plaintiff has made monthly payments into an escrow account for payment of property taxes and insurance. JA11, JA16. Nothing in Plaintiff's mortgage agreement states the he will earn interest on the funds held in his escrow account.

Instead, the mortgage agreement states that it "shall be governed by Federal law and the law of the jurisdiction in which the Property is located." JA36. When Plaintiff obtained his mortgage loan, Bank of America provided him with a notice to ensure that he understood that, consistent with federal law, he would not receive interest on his escrow account:

> Your loan was originated by Bank of America, N.A. and will be serviced by BAC Home Loans Servicing, LP, an operating subsidiary of Bank of America, N.A. As a federally chartered bank, Bank of America and its operating subsidiaries are subject to federal law and the Office of the Comptroller of the Currency regulations, and in most cases are not subject to state laws that regulate or otherwise affect their credit activities. The federal law and regulations that Bank of America and its subsidiaries are subject to do not require the payment of interest on escrow accounts. Accordingly, you will not receive interest on your

escrow account even if your state has a law concerning the payment of interest on escrow accounts.

JA40.

Nearly eight years after receiving this notice, Plaintiff filed this putative class action lawsuit. All of his claims—for breach of contract, unjust enrichment, and violations of Section 5-601 and New York G.B.L. § 349 (prohibiting deceptive acts or practices)—depend on the allegation that Bank of America must pay at least 2 percent interest on his account pursuant to New York law. JA19-24. For most of the proposed class period, this 2 percent rate vastly exceeded prevailing interest rates, including the six-month yield on United States Treasury securities.[2]

2. *The district court rejected Bank of America's preemption defense and certified its order for interlocutory appeal.*

Bank of America moved to dismiss all claims in the amended complaint on the ground that federal law preempts New York's interest-on-escrow law as applied to national banks. The district court issued a single opinion deciding Bank of America's motions to dismiss in this case and a related case, *Hymes v. Bank of America*, No. 21-403, which is also pending before this Court.

---

[2] *See, e.g.,* https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2016.

The district court rejected Bank of America's preemption defense and allowed Plaintiff's breach-of-contract claim to proceed.[3]  The court observed that Bank of America's preemption defense is "a question of first impression" in this circuit that implicates "two acts of Congress"—the National Bank Act and the Dodd-Frank Act—that "speak past each other."  JA60; JA83.

The district court first interpreted the relevant Dodd-Frank provision, which requires lenders to maintain escrow accounts in certain situations and, for those specific escrow accounts, topay interest "[i]f prescribed by applicable State or Federal law." 15 U.S.C. § 1639d(g)(3).  The court concluded that this provision accepts, not alters, the prior scope of National Bank Act preemption—as the court put it, this provision "was not intended to impact [National Bank Act] preemption one way or another."  JA83; *see also* JA62-69 & n.9.  The court nevertheless interpreted this provision as evidence that the National Bank Act did not preempt state laws requiring national banks to pay interest on either the mandatory escrow accounts addressed

---

[3] The district court dismissed the claims for unjust enrichment and for violations of Section 5-601 and G.B.L. § 349 on separate grounds.  JA84-86 & n.19.  Plaintiff's breach-of-contract claims survived the motion to dismiss because, given the preemption ruling, the court held that he had adequately alleged breach of the contractual provision stating that Bank of America would comply with "applicable law."  *Id.* at JA87.

in § 1639d(g)(3) or any other escrow account that was not addressed in that section. JA83.[4]

The district court then applied the *Barnett Bank* standard to hold that the National Bank Act does not preempt New York's interest-on-escrow law. JA75-83. After observing that "[t]he Supreme Court has never explained in detail what this standard entails," JA76, the court rejected the preemption defense because "compliance with the state law" did not amount to "practical abrogation of the banking power at issue," JA78. In reaching this conclusion, the court declined to apply the OCC's preemption regulations and concluded that the OCC's views on National Bank Act preemption are entitled to no deference because they are unpersuasive and "do[] not in any way implicate the agency's substantive expertise." JA69-74.

On October 7, 2020, the district court entered an order certifying its ruling on the motion to dismiss for interlocutory appeal under § 1292(b). JA125-26. In doing so, the court noted that the preemption issue "is a question of first impression in the Second Circuit," and that "some of the determinations that are central to the preemption analysis are difficult because the precise contours of certain pivotal terms are not well defined." JA133. The court recognized that there were "substantial grounds

---

[4] The Dodd-Frank provision does not apply to Plaintiff's escrow account because that account was established before Dodd-Frank took effect, and the law does not apply retroactively. JA83 n.10.

for dispute" about the proper application of the *Barnett Bank* standard.  JA134.  The district court also noted that there is substantial grounds for dispute regarding the deference owed to the OCC's regulations.  *Id.*  Notably, this Court held that the same regulations were entitled to deference in *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005), and the district court's opinion cast doubt on the continued validity of *Burke* based on the Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555 (2009).  JA135.

Bank of America filed a timely petition for permission to appeal pursuant to 28 U.S.C. § 1292(b), which this Court granted on February 19, 2021.  JA141-42.

## SUMMARY OF ARGUMENT

The National Bank Act and OCC regulations preempt state laws that prevent or significantly interfere with national banks' exercise of their federal banking powers, unless Congress has made an explicit statement that national banks are subject to particular state laws.  *Barnett Bank*, 517 U.S. at 33-34.  New York's interest-on-escrow law prevents and significantly interferes with Bank of America's exercise of its real-estate lending powers, and Congress has not explicitly stated that national banks are subject to such state laws.  The New York law is thus preempted as to national banks, and Plaintiff's claims should be dismissed.

I. A.  State interest-on-escrow laws significantly interfere with national banks' exercise of their federal power to establish the terms and conditions of mortgage

loans, including the terms on which they will establish and service escrow accounts. Congress has expressly authorized national banks to "make, arrange, purchase, or sell" loans on real estate, and to exercise all incidental powers necessary to perform an express power. 12 U.S.C. § 371(a); *id.* § 24 (Seventh). These powers include the authority to provide, establish, and service escrow accounts, which includes setting the terms and conditions for those accounts.

B. Under *Barnett Bank*, the National Bank Act "ordinarily" preempts contrary state law. 517 U.S. at 33. The Supreme Court has interpreted the National Bank Act to preempt state laws that impose even narrow limitations on a national bank's powers, such as limiting the specific words a bank can use in advertising. Other courts have recognized that *Barnett Bank* sets a low threshold for preemption and have applied that standard to hold that the National Bank Act preempts state laws that, for example, limit the order in which banks post transactions to consumer accounts, or specify particular disclosures a bank must make regarding its products and services. Departing from this precedent, the district court incorrectly concluded that a state law may be preempted only if it amounts to a "practical abrogation" of the banking power at issue—a heightened standard of preemption that significantly undermines the national uniformity the National Bank Act was intended to promote.

C. The National Bank Act preempts state interest-on-escrow laws under a proper application of *Barnett Bank*. The state law prevents Bank of America from

offering escrow accounts unless it pays interest on the account, and it significantly interferes with the Bank's power to decide whether, and how much, interest to pay on escrow accounts, by mandating that interest must be paid at a rate of 2 percent. The OCC agrees with this analysis. It has filed amicus briefs, including in this case, expressing the agency's expert view that state interest-on-escrow laws are preempted under *Barnett Bank* because forcing national banks to comply with different state laws significantly interferes with national banks' real-estate lending powers. The district court erred in not giving deference to the OCC's views.

D. OCC regulations confirm that the New York law is preempted. OCC's preemption regulations provide that national banks may exercise their mortgage lending authority without regard to state-law limitations on, among other things, escrow accounts. 12 C.F.R. § 34.4(a)(6). This Court has previously given deference to the same regulation, and the district court erred by not doing so here.

II. A. Congress has not explicitly provided that national banks are subject to state interest-on-escrow laws. Without such an explicit statement, those state laws are preempted. The National Bank Act grants national banks broad powers to "make, arrange, purchase or sell" real-estate loans, and does not include any statement that these federal banking powers are limited by state law. 12 U.S.C. § 371(a).

B.  Nor does the Dodd-Frank Act contain the necessary explicit statement. Properly construed, the relevant provision—Section 1639d(g)(3)—accepts the existing regime of National Bank Act preemption.  It does not force national banks to comply with states' interest-on-escrow laws that had, to that point, been preempted. Instead, Section 1639d(g)(2) merely extends federal oversight to creditors who were *already* obligated to pay interest on an escrow account under state law.  For this reason, the district court correctly concluded that Section 1639d(g)(3) does not address preemption.  That conclusion should have ended the district court's review of Dodd-Frank.  The court incorrectly relied on statutory silence concerning preemption as evidence that Congress intended for national banks to comply with state interest-on-escrow laws.  That approach conflicts with *Barnett Bank*.

C. At a minimum, New York's interest-on-escrow law is preempted as to Plaintiff's escrow account.  The district court relied on Section 1639d(g)(3) in finding no preemption, but Plaintiff cannot rely on that provision.  As he conceded, his escrow account is not governed by Section 1639d because it was established before that provision took effect.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion to dismiss and preemption determination.  *Macpherson v. JPMorgan Chase Bank, N.A.*, 665 F.3d 45, 46 (2d Cir. 2011).

## I.  State Interest-on-Escrow Laws Prevent or Significantly Interfere with National Banks' Exercise of Federal Banking Powers.

The National Bank Act has powerful and unusual preemptive force.  "States can exercise no control" over national banks, "nor in any wise affect their operation, except in so far as Congress may see proper to permit."  *Watters*, 550 U.S. at 11 (quotation marks omitted).  To ensure that a state's limited authority to enforce its laws against national banks remains properly limited, the usual presumption against federal preemption "disappears" in the field of "[r]egulation of federally chartered banks."  *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005).

The National Bank Act preempts state interest-on-escrow laws as applied to national banks because those laws "prevent or significantly interfere with the national bank's exercise of its powers."  *Barnett Bank*, 517 U.S. at 33.  Those state laws prevent national banks from offering escrow accounts unless they comply with state law requirements to pay interest on escrow account balances, and they significantly interfere with national banks' exercise of their real-estate lending powers. The OCC agrees that the state law is preempted, and its regulations provide an additional basis for preemption.

### A.  Federal Law Authorizes National Banks to Establish the Terms and Conditions of Mortgage Loans, Including Escrow Accounts.

To apply the *Barnett Bank* standard, courts first identify the specific federal banking powers at issue, and then analyze the effect the state law has on the exercise

of those powers.  Here, the federal banking power at issue is Bank of America's power to establish the terms and conditions of mortgage loans, including the terms and conditions on which to establish and service escrow accounts.

National banks have federal power to establish the terms and conditions for mortgage loans.  Congress expressly authorized national banks to "make, arrange, purchase, or sell" loans on real estate.  12 U.S.C. § 371(a).  Congress has also authorized national banks to exercise all incidental powers necessary to perform an express power.  *Id.*  § 24 (Seventh); *Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 41 n.4 (2d Cir. 2014).  These grants of authority include the power to establish the terms and conditions of mortgage loans, including interest rates and loan origination fees.  One "term" of a mortgage loan is the price, or interest rate, charged to a borrower as "compensati[on] … for an extension of credit."  12 C.F.R. § 7.4001(a).

Mortgage loan agreements often include terms and conditions governing the creation and servicing of an escrow account.  Plaintiff's mortgage agreement, for example, specifically identified the "Escrow Items" he must pay and explained how Bank of America would service the escrow account.  JA34.  Mortgage loan agreements include these terms and conditions because escrow accounts are a means for national banks to protect their security interest when they make real-estate loans.

Escrow accounts allow banks to mitigate the risk of loss that would arise if the borrower failed to pay taxes or to have the property properly insured. While banks could also mitigate this risk by charging higher interest rates or origination fees, or lending in lower amounts, escrow accounts provide an alternative mechanism to mitigate risk.

The OCC has long recognized that the grants of authority in 12 U.S.C. § 371 and § 24 (Seventh) empower national banks to require a borrower to make tax and insurance payments into an escrow account as a term of the mortgage. *See* OCC, Corporate Decision No. 99-06, 1999 WL 74103, at *2 (Jan. 29, 1999) (real-estate lending powers include the power "to provide … escrow services"); JA113 (national banks have "implied authority to provide, establish, and service escrow accounts"). Indeed, as the district court observed, "it is untenable to think national banks lack the power to maintain [escrow] accounts." JA76.

### B. State Laws May Prevent or Significantly Interfere with the Exercise of National Bank Powers Even When They Impose Only Narrow Limitations on Those Powers.

State laws that "prevent or significantly interfere" with a national bank's exercise of its federal banking power are preempted. *Barnett Bank*, 517 U.S. at 33. The district court concluded that, under this standard, state laws are preempted only if they "practical[ly] abrogat[e]" or "nullif[y]" a national bank's exercise of a federal banking power. JA78-79. As the OCC explained, this conclusion imposes "a new

heightened standard" for National Bank Act preemption, and it "stands in stark contrast to the preemption standard set forth in *Barnett Bank* and the OCC's—as well as many other federal courts'—interpretation of that standard."  JA116.

        *1.*    *The Supreme Court has applied the National Bank Act to preempt narrow state-law limitations.*

In applying the *Barnett Bank* standard, the district court observed that the Supreme Court "has never explained in detail what this standard entails."  JA134.  The court therefore "attempted to ascertain the contours of this standard by examining two older Supreme Court cases: *Franklin Nat. Bank of Franklin Square v. People*, 347 U.S. 373 (1954), and *Anderson Nat. Bank v. Luckett*, 321 U.S. 233 (1944)."  JA134.  Because "defining the precise contours of the *Barnett Bank* standard from such a limited sample of cases is inherently difficult," the court acknowledged that its "practical abrogation" test was subject to dispute.  *Id.*  The district court misconstrued Supreme Court precedent and, as a result, set the bar too high for preemption under the National Bank Act.

In *Barnett Bank*, the Supreme Court explained that where, as here, "Congress has *not* expressly conditioned the grant of [national bank] 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies."  517 U.S. at 34.  Thus, absent a provision of federal law expressly permitting states to regulate national banks, such regulation is permitted only where "doing so does not prevent or significantly interfere with the national bank's exercise of its powers."

*Id.* Applying these principles, the *Barnett Bank* Court held that the National Bank Act preempted a state law prohibiting national banks from selling insurance. Even though federal and state law did not impose conflicting duties on national banks, and even though the national bank could have complied with both federal and state law, the Supreme Court concluded that the state law prevented or significantly interfered with the bank's exercise of its federal powers. *See id.*

Nothing in *Barnett Bank* suggests that a state law is preempted only if it "abrogat[es]" or "nullif[ies]" the national bank's power. JA78-79. The Supreme Court acknowledged that the state and federal laws at issue were not in "irreconcilable conflict" because the laws did not "impose directly conflicting duties on national banks." *Barnett Bank*, 517 U.S. at 31. But the state law was nevertheless preempted because the "Federal Statute's language suggests a broad, not a limited, permission" to sell insurance, and the state law interfered with the exercise of that power. *Id.* at 32. In so doing, the Supreme Court relied on prior decisions using different formulations of the preemption test without suggesting that those formulations were substantively different. *Id.* at 33-34 (state laws are preempted when they "unlawfully encroach on the rights and privileges" of national banks, "hamper" the exercise of federal banking powers, or "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve" (cleaned up)). The

Supreme Court has continued to use these other formulations of the standard, including in discussing preemption involving national banks' real-estate lending powers. *See Watters*, 550 U.S. at 13 ("Beyond genuine dispute, state law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the [National Bank Act]."). These alternative formulations of the *Barnett Bank* standard further demonstrate that "practical abrogation" is not the correct test.

In explaining why the state law in *Barnett Bank* was preempted, the Supreme Court looked to its earlier decision in *Franklin National Bank*, a case the Court said was "quite similar" to *Barnett Bank*. 517 U.S. at 33. *Franklin National Bank* diverges from the district court's "practical abrogation" test. The district court incorrectly described the conflict between federal and state law in *Franklin National Bank* by stating that the National Bank Act "expressly authorized banks to receive deposits," while "state law prevented them from in any way communicating this fact to prospective customers." JA77. But the state law was not nearly so broad, and it did not, as the district court concluded, "practically nullif[y] a specific grant of power." JA79. It merely prohibited banks from using the words "saving" or "savings" in their advertising or business. *Franklin National Bank*, 347 U.S. at 374. Far

from preventing national banks "from in any way communicating" that they accepted deposits, *id.*, the state law permitted national banks to communicate that fact in every way except by using the words "saving" or "savings." *Franklin Nat'l Bank*, 347 U.S. at 378. The Supreme Court nevertheless held that the National Bank Act preempted the state law. *Id.* at 378-79.

In reaching this conclusion, the Supreme Court treated as irrelevant the state court's finding that every other national bank in New York complied with the law, with no apparent harm to their business. *See People v. Franklin Nat'l Bank of Franklin Square*, 305 N.Y. 453, 461 (1953), *reversed by Franklin Nat'l Bank*, 347 U.S. at 379. Those banks did so by removing the prohibited terms from their advertising and replacing them with "such synonymous expressions as 'special interest account', 'thrift account' and 'compound interest account'." *Id.* The Supreme Court nevertheless held that the law was preempted because the prohibition on the words "saving" or "savings" amounted to a significant interference with national banks' incidental power to advertise their banking services. *Franklin Nat'l Bank*, 347 U.S. at 378.[5]

---

[5] The district court noted the Supreme Court's statement in *Franklin National Bank* that "it could not subscribe to 'an interpretation that would permit a national bank to engage in a business but gave no right to let the public know about it.'" JA77 (quoting *Franklin Nat'l Bank*, 347 U.S. at 377-78). The quoted portion of *Franklin National Bank* did not describe the state law's effect; it explained why the national

The Supreme Court held that the state law at issue in *Anderson National Bank* was not preempted, but that case does not support the district court's "practical abrogation" test. The Supreme Court held that a Kentucky escheat law, which regulated when the state could claim ownership of abandoned bank deposits, did not "infringe or interfere with any authorized function of the bank." *Anderson*, 321 U.S. at 249. The escheat law provided that when a deposit had been presumed abandoned under state law, the state could demand payment of the deposit from a bank—just as the accountholder could have demanded payment from the bank before abandoning the account. *Id.* The state law therefore did not impose a new obligation on national banks to satisfy a valid demand for payment from a deposit account—it simply governed *who* could legally demand payment of the deposit. Thus, like any law governing inheritance, the Kentucky law determined whose money the national bank held, not how the bank should operate. Unsurprisingly, the Court held that the "state assuming the bank's obligation to the depositors" presented "no unlawful encroachment on the rights and privileges of national banks." *Id.* at 251-52.

In sum, as the OCC has observed, *Franklin National Bank* "demonstrates that 'significant interference" with national bank powers can be established even by narrow state limits on national bank practices," and *Barnett Bank* itself "illustrates that

---

bank's explicit authority to take deposits must be buttressed by the implied authority to advertise that service. *Franklin Nat'l Bank*, 347 U.S. at 377-78.

narrowly targeted state restrictions can impermissibly burden a national bank's exercise of its powers sufficient to establish preemption."  OCC, *Lusnak* Amicus Br. at 8.  Nor does *Anderson National Bank* support the district court's heightened standard for preemption; it merely provides an example of a state law that "establish[es] the legal infrastructure that surrounds and supports national banks' ability to do business."  JA122.  Accordingly, the district court erred in construing Supreme Court precedent as holding that the National Bank Act preempts only those state laws that amount to  a "practical abrogation" of the national bank's federal powers.

> 2. *Courts have recognized that the level of interference necessary for preemption is not very high.*

Courts routinely apply *Barnett Bank* to hold that the National Bank Act preempts state laws seeking to regulate the terms of national bank products and services.  In so doing, courts do not view a single state's law in isolation, but instead consider the interference that would arise if every state and local government were permitted to impose different and potentially conflicting requirements. *See Watters*, 550 U.S. at 13-14 (National Bank Act preemption prevents "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking").  These decisions demonstrate that, under *Barnett Bank*, "the level of 'interference' that gives rise to preemption under the [National Bank Act] is not very high." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009); *Am.*

*Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1017 (E.D. Cal. 2002) (describing the preemption standard as "remarkably low").

The National Bank Act preempts state laws that prevent a national bank from fully exercising its federal powers, even when the state law does not entirely abrogate or nullify that power. For example, in *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 723 (9th Cir. 2012), the Ninth Circuit recognized that national banks have the authority to determine the method for posting transactions to customer accounts. The state law did not purport to nullify that power, but instead prohibited the bank from posting transactions in high-to-low order, leaving the bank free to choose among other possible posting orders (such as low-to-high or chronological). *Id.* The Ninth Circuit held that this state law restriction on the methods for posting was preempted because it "prevents or significantly interferes with a national bank's federally authorized power to choose a posting order." *Id*. at 725.

The Eleventh Circuit's decision in *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1196-97 (11th Cir. 2011), also illustrates this point. There, the federal law authorized national banks to charge check-cashing fees to anyone who presented a check for payment. The state law at issue did not completely nullify that power—it permitted national banks to charge check-cashing fees to their customers, while prohibiting them from charging those fees to non-accountholders. *Id.* at 1197. The Eleventh Circuit held that this state law was preempted because it significantly

interfered with national banks' exercise of their federal powers. *See id.* at 1196-97.

The court reasoned that "[t]he state's prohibition on charging fees to non-account-holders, which reduces the bank's fee options by 50%, is in substantial conflict with federal authorization to charge such fees." *Id.* at 1198; *see also Wells Fargo Bank of Tex. NA v. James*, 321 F.3d 488, 491 & n.3 (5th Cir. 2003) (holding that a Texas law regulating check-cashing fees was preempted because "where a state statute interferes with a power which national banks are authorized to exercise, the state statute irreconcilably conflicts with the federal statute and is preempted").

The National Bank Act also preempts state laws requiring national banks to make certain disclosures, regardless of whether those disclosure requirements abrogate or nullify any federal power. *See Parks v. MBNA Am. Bank, N.A.*, 54 Cal. 4th 376 (2012) (disclosure requirements for convenience checks preempted); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008) (disclosure requirements for loans or fee charging practices preempted). In *Parks*, the California Supreme Court refused to draw a distinction between state laws that prohibit national banks from exercising a particular federal power unless they comply with state law, and laws that impose additional requirements on the exercise of the power. *Id.* at 387-88 (acknowledging that the state law did not "outlaw a category of banking activity"). For purposes of preemption, it makes no difference whether the state law is "phrased as a conditional permission" (a bank "may offer convenience checks so

long as it complies with" state law), or whether it is phrased "as a contingent prohibition" (a bank "may not offer convenience checks unless it complies with" state law). *Id.* (emphasis omitted). In either case, the law poses a significant interference with the national bank's exercise of its lending power and is preempted. *Id.*

These decisions are only some of the many cases in which courts have held that the National Bank Act preempts state laws that purport to restrict national banks' authority to set the terms for their products and services. Courts have also held that the National Bank Act preempts state laws regulating administrative fees on stored-value gift cards, *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532-33 (1st Cir. 2007), prohibiting national banks from charging fees for ATM use, *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 561-64 (9th Cir. 2002), or requiring banks to itemize billing, *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91 (D. Conn.), *aff'd*, 666 F. App'x 84 (2d Cir. 2016). Recently, a district court in this circuit held that applying state law usury limits to loans originated and then securitized by federal banks would significantly interfere with a national bank's federal powers "to charge interest on the loans it issues, to sell interests in loan contracts, and to participate in the securitization market." *Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 50 (E.D.N.Y. 2020).

The district court's "practical abrogation" standard conflicts with these decisions. The court attempted to distinguish these cases on the ground that the OCC

had issued regulations or guidance supporting preemption of the state laws at issue. JA80. But the OCC has done the same here. *See infra* Part I.D. Moreover, in many prior cases, the court did not rely solely on OCC regulations, but instead also applied *Barnett Bank* to hold that the National Bank Act preempted state law. *See, e.g.*, *Baptista*, 640 F.3d at 1197; *Gutierrez*, 704 F.3d at 723.

The district court also attempted to distinguish much of the relevant case law on the ground that the other cases involved state-law attempts to restrict national banks' power to charge fees. JA81 n.17. But there is no valid reason to treat a bank's powers to collect payments from customers and to make payments to customers differently. Both involve a transfer of funds between the bank and customer as compensation for the bank's services—the only difference is whether the bank or customer is receiving the funds.

In any event, many National Bank Act preemption cases do not involve a bank's power to set fees. *See, e.g.*, *Gutierrez*, 704 F.3d at 723 (power to determine posting order of transactions); *Parks*, 54 Cal. 4th at 388 (power to loan money); *Rose*, 513 F.3d at 1032 (same); *SPGGC*, 488 F.3d at 528-29 (power to issue gift cards). The district court dismissed these decisions as "not instructive" in how to apply *Barnett Bank*, but they provide further evidence that the standard for preemption under *Barnett Bank* is "remarkably low." *Lockyer*, 239 F. Supp. 2d at 1017; JA81.

## C. New York's Interest-on-Escrow Law Prevents or Significantly Interferes with Bank of America's Exercise of its Federal Powers.

Under a proper application of *Barnett Bank*, the National Bank Act preempts New York's interest-on-escrow law because the law significantly interferes with Bank of America's exercise of its federal banking powers. The OCC agrees with that conclusion, but the district court erred by rejecting the agency's view.

New York's interest-on-escrow law regulates quintessential banking decisions—whether to pay interest on an account the bank requires to protect loan collateral and, if so, at what rate. By seeking a ruling that Bank of America must comply with the New York law, Plaintiff seeks to prohibit Bank of America from exercising its federal authority to include a term in its mortgage loan agreements requiring an escrow account, unless the bank complies with the state-law requirement to pay interest on that account balance. Plaintiff also seeks to strip national banks of the power to decide whether to pay on escrow accounts by mandating that interest must be paid, and to significantly limit the bank's power to select a rate of interest by mandating a rate of at least 2 percent. The state law's requirements make escrow accounts a less attractive mechanism for mitigating lending risks, and compel banks to (i) use other means (such as higher mortgage interest rates or loan origination fees, or reduced loan amounts) to mitigate its risk, (ii) do nothing and assuming greater risk, or (iii) refrain from making the loan at all.

Where state law so directly restricts and burdens a national bank's federal lending authority, nothing more is required to show preemption. A state law that dictates whether national banks must pay interest on mortgage escrow accounts—and at what rate—more substantially interferes with a national bank's powers than a state law that limits the terms it can use in advertising, *Franklin Nat'l Bank*, 347 U.S. at 378, requires a national bank to include a disclosure on a convenience check, *Parks*, 54 Cal. 4th at 387, or limits the bank's choice of posting order, *Gutierrez*, 704 F.3d at 723. The law cannot be characterized as part of a state's generally applicable criminal, contract, or property laws, or otherwise simply forming part of "the legal infrastructure that surrounds and supports national banks' ability to do business." JA122. A law that regulates a national bank's decision to pay interest on escrow-account balances has significant consequences for the risk, pricing, and structure of a loan transaction. This state law thus interferes with the exercise of banking powers in a much different way and to a much greater degree than the escheat law in *Anderson National Bank*, which merely assigned the accountholder's rights to the state without imposing additional restrictions on a bank's maintenance of deposit accounts.

The state law's interference with national banking powers is magnified when the Court considers, as precedent requires, the cumulative effect of permitting each state to impose different regulations for escrow accounts. *Watters*, 550 U.S. at 13-

14. If New York may require national banks to pay the state's own specified rate of interest on mortgage escrow accounts, then so, too, may every other state and local government. National Bank Act preemption is designed to prevent this sort of "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking." *Id.* This threat is not merely hypothetical. At least thirteen states have enacted interest-on-escrow laws, and they have adopted a variety of approaches. *See supra* p. 10.

For the period of 2018 to present, the argument for preemption is particularly compelling. Beginning in 2018, state-chartered banks are no longer required to pay the 2 percent statutory rate. *See supra* p. 11. This rule was justified by the need to achieve parity between state-chartered and federally chartered banks. *Id.* As New York's Superintendent of Financial Services observed, OCC regulations preempt the state's interest-on-escrow law as applied to national banks, and thus national banks are not subject to the law. *Id.* Because the district court disagreed with the Superintendent's view on preemption and held that Section 5-601 applies to national banks, if the district court's decision is permitted to stand, the state law would discriminate against national banks by requiring them to pay at least 2 percent interest while state-chartered banks can pay a lesser amount. *See* 12 U.S.C. § 25b(b)(1)(A) (state law preempted if applying it "would have discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State").

The Ninth Circuit reached a contrary conclusion in *Lusnak v. Bank of America*, 883 F.3d 1185 (9th Cir. 2018), but that decision is an outlier and the Court should not follow it. *Lusnak* cannot be reconciled with the body of precedent discussed above, and the court's opinion makes little effort to do so. Moreover, the Ninth Circuit did not follow the established method of analyzing the preemption issue: It did not identify the specific federal banking powers at issue; nor did it meaningfully consider the ways in which the state law interferes with the exercise of those powers. The *Lusnak* court also failed to consider the cumulative effect of allowing each state (and local governments) to impose distinct requirements for escrow accounts. The OCC agrees that *Lusnak* "comprehensively misinterpreted *Barnett Bank*," and that "a proper application of *Barnett* should have resulted in the panel affirming the preemption of the California escrow statute." OCC Amicus Br. at *9, *Lusnak v. Bank of America*, No. 14-56755 (filed Apr. 23, 2018), 2018 WL 3702582.

B. The OCC agrees with Bank of America that New York's interest-on-escrow law significantly interferes with national banks' exercise of their federal powers. JA113-14. The Court should defer to the agency's views on this issue.

In multiple amicus briefs, including one filed in the district court in this case, the OCC has expressed its consistent view that state interest-on-escrow laws are preempted under a proper application of *Barnett Bank*. *Id*. The OCC's briefs explain why state interest-on-escrow laws significantly interfere with national banks' power

"to provide, establish, and service escrow accounts." JA113. In *Lusnak*, the OCC explained these state laws significantly interfere with national banks' power because they "(1) impose additional burdens on national bank lending activity, (2) add a fixed and inflexible interest rate on national bank escrow account activity, and (3) subject national banks to potentially diverse and duplicative requirements across other states." OCC Amicus Br., 2018 WL 3702582, at *15. Similarly, before the district court in this case, the OCC explained that requiring national banks to comply with the New York interest-on-escrow law "risks allowing states to impose costly operational and administrative burdens on national banks' lending activities" in a manner contrary to Congressional intent." JA122 (quotation marks and citation omitted).

This Court has held that courts should defer to a federal agency's amicus brief when it reflects the agency's "specialized experience," *Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 360 n.3 (2d Cir. 2015), and it has deferred to the OCC's preemption views in a litigation brief, *see SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 190-91 (2d Cir. 2007). The district court erred in refusing to give deference to the OCC's views. JA73-74.

The district court concluded that "the OCC's interpretation does not in any way implicate the agency's substantive expertise," because the brief "is based almost exclusively on the agency's analysis … of relevant case law." JA73. That is incorrect. The OCC has not limited its amicus briefs to explaining the *Barnett Bank*

standard; it has also expressed its view that state interest-on-escrow laws are preempted under that standard. JA73-74. The OCC's application of the preemption standard to a particular state law cannot be dismissed as merely an analysis of the case law. It necessarily required a substantive assessment regarding the impact of specific state laws on national banks' exercise of federal banking powers.

The district court also refused to defer to the OCC's amicus brief in *Lusnak* by suggesting that the brief did not specifically address whether federal law preempts state interest-on-escrow laws.[6] The amicus briefs, however, provide the OCC's interpretation on that specific question. JA113-14; *Lusnak*, OCC Amicus Br., 2018 WL 3702582, at *10. Finally, contrary to the district court's suggestion, the denial—without explanation—of rehearing en banc in *Lusnak* cannot be viewed as evidence that the Ninth Circuit refused to defer to the OCC's views. *See* Fed. R. App. P. 35(a)(1), (a)(2) (en banc review available only when "necessary to secure or maintain uniformity of the court's decision" or to address a "question of exceptional importance"). The Court should defer to the OCC's interpretation here.

---

[6] The district court incorrectly declined to defer to the OCC's regulations on the ground that they did not demonstrate that the agency had specifically considered whether the National Bank Act preempts state interest-on-escrow laws. *See infra* Part I.D. The court then suggested that the amicus brief had the same purported flaws as the regulations. JA74.

### D.    The OCC Regulations Confirm That New York's Interest-on-Escrow Law Is Preempted.

This Court has "recognized that the OCC may issue regulations with preemptive effect." *Wachovia Bank*, 414 F.3d at 314.  The OCC has issued regulations that preempt state-law limitation on escrow accounts, but the district court incorrectly declined to apply them here.

The OCC regulations provide that national banks may exercise their real-estate lending authority "without regard to state law limitations concerning … [e]scrow accounts, impound accounts, and similar accounts."    12 C.F.R. § 34.4(a)(6).  The regulations further provide that national banks may exercise their real-estate lending authority without regard to state laws relating to the "terms of credit," *id*. § 34.4(a)(4), or "[t]he ability of a creditor to require or obtain … risk mitigants," *id*. § 34.4(a)(2).  An escrow account is a "term of credit" and a "risk mitigant" because it affects the payments due by a borrower each month and reduces the risk of loss to the security that the borrower has given to the bank to ensure the borrower does not default on the loan.

The district court erred in refusing to defer to these regulations.  This Court has reviewed the same regulations and concluded that their validity depends on the "reasonableness of the OCC's exercise of its regulatory authority." *Burke*, 414 F.3d at 314-15.  The issue in *Burke* was whether state banking laws that regulated subsidiaries of national banks were preempted.  *Id.* at 310.  The Court held that Section

34.4, in addition to other OCC regulations, preempted the state laws, reasoning that it "must defer to the [OCC's] regulations if they reflect a reasonable construction of the statutory scheme." *Id.* at 318.

Departing from *Burke*, the district court denied Bank of America's motion to dismiss because, in the court's view, *Burke* was "not fully apposite." JA70. Yet in certifying the order for interlocutory appeal, the district court conceded that *Burke* "was not entirely inapposite either." JA135. To support its conclusion that the OCC regulations do not preempt state interest-on-escrow laws, the district court reasoned that *Burke* did not control because subsequent events have "undermined aspects of its approach," *id.*, including the Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555, 576 (2009).

*Wyeth*, however, did not overrule *Burke*. In *Wyeth*, the Supreme Court merely restated the traditional rule that "agencies have no special authority to pronounce on preemption *absent delegation by Congress*." 555 U.S. at 577 (emphasis added). Because Congress had not delegated authority to preempt state law to the Food and Drug Administration—the relevant agency in *Wyeth*—the Supreme Court gave only *Skidmore* deference to its preemption determinations. *Id.* But here the OCC has authority to promulgate regulations that "demarcate more clearly what state laws are and are not preempted with respect to real estate lending activities." *Burke*, 414 F.3d at 320. That is because Congress has entrusted the OCC with "primary responsibility

for surveillance of 'the business of banking' authorized by § 24 Seventh," *Na-tionsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995), and because federal banking regulations have "no less preemptive effect than federal statutes," *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). *Wyeth* thus does not disturb the Court's holding in *Burke*.

The district court also concluded that the Dodd-Frank Act undermined *Burke* by "effectively appl[ying] *Wyeth* to the OCC." JA70. As the OCC has explained, however, the Dodd-Frank Act "did not represent a change in [the] existing law" that entitles the OCC's conclusions "to 'some weight.'" JA120 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000)). In any event, Plaintiff's escrow account is not governed by Dodd-Frank because it was established before that law took effect, and the law does not apply retroactively. *See infra* p.56.

Even if *Burke* were no longer controlling, the OCC's regulations remain entitled to *Skidmore* deference because the regulations reflect the OCC's expertise. When the OCC originally promulgated the regulations, its judgment was informed by "several years of litigation experience with the *Barnett* analysis," and the regulations were "grounded in its supervisory judgment regarding the potential effect of those interactions on bank activities." *Lusnak*, OCC Amicus Br., 2018 WL 3702582, at *10; *accord* 76 Fed. Reg. at 43,557 (OCC's preemption regulations are "based on

the OCC's experience with the potential impact of such laws on national bank powers and operations"). The agency's view has been consistent also, as it re-affirmed the position in a 2011 rulemaking and again in multiple amicus briefs. *See* 76 Fed. Reg. at 43,557; *Lusnak*, OCC Amicus Br., 2018 WL 3702582, at *5-16.

The district court did not "question the persuasiveness of the 2004 regulations more generally." JA71 n.14. Instead, it questioned the persuasiveness of the OCC's reasons for preempting state interest-on-escrow laws specifically, stating that there is no evidence that the OCC "gave any thought whatsoever to the specific question raised in this case, which is whether the NBA preempts *escrow interest laws*." JA71. But in promulgating its regulations, the OCC decided against a law-by-law approach, opting instead to "identify categories and/or terms of state laws that are preempted." 76 Fed. Reg. at 43,556. The OCC considered objections to this categorical approach and explained that, "[w]here the same type of impediment exists under multiple states' laws, a single conclusion of preemption can apply to multiple laws that contain the same type of impediment." *Id.* Instead of rejecting the OCC's categorical approach, the district court should have deferred to the agency's reasoned

explanation for adopting that approach. The district court did not address the OCC's reasoning, much less conclude that it was unpersuasive.[7]

The district court's refusal to defer to the OCC's decision to identify preempted state laws by category conflicts with decisions of other courts, including this Court, which have routinely enforced 12 C.F.R. § 34.4 without parsing the OCC's rulemaking for "specific" references to particular types of state law. *See, e.g.*, *Burke*, 414 F.3d at 314-15; *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556-57 (9th Cir. 2010) (applying Section 34.4 to a state unfair competition law); *Powell v. Huntington National Bank*, 226 F. Supp. 3d 625, 639-42 (S.D. W.Va. 2016) (applying Section 34.4 to preempt state law regulating how national bank posts mortgage payments); *Smith v. Wells Fargo & Co.*, 2008 WL 11404524, at *1 (S.D.N.Y. Apr. 2, 2008) (applying Section 34.4 to a claim challenging a fee as misleading).

Finally, this Court has already upheld a federal agency's authority to enforce nearly identical regulations to preempt the same New York interest-on-escrow law.

---

[7] Dodd-Frank requires the OCC to make preemption determinations on a "case-by-case" basis, 12 U.S.C. § 25b(b)(3), but the OCC has reasonably interpreted that provision to apply only to preemption determinations made after Dodd-Frank took effect, 76 Fed. Reg. at 43,557. The district court agreed that this provision applied only to "future" preemption determinations. JA52 (Dodd-Frank "required future determinations … to be made case-by-case" (cleaned up)); JA72-73 (Dodd-Frank "mandat[es] that future determinations affecting state consumer protection laws be made on a case-by-case basis").

*See Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 181 (2d Cir. 2005). [8]   In

*Flagg*, the district court held that regulations promulgated by the Office of Thrift

Services ("OTS") preempted New York's interest-on-escrow law, and this Court af-

firmed that decision by determining that the OTS acted within its authority in issuing

those preemption regulations.  *Id.*

Flagg involved preemption under the Home Owners' Loan Act, where field

preemption applied, but the Court's reasoning also supports preemption here.  Just

as the Home Owners' Loan Act is intended "to enforce consistent, nationwide regu-

lations  affecting  lending  practices,"  *id.*  at  183,  "[d]iverse  and  duplicative

superintendence of national banks' engagement in the business of banking … is pre-

cisely what the [National Bank Act] was designed to prevent."  *Watters*, 550 U.S. at

13-14.  Courts have treated the OTS and OCC regulations similarly because their

"similarities  are  not  accidental"—the  "OCC  looked  to  existing  preemption  provi-

sions when determining how best to protect national bank operations from intrusive

state regulation."  *Fultz v. World Sav. & Loan Ass'n*, 2008 WL 4131512, at *1 (W.D.

Wash.  Aug. 18, 2008); *see also Zlotnik v. U.S. Bancorp*, 2009 WL 5178030, at *6

---

[8] *Compare* 12 C.F.R. § 34.4(a)(6) ("A national bank may make real estate loans …
without regard to state law limitations concerning … [e]scrow accounts, impound
accounts, and similar accounts."), *with id.* § 560.2(a), (b)(6) ("[F]ederal savings as-
sociations may extend credit … without regard to … state laws purporting to impose
requirements regarding … [e]scrow accounts, impound accounts, and similar ac-
counts[.]").

(N.D. Cal. Dec. 22, 2009) (because the preemption regulations are "almost identical … the preemption analysis remains the same"). The district court should have done the same here.

## II. Congress Has Not Expressly Made National Banks Subject to State Interest-on-Escrow Laws.

In *Barnett Bank*, the Supreme Court observed that some provisions of the National Bank Act "accompany a grant of explicit power with an explicit statement that the exercise of that power is subject to state law." 517 U.S. at 34. When Congress has expressly required compliance with state law, the Supreme Court "has interpreted those explicit provisions to mean what they say." *Id.*

The National Bank Act's grant of real-estate lending powers is not accompanied by an explicit statement that national banks are subject to state law. Plaintiff argued that a provision of the Dodd-Frank Act—Section 1639d(g)(3)—contains such a direction, but the district court correctly concluded that this provision "has nothing to say about preemption one way or the other." JA64. The district court's consideration of Dodd-Frank should have been complete when it reached that conclusion. The court thus erred by viewing Dodd-Frank's silence regarding preemption as expressing Congress's intent for national banks to comply with state interest-on-escrow laws. The court further erred by giving Plaintiff the benefit of the Dodd-Frank provision since—as the court acknowledged—the provision does not govern his escrow account.

**A.** **The National Bank Act Does Not Require National Banks to Comply with State Interest-on-Escrow Laws.**

When Congress intends for national banks to comply with state law, it says so explicitly and in the same provision that grants national banks the authority to act. *See Barnett Bank*, 517 U.S. at 34 (collecting cases); *Franklin Nat'l Bank*, 347 U.S. at 378 n.7 (same). Multiple provisions of the National Bank Act follow this pattern:

- Congress has authorized national banks to operate branches, but only in a manner "authorized to State banks by the law of the State in question." 12 U.S.C. § 36(c).

- Congress has authorized national banks to act as fiduciaries, but only if they do so "not in contravention of State or local law." 12 U.S.C. § 92a(a).

- Congress has authorized national banks to charge interest, but only "at the rate allowed by the laws of the State . . . where the bank is located." 12 U.S.C. § 85.

- When a State or political subdivision deposits money, Congress has authorized national banks to provide security "as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State." 12 U.S.C. § 90.

Plaintiff has never argued—nor did the district court hold—that Congress followed this usual approach of accompanying the express grant of a power to national banks with an express statement that national banks are subject state law. Congress explicitly granted national banks power to "make, arrange, purchase or sell" real-estate loans" in Section 371(a). 12 U.S.C. § 371(a). That express grant of authority is accompanied by two—and only two—express limitations: national banks' real-

estate lending authority is "subject to section 1828(*o*) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." *Id.* Neither of those express limitations requires compliance with any state law, much less state interest-on-escrow laws.[9]

Section 371(a)'s history demonstrates that Congress deliberately chose not to subject national banks' real-estate lending powers to state law. Congress originally granted national banks limited authority to make real-estate loans. 38 Stat. 273 (1913). This original grant of power authorized certain national banks to make short-term loans secured by "improved and unencumbered farm land." *Id.* The provision has been amended more than a dozen times in the past century. For much of the last century, it included an express limitation related to state law. In 1927, Congress amended the provision to require national banks to exercise their mortgage lending power in compliance with state laws limiting the interest rates that banks could charge. 44 Stat. 1233 (1927) (amending Section 371 to include an explicit statement that national banks could charge no more than "the maximum rate authorized by law to be paid … by State banks"). Congress later removed that express restriction in

---

[9] Section 1828(*o*) authorizes federal agencies to promulgate regulations related to insured depository institutions and is not relevant here. 15 U.S.C. § 1828(*o*). And the OCC has done the opposite of directing national banks to comply with state interest-on-escrow laws, by repeatedly expressing its view in regulations and amicus briefs that national banks need *not* comply with such laws. *See supra* pp. 37-45.

1974 as part of a reform "to authorize wider real estate lending and investment powers for national banks."  H.R. Rep. No. 93-1113, at 6 (1974); *see* Pub. L. No. 93-383, 88 Stat. 633, 716 (1974).

In short, the current version of Section 371 does not expressly condition national banks' exercise of their real-estate lending authority upon compliance with state law.  The law thus does not require national banks to pay interest on escrow accounts under state law as a condition to exercise its real-estate lending powers.

### B. The Dodd-Frank Act Does Not Require National Banks to Comply with State Interest-on-Escrow Laws.

Plaintiff contends that the Dodd-Frank Act supplied the necessary explicit statement to subject national banks to state interest-on-escrow laws, but the district court correctly concluded that the relevant Dodd-Frank provision does not address preemption.  That conclusion should have ended the district court's review of Dodd-Frank.  Instead, the court incorrectly relied on the statutory silence on preemption as evidence that Congress intended for national banks to comply with state interest-on-escrow laws.

#### 1. *Dodd-Frank lacks an explicit statement that national banks are subject to state interest-on-escrow laws.*

Plaintiff argued that a provision in the Dodd-Frank Act, which amended the Truth in Lending Act ("TILA"), requires national banks to comply with state interest-on-escrow laws. JA14.  This provision states that a creditor must pay interest on

mortgage escrow accounts "[i]f prescribed by applicable State or Federal law." 15 U.S.C. § 1639d(g)(3). The district court correctly concluded that the provision "has nothing to say about preemption one way or the other." JA64.

Properly construed, this provision does not change the application of the *Barnett Bank* preemption standard, and hence did not require any national bank to comply with an otherwise-preempted state interest-on-escrow law. Instead, for any mortgage that a creditor was *already* obligated to pay interest on the escrow account, prior to Dodd-Frank, the creditor also became obligated to pay interest under this new TILA provision. This result furthered Dodd-Frank's objective of giving the federal Bureau of Consumer Financial Protection enforcement authority over state-chartered banks and non-depository lenders. *See* 12 U.S.C. § 5514(c).

This interpretation of Section 1639d(g)(3) is supported by the ordinary meaning of "applicable," which is commonly defined to mean "able to be applied; appropriate." Webster's II New College Dictionary 55 (1999). A preempted law is not "able to be applied," and thus does not constituted an "applicable" law under Section 1639d(g)(3). This result is consistent with *de la Cuesta*, where the Supreme Court held that a national bank was not subject to a preempted state law pursuant to a deed of trust that "is to be governed by the 'law of the jurisdiction' in which the property is located." 458 U.S. at 158 n.12. Just as a preempted state law does not

"govern[]" a bank's conduct, a preempted law likewise is not "applicable" to a national bank.

Section 1639d(g)(3) read as a whole confirms this interpretation. Section 1639d(g)(3) begins with the phrase "[i]f prescribed by applicable State or Federal law," and ends by stating that interest payments under this provision should be made in the "manner as prescribed by that applicable State or Federal law." *Id.* § 1639d(g)(3). The opening conditional phrase indicates that the rest of the provision—the operative portion that imposes the interest requirement—applies only if another law (either state or federal) already requires the payment of interest on escrow accounts. The last portion of the provision also requires that another law independently imposes a requirement to pay interest on escrow accounts, because it instructs creditors to pay interest in the manner prescribed by that other law. Put another way, Section 1639d(g)(3)'s language demonstrates that the provision does not impose any new obligation to pay interest on escrow-account balances.

Other Dodd-Frank provisions confirm this interpretation. When Congress wanted to modify the extent to which national banks were required to comply with state law, it did so explicitly in Subtitle D of Title X of Dodd-Frank by amending the National Bank Act. *See* Pub. L. No. 111-203, 124 Stat. 1376, §§ 1041-48 (2010). That subsection is titled "Preservation of State Law," and its eight sections set forth,

among other things, the preemption standards for national banks, *see id.*, § 1044, and require national bank subsidiaries to comply with state law, *see id.*, § 1045.

Congress could have expressly identified state interest-on-escrow laws as among the state laws "preserved" as applied to national banks, but it did not do so. Unlike the amendments to the National Bank Act, Section 1639d does not mention national banks, the National Bank Act, or preemption. Section 1639d also is codified in a different Title of the United States Code and as part of a different statutory regime. It thus lacks the necessary "explicit statement that the exercise of" Bank of America's banking powers are "subject to state law." *Barnett Bank*, 517 U.S. at 34.

Despite agreeing that Section 1639d(g)(3) does not address preemption, the district court purported to adopt a different interpretation of "applicable." JA64. The court's lengthy discussion of the meaning of this term is a red herring. Much of that analysis addresses why "applicable" cannot mean "not preempted," but Bank of America does not contend that the term *means* "not preempted." It simply argued that the fact that a law is preempted is one reason why it would not be "applicable"; another reason would be that the law by its own terms does not apply to a particular loan. *See, e.g.*, Md. Code Ann. Com. Law § 12-109(c)-(d) (listing two exceptions to state interest-on-escrow law).

The district court concluded that "applicable" "is best read as meaning 'relevant' or 'having relevance,'" and not "able to be applied." JA65. But the court

incorrectly viewed "relevant" and "able to be applied" as different definitions of "applicable." The district court relied on *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011), but that case quotes two dictionary definitions of "applicable": "capable of being applied: having relevance" and "fit, suitable, or right to be applied: appropriate." *Id.* (quoting Webster's Third New International Dictionary 105 (2002)). Given that "capable of being applied" and "having relevance" are included in the same definition, they should be treated as synonymous. There is thus no need to choose between "capable of being applied" and "having relevance"; those two phrases can be used interchangeably or combined to form a single definition. Under this definition, a preempted law is not "applicable" within the meaning of Section 1639d(g)(3) because it is not "capable of being applied" and does not "hav[e] relevance." *Id.*

> 2.  *The district court incorrectly relied on statutory silence to infer congressional intent regarding preemption.*

Despite concluding that the relevant Dodd-Frank provision does not address preemption, the district court nevertheless viewed the provision as supporting its application of the *Barnett Bank* test. JA83. The district court erred in interpreting Congress's silence as evidence of intent to require national banks to comply with state law.

The district court treated its conclusion that Section 1639d(g)(3) is silent on preemption as evidence that "Congress did not intend to create a preemption-based

exception for national banks." JA68-69; JA64 (declining to interpret Section 1639d(g)(3) to "create a massive preemption-based exemption for national banks"). The court's reasoning gets the relevant question under *Barnett Bank* backwards. The question is not whether Congress enacted a "preemption-based exemption"; the question is whether Congress has "accompan[ied] a grant of explicit power with an explicit statement that the exercise of that power is subject to state law." 517 U.S. at 34. When Congress has expressly required compliance with state law, "this Court has interpreted those explicit provisions to mean what they say." *Id.* But "where Congress has *not* expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." *Id.* That is because "Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.* at 33.

As in *Barnett Bank*, Congress's silence on preemption should have been interpreted as evidence that Congress has not conditioned the exercise of national banks' real-estate lending powers on compliance with state law. Section 371(a)'s "language suggests a broad, not a limited, permission." *Id.* at 32. The express grant of authority is accompanied by two express limitations, but neither of them requires compliance with any state law. 12 U.S.C. § 371(a). Section 371(a)'s history further demonstrates that Congress deliberately chose not to subject national banks' real-estate lending powers to state law. A prior version of the law required national banks

to exercise their mortgage lending power in compliance with state laws limiting the interest rates that banks could charge, but Congress removed that limitation "to authorize wider real estate lending and investment powers for national banks." H.R. Rep. No. 93-1113, at 6 (1974); *see supra* pp. 48-49

Congress's silence also should not be interpreted as evidence that Congress intended for national banks to be subject to state interest-on-escrow laws given the state of the law when Dodd-Frank was enacted. When Congress enacted Section 1639d, this Court and regulators had long agreed that federally chartered depository institutions were not subject to state escrow laws, including laws requiring the payment of interest on escrow account balances. *See, e.g.*, 12 C.F.R. § 34.4(a)(2), (a)(4), (a)(6); 12 C.F.R. § 560.2(b)(6); *Flagg*, 396 F.3d at 181-85. Nothing in the Dodd-Frank Act suggests Congress intended to overturn these regulations and court decisions. Given the "venerable canon of construction that Congress is presumed to legislate with familiarity of the legal backdrop for its legislation," *Mobil Cerro Negro, Ltd. v. Bolivian Republic of Venezuela*, 863 F.3d 96, 114 (2d Cir. 2017), Congress's silence indicates an intent to preserve—not disrupt—the long-held view that states lack authority to regulate national banks' escrow accounts. *See, e.g.*, *United States v. Madigan*, 300 U.S. 500, 506 (1937) ("[T]he modification by implication of the settled construction of an earlier and different section is not favored");

*United States v. Wilson*, 503 U.S. 329, 336 (1992) ("It is not lightly to be assumed that Congress intended to depart from a long established policy.").

Similarly, the district court was incorrect to view RESPA as support for subjecting national banks to state interest-on-escrow laws. JA62-63. RESPA may demonstrate that Congress has subjected national banks to additional federal laws, but that is very different from subjecting them to state laws. The Supreme Court and other courts have repeatedly rejected the view that federal restrictions on national bank powers leave states free to impose their own restrictions on those powers as well. *See Barnett Bank*, 517 U.S. at 33-34 (preemption when federal law "contains no 'indication' that Congress intended to subject that power to local restriction"); *Bank of Am.*, 309 F.3d at 565 (federal anti-preemption provision "does not save the Ordinances against preemption by the … National Bank Act"); *Bank One, Utah v. Guttau*, 190 F.3d 844, 850 (8th Cir. 1999) (federal anti-preemption provision did not "grant[] the states any additional authority to regulate national banks"); c*f. United States v. Locke*, 529 U.S. 89, 107 (2000) ("We think it quite unlikely that Congress would use a means so indirect … to upset the settled division of authority" between state and federal governments.). Because RESPA is clear that state law is "unaffected" by its provisions, 12 U.S.C. § 2616, Congress did not express clear intent for national banks to be subject to state law requirements to pay interest on escrow accounts.

**C.    At a Minimum, Dodd-Frank Cannot Help Plaintiff Because It Does Not Apply to His Escrow Account.**

The National Bank Act and OCC regulations preempt New York's interest-on-escrow law for all mortgage escrow accounts that national banks provide, establish, or service. *See supra* Part I.  In reaching the contrary result, the district court relied on Section 1639d(g)(3) to hold that the state law was not preempted. JA83.  The court's analysis should not benefit Plaintiff because, as he conceded, his escrow account is not governed by Section 1639d.

In holding that the National Bank Act did not preempt New York law, the district court was influenced by its perception of Congress's intent in enacting Section 1639d(g)(3).  *Id.*  Even assuming the court correctly determined Congress's intent—it did not, *see* Part II.B.2 *supra*—that intent cannot be construed as requiring national banks to pay interest on *all* escrow accounts, because Section 1639d(g)(3) does not impose a requirement to pay interest on all escrow accounts.  JA83 n.18.  Section 1639d(g)(3) addresses payment of interest only for escrow accounts that are "mandatory" under Section 1639d—meaning that one of the conditions in 15 U.S.C. § 1639d(b) is satisfied—and established after that provision took effect.  JA53.  Plaintiff's escrow account was established before Section 1639d took effect, and so he conceded that his escrow account was not "mandatory" under Section 1639d.  *Id.* & n.5.  The district court's preemption analysis thus cannot help Plaintiff because

Section 1639d(g)(3) does not apply to him. JA69 ("[S]ection 1639d(g)(3) does not govern the specific loans at issue in this case").

In addressing preemption under the OCC regulations, the district court relied on 12 C.F.R. § 34.4(b)(9), which provides that OCC regulations do not preempt any law that is "made applicable by Federal law" to the "extent consistent" with *Barnett Bank*. JA71. The court held that this provision applies here because of Section 1639d(g)(3), JA83, but that is necessarily incorrect for Plaintiff's account. By conceding that Section 1639d(g)(3) does not apply to his account, Plaintiff cannot rely on that provision as the basis for invoking 12 C.F.R. § 34.4(b)(9). And interest-on-escrow laws do not fall within any of the other categories of state laws preserved under Section 34.4(b). New York's interest-on-escrow law is thus preempted as to Plaintiff's escrow account under Section 34.4(a).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order and hold that federal law preempts state interest-on-escrow laws.

Respectfully submitted,

/s/ *Mark W. Mosier*

Thomas M. Hefferon
GOODWIN PROCTER LLP
1900 N Street NW
Washington, D.C. 20036
(202) 346-4000
thefferon@goodwinlaw.com

Mark W. Mosier
Andrew Soukup
Laura Dolbow
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, D.C. 20001-4956
202-662-6000
mmosier@cov.com
asoukup@cov.com
ldolbow@cov.com

June 4, 2021

*Counsel for Defendant-Appellant
Bank of America, N.A.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32.1(a)(4)(A) because it contains 13,881 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14 point font.

June 4, 2021

/s/ *Mark W. Mosier*
Mark W. Mosier
*Counsel for Defendant-Appellant*
*Bank of America, N.A.*