# 21-400

## In the United States Court of Appeals for the Second Circuit

---

ALEX CANTERO, individually and on behalf of all others similarly situated,
*Plaintiff-Appellee,*

v.

BANK OF AMERICA, N.A.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)
Case No. 18-cv-4157 (The Hon. Roslynn Mauskopf)

---

### SUPPLEMENTAL OPENING BRIEF OF PLAINTIFF-APPELLEE

---

HASSAN ZAVAREEI
ANNA C. HAAC
TYCKO & ZAVAREEI LLP
1828 L Street, NW
Suite 100
Washington, DC 20036
(202) 973-0900

DEEPAK GUPTA
JONATHAN TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

*(counsel continued on inside cover)*

August 26, 2024

*Counsel for Plaintiff-Appellee*

JONATHAN M. STREISFELD
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
1 West Las Olas Boulevard
Ft. Lauderdale, Fl 33301
(954) 525-4100

TODD S. GARBER
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
1 North Broadway, Suite 900
White Plains, NY 10601
(914) 298-3283

# **TABLE OF CONTENTS**

Table of authorities ................................................................................. ii

Introduction ........................................................................................... 1

Argument ............................................................................................... 3

    I.    Bank of America has not shown that New York's law imposes the kind of significant practical impediment to exercising a banking power that is required to preempt the law under Dodd-Frank. ...................................................................... 3

        A.    Because this case is unlike any case in which the Supreme Court has found significant interference, there is no basis for declaring New York's law preempted as a matter of law. .......................................................... 5

        B.    Comparing this case to cases where the Supreme Court has found no significant interference only confirms that there is no basis for declaring New York's law preempted. ....... 11

        C.    The text, structure, and history of Dodd-Frank further confirm that New York's law is not preempted. ....................... 15

        D.    If Bank of America believes it can substantiate its claim of significant interference, it is free to try to build a record and make that showing as the case proceeds to discovery. ............................................................... 18

    II.    This Court should affirm the decision below rather than remand. .......................................................................... 20

Conclusion .......................................................................................... 21

i

# TABLE OF AUTHORITIES

## Cases

*Anderson National Bank v. Luckett,*
    321 U.S. 233 (1944) ...............................................................4, 11, 12, 13

*Barnett Bank of Marion County, N.A. v. Nelson,*
    517 U.S. 25 (1996) .............................................................................1, 5, 7, 8

*Biestek v. Berryhill,*
    587 U.S. 97 (2019).................................................................................. 19

*Bowler v. Hawke,*
    320 F.3d 59 (1st Cir. 2003).................................................................... 19

*Cantero v. Bank of America, N.A.,*
    144 S. Ct. 1290 (2024) ...................................................................*passim*

*Chamber of Commerce v. Whiting,*
    563 U.S. 582 (2011) ............................................................................... 8

*Cuomo v. Clearing Housing Association,*
    557 U.S. 519 (2009)...............................................................................15

*Federal National Mortgage Association v. Lefkowitz,*
    390 F. Supp. 1364 (S.D.N.Y. 1975) ............................................. 2, 4, 13

*Fidelity Federal Savings & Loan Association v. de la Cuesta,*
    458 U.S. 141 (1982)...........................................................................5, 9

*First National Bank of San Jose v. California,*
    262 U.S. 366 (1923)........................................................................ 5, 10

*Franklin National Bank of Franklin Square v. New York,*
    347 U.S. 373 (1954) ...................................................................5, 6, 7, 11

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ............................................................................... 8

*Kivett v. Flagstar Bank, FSB,*
    2024 WL 3901188 (9th Cir. Aug. 22, 2024)......................................2, 18

*McClellan v. Chipman,*
    164 U.S. 347 (1896) .................................................................... 12, 14, 15

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ................................................................ 12

*National Bank v. Commonwealth,*
    76 U.S. (9 Wall.) 353 (1870) ............................................................. 12, 14

*People v. Franklin National Bank of Franklin Square,*
    105 N.Y.S.2d 81 (N.Y. Sup. Ct. 1951) ...................................................... 7

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................................. 20

## Statutes

12 U.S.C. § 24 ......................................................................................... 6, 15

12 U.S.C. § 25b ...................................................................................... *passim*

12 U.S.C. § 36 ........................................................................................... 17

12 U.S.C. § 371 ........................................................................................... 5

12 U.S.C. § 5553 ....................................................................................... 18

15 U.S.C. § 1639d ..................................................................................... 11

## Other Authorities

*Bank Activities and Operations; Real Estate Lending and Appraisals,*
    69 Fed. Reg. 1904, 1912 (Jan. 13, 2004) ................................................... 16

Roderick M. Hills, Jr.,
    *Exorcising McCulloch: The Conflict Ridden History of American Banking*
    *Nationalism and Dodd-Frank Preemption,* 161 U. Pa. L. Rev. 1235 (2013) .................. 16

S. Rep. No. 111-176 (2010) ......................................................................... 16

Scalia & Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ................................. 17

## INTRODUCTION

Fifty years ago, New York passed a statute requiring all banks to pay at least 2% interest on mortgage-escrow accounts. Two years ago, this Court declared that statute to be preempted as applied to national banks like Bank of America. *Cantero v. Bank of Am., N.A.*, 49 F.4th 121 (2d Cir. 2022), *vacated*, 144 S. Ct. 1290 (2024). This Court held that federal law preempts any state law that purports to control the exercise of a national banking power, regardless of "how much [the] state law impacts" the exercise of that power or "the magnitude of its effects." *Id.* at 131. Because New York's law "would exert control over" national banks' asserted power "to create and fund escrow accounts," this Court concluded that the law was preempted. *Id.* at 125, 134.

After this Court's decision, the Supreme Court granted certiorari. The United States and a broad coalition of states (from New York to Texas) filed briefs criticizing this Court's analysis, and the Supreme Court then unanimously overturned this Court's decision. In an opinion by Justice Kavanaugh, the Supreme Court held that the control test is not the correct standard for preemption here. *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1301 (2024). The correct standard, rather, is the one articulated by the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), and codified in the Dodd-Frank Act of 2010: A state law is preempted "only if," as relevant here, it "'prevents or significantly interferes with the exercise by the national bank of its powers.'" *Cantero*, 144 S. Ct. at 1301 (quoting 12 U.S.C. § 25b(b)(1)(B)).

"A court applying that *Barnett Bank* standard," the Supreme Court made clear, "must make a practical assessment of the nature and degree of the interference caused by a state law." *Id.* at 1300. It must focus on the particular "text and structure of the [relevant] laws" and ask whether the degree of interference with the asserted banking power is "more akin" to the interference in cases where the Supreme Court has found significant interference or to the interference in cases where it has not. *Id.* at 1300–01 & n.3. Because this Court "did not conduct that kind of nuanced comparative analysis," the Supreme Court vacated and remanded. *Id.* at 1301.

Now this Court's task is to conduct the requisite comparative analysis. It will not be the first court to do so. The district court below surveyed the cases in which the Supreme Court has found significant interference and held that, as compared to them, any interference caused by this law is "minimal." JA-78. In doing so, the court aligned itself with the first court to uphold New York's law, a three-judge panel back in 1975, which also engaged in a comparative analysis with Supreme Court precedent and also concluded that any interference caused by the law is "insignificant." *Fed. Nat'l Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1369 (S.D.N.Y. 1975). And just last week, the Ninth Circuit reached the same conclusion as to California's 2%-interest-on-escrow law. *Kivett v. Flagstar Bank, FSB*, 2024 WL 3901188, *2 (9th Cir. Aug. 22, 2024).

This Court should join the consensus. Because the district court below asked the right question and got the right answer, this Court should affirm.

**ARGUMENT**

I.  **Bank of America has not shown that New York's law imposes the kind of significant practical impediment to exercising a banking power that is required to preempt the law under Dodd-Frank.**

The Supreme Court's decision in this case confirms that preemption turns on "a practical assessment of the nature and degree of the interference caused by [the] state law." *Cantero*, 144 S. Ct. at 1300. "Under Dodd-Frank, as relevant here, courts may find a state law preempted 'only if,' 'in accordance with the legal standard' from *Barnett Bank*, the law 'prevents or significantly interferes with the exercise by the national bank of its powers.'" *Id.* at 1301 (quoting 12 U.S.C. § 25b(b)(1)(B)). If the "law prevents or significantly interferes with the national bank's exercise of its powers, the law is preempted." *Id.* at 1300. But if not, "the law is not preempted." *Id.*

The Supreme Court also confirmed that there is no "bright line" rule to assess when "the nature and degree of [] interference" is "significant." *Id.* Instead, a court must conduct a "nuanced comparative analysis." *Id.* The court should "consider the interference caused by the state laws in *Barnett Bank*" and in the "precedents on which *Barnett Bank* relied," some of which found significant interference and some of which did not. *Id.* The court should find the law to be preempted only if the proponent of preemption has shown that the law interferes with the exercise of a banking power in a way that is "more akin" to the level of interference in cases where the Supreme Court held that the state law at issue was preempted. *Id.* Further, a court may answer

3

this question, if it is able, "based on the text and structure of the laws, comparison to [Supreme Court] precedents, and common sense." *Id.* at 1301 n.3. If a court is satisfied that there is significant interference using these analytical tools, it should hold that the state law is preempted. But if that showing has not been made (or not yet been made because factual development is necessary), the court should decline to do so.

Applying these principles here yields a clear answer: Nothing in any statute or Supreme Court case authorizes displacing New York's law, nor does common sense. As the district court below correctly held, any interference caused by this law is "minimal" when "[c]ompared to the state laws in *Barnett Bank*" and the other cases in which the Supreme Court has found significant interference. JA-78. In those cases, the state laws imposed a significant practical impediment to the exercise of an express banking power. Not here. As another district court observed when it upheld the same law against a preemption challenge nearly half a century ago: "The case presenting the closest analogy," *Lefkowitz*, 390 F. Supp. at 1368, is the very case that *Barnett Bank* later cited "as the primary example of a case where state law was not preempted," *Cantero*, 144 S. Ct. at 1299 (discussing *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944)).

That observation remains true today. Now, as then, close examination of the relevant statutes, Supreme Court cases, and common sense shows that any burden is "insignificant." *Lefkowitz*, 390 F. Supp. at 1369. If Bank of America believes it can show otherwise, it may try to make that showing with evidence as the case proceeds.

4

A.    Because this case is unlike any case in which the Supreme Court has found significant interference, there is no basis for declaring New York's law preempted as a matter of law.

The comparative inquiry starts with the cases where the Supreme Court has found significant interference. These include not only *Barnett Bank*, but three cases cited in that opinion: *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954); *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141 (1982); and *First National Bank of San Jose v. California*, 262 U.S. 366 (1923). We discuss each in turn.

**Barnett Bank.** The degree of interference in *Barnett Bank* was significant by any measure. The question before the Supreme Court was "whether a federal statute that permits national banks to sell insurance in small towns pre-empts a state statute that forbids them to do so." 517 U.S. at 27. By its terms, the federal statute expressly provided that "national banks 'may' sell insurance in small towns," so the relevant national banking power was the power to sell insurance in small towns. *Id.* at 28. The Court held that the state statute significantly interfered with the exercise of that power because it prohibited national banks from exercising the power altogether.

This case couldn't be more different. Here, no "Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids." *Contra id.* at 31. Bank of America has identified only two federal statutes as being relevant: One grants national banks the power to make real-estate loans, 12 U.S.C. § 371; the other grants national banks any "incidental powers as shall be necessary to carry on

5

the business of banking," *id.* § 24 Seventh. According to Bank of America, the power to use mortgage-escrow accounts when not required by law is necessary to the business of banking and is thus an incidental power. But even assuming that were true, there is no serious argument that New York's law "forbids" the exercise of that asserted incidental power. *Contra Barnett Bank*, 517 U.S. at 31. As the district court explained below, all that New York's law does is require mortgage lenders "to pay interest on the comparatively small sums deposited in mortgage escrow accounts." JA-78. "It does not bar the creation of mortgage escrow accounts, or subject them to state visitorial control, or otherwise limit the terms of their use." *Id.* "Compared to the state law[] in *Barnett Bank*," then, the "degree of interference is minimal." *Id.*

**Franklin.** The same goes for *Franklin*. The federal statute invoked in that case expressly authorized national banks "to receive savings deposits." 347 U.S. at 374. A state law, however, barred national banks—but not certain state banks—from using "the word 'savings,' or its variants," anywhere "in their advertising or business." *Id.* at 374–75. The Supreme Court held that the state law was preempted.

As it did in *Barnett Bank*, the Court focused its preemption analysis on the text of the federal statute. *See Cantero*, 144 S. Ct. at 1301 n.3 (citing *Franklin* as an example of a case where preemption was "based on the text and structure of the laws"). Because "Congress has given a particular label to this type of account," the Court concluded that national banks must be able not only to accept savings deposits, but

6

"to let the public know about it … by using the commonly understood description which Congress has specifically selected." *Franklin*, 347 U.S. at 378; *see Cantero*, 144 S. Ct. at 1298. The state law significantly interfered with the exercise of that statutory power by completely prohibiting national banks from using the very word that Congress had itself used in the statutory text (and the very word that was most closely linked to the product in the minds of consumers). *See Cantero*, 144 S. Ct. at 1301 n.3 (describing *Franklin*'s key reasoning as being that state "law interfered with [the bank's] ability to use a 'particular label' that federal law 'specifically selected'"). For that reason, as the Supreme Court later explained in *Barnett Bank*, the degree of interference in *Franklin* was "quite similar" to the degree of interference in *Barnett Bank*, 517 U.S. at 33.

The Court in *Franklin* also had the benefit of a "large record" documenting the law's real-world "consequences upon banks." *Franklin*, 347 U.S. at 376. This record confirmed the correctness of the Supreme Court's basic conclusion: Congress had used the word "savings" for a reason, and the state law, by outlawing that word, had "restrict[ed] national banks tremendously in obtaining savings deposits." *People v. Franklin Nat'l Bank of Franklin Square*, 105 N.Y.S.2d 81, 94 (N.Y. Sup. Ct. 1951). The record detailed the law's "crippling obstruction" of this express statutory power—in testimony, economic data from before and after the law's passage, and consumer surveys. *Id.*; *see id.* 87–95 (recounting the evidence). This evidence established that the

7

law put "national banks at a disadvantage in the competition for savings deposits" by forcing them to use words that were "not well understood and [did] not attract depositors in anything like the numbers that the word 'savings' does." *Id.* at 87–88.

Now compare all that with this case. Unlike in *Franklin*, where the preemption analysis hinged on the text of a federal statute, Bank of America points to no statutory text that is even remotely comparable—a fatal shortcoming given that preemption is a matter of "congressional intent." *Barnett Bank*, 517 U.S. at 30; *see Kansas v. Garcia*, 589 U.S. 191, 208 (2020) ("All preemption arguments must be grounded in the text and structure of the statute at issue." (cleaned up)); *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) ("[I]t is Congress … that pre-exempts state law."). And unlike in *Franklin*, where abundant record evidence substantiated the text's importance and showed that the state law posed a significant practical impediment to the exercise of an express power, Bank of America has offered no such proof here. It has identified no evidence that New York's law has had *any* effect on the ability of national banks to create and fund mortgage-escrow accounts, let alone a significant effect.

And "common sense" strongly suggests that this evidence doesn't exist. *Cantero*, 144 S. Ct. at 1301 n.3. New York's law has been in effect for half a century, and "state banks have been complying with [it]," as counsel from the Solicitor General's Office told the Supreme Court, "without material impairment." *Cantero* Tr. 56. National banks, too, have complied with the law in the past, including even Bank of America,

and many do so today. A dozen other states have similar laws, and Bank of America has been complying with California's 2%-interest-on-escrow law for several years. Given all this, it is hard to imagine that these laws could significantly interfere with powers that are "necessary" to banking. 12 U.S.C. § 24 Seventh. But if they do so, Bank of America will be well positioned to make that showing as the case unfolds.

*Fidelity.* Nor is this case anything like *Fidelity*. There, a federal law expressly granted a federal savings and loan association the power to include what is known as a "due on sale" clause in its contracts with borrowers and to enforce the clause "at its option." 458 U.S. at 146–47. A state law, by contrast, had "forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option.'" *Id.* at 155. The state law thus presented the same degree of interference with the federal law as in *Barnett Bank*: It entirely prohibited the exercise of a power that had been expressly granted to national banks. Again, New York's law does nothing of the sort.

The power in *Fidelity*, to be sure, was expressly granted by a regulation (rather than a statute, as in *Barnett Bank* and *Franklin*). The Court held that the agency had exercised its "plenary" statutory "authority to pre-empt state law." *Id.* at 160–62. This case, by contrast, does not involve an express grant of power by a regulation. And although a different agency (the Office of the Comptroller of the Currency, or OCC) has purported to directly preempt state interest-on-escrow laws, it has no delegated authority to do so beyond its limited authority to make a preemption determination

9

under the procedures set forth in Dodd-Frank. 12 U.S.C. §§ 25b(b), (c). As the United States explained in its brief to the Supreme Court, the OCC did not exercise its authority to make a preemption determination under Dodd-Frank, and its "broad[] view" of preemption contravenes "the text, structure, and history of the statute." U.S. *Cantero* Br. 6–7 nn.3–4. The OCC's regulation is therefore irrelevant to this case. The only powers that matter here are the powers that have been granted by *Congress*.

**First National Bank of San Jose.** Last up is *First National Bank of San Jose*. That case involved a California law that allowed the state to seize deposits in bank accounts that had been inactive for a specified period of time without requiring proof of abandonment. 262 U.S. at 366–67. The Court held that the law was preempted as applied to national banks because it operated in "an unusual way"—to the detriment of depositors—and so was "incompatible with" Congress's decision to "specifically empower[]" national banks "freely to accept deposits from customers irrespective of domicile with the commonly consequent duties and liabilities." *Id.* at 370.

Central to the Court's holding was its observation about the law's predicted effects—that potential customers would "hesitate to subject their funds to possible confiscation" if such laws were enforced. *Id.* As the Court would later put it in *Anderson*, the outcome in *First National Bank of San Jose* thus "turned … on the effect of the state statute in altering the contracts of deposit in a manner considered so unusual

and so harsh … as to deter [depositors] from placing or keeping their funds in national banks." *Anderson*, 321 U.S. at 250 (distinguishing *First National Bank of San Jose*).

New York's law is different in every respect. It is not "unusual." *Id.* Interest-on-escrow laws have existed in many states for decades—and indeed, are now part of *federal law* for many mortgage loans. *See* 15 U.S.C. § 1639d(a), (b), (g)(3). Nor is the law "harsh." *Anderson*, 321 U.S. at 250. To the contrary, the law *benefits* consumers. So it "could produce no such deterrent effect." *Cantero*, 144 S. Ct. at 1300.

*    *    *

To sum up, this case lacks any of the hallmarks of significant interference. New York's law does not prohibit the exercise of a power that has been expressly granted to national banks (as in *Barnett Bank* and *Fidelity*). It does not prevent them from doing anything "specifically selected" by Congress or impose any significant practical barrier to the exercise of an express power (as in *Franklin*, 347 U.S. at 348). And it is not so harsh and unusual as to deter customers from using national banks (or national banks from using escrow accounts). It thus cannot be preempted as a matter of law.

**B.    Comparing this case to cases where the Supreme Court has found no significant interference only confirms that there is no basis for declaring New York's law preempted.**

Now switch to the cases where the Supreme Court has found that a state law did *not* significantly interfere with the exercise of a national banking power. The Court in *Barnett Bank* and *Cantero* identified three cases as particularly relevant on this

11

point: (1) *Anderson*; (2) *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1870); and (3) *McClellan v. Chipman*, 164 U.S. 347 (1896). As before, we take the cases one by one.

**Anderson.** The *Barnett Bank* Court cited *Anderson* "as the primary example of a case where state law was not preempted." *Cantero*, 144 S. Ct. at 1299. The state law in *Anderson* was "seemingly similar" to the law in *First National Bank of San Jose*. *Id.* Like that earlier law, the law in *Anderson* required banks to "turn over to the state[] deposits which have remained inactive and unclaimed for specified periods." 321 U.S. at 236. Unlike that earlier law, however, the law in *Anderson* required proof of abandonment.

The Court began its analysis by asking whether the law discriminated against national banks (as the law had in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), and whether "any word in the national banking laws [] expressly or by implication conflicts with the [state law]." *Anderson*, 321 U.S. at 247–48. Finding that both answers were no, the Court then examined the law's practical effect, inquiring into whether it was "so burdensome as to be inapplicable to the accounts of depositors in national banks." *Id.* at 248. The Court determined that "[i]t cannot be said that [the law] would have that effect." *Id.* at 252. Because the state law in *Anderson* required proof of abandonment, it did not mandate what was "in effect 'confiscation' of depositors' accounts," as the law in *First National Bank of San Jose* had done. *Anderson*, 321 U.S. at 251–52. Nor did it bring about an "unusual alteration of depositors' accounts." *Id.* at 251. The Court therefore concluded that the law was unlikely to "deter [depositors]

from placing their funds in national banks"—at least not any "more than would the tax laws, the attachment laws," or any number of non-preempted state laws to which national banks are subject. *Id.* at 252. Accordingly, the law in *Anderson* did not "impose an undue burden on the performance of the banks' functions." *Id.* at 248.

This case is similar. As multiple courts have recognized, *Anderson* "present[s] the closest analogy." *Lefkowitz*, 390 F. Supp. at 1368; *see* JA-76–79. The interference there wasn't meaningfully different than the interference here. In *Anderson*, the state law required national banks to hand over money to the state even though they would have preferred to hold the money and earn interest on it indefinitely. Which is why one bank sued to enjoin the law: It wanted to have "full use of the funds until—if ever—they were claimed." *Lefkowitz*, 390 F. Supp. at 1368. In this case, national banks may hold the money deposited in escrow accounts and are generally free to earn interest for themselves on those "comparatively small sums" if they so choose. JA-78. They just have to pay interest to the consumer at the rate set by law.

Will that cost banks money? Of course. But as *Anderson* makes plain, that isn't the question. The law in *Anderson* also cost banks money, as do all sorts of state laws that everyone agrees are not preempted—from foreclosure laws (as the district court below pointed out, JA-79) to "the tax laws, the attachment laws," and innumerable other laws that "a state may maintain and apply to … national banks" (as the Court in *Anderson* pointed out, 321 U.S. at 252). So the question isn't whether the state law

will cause national banks to be less profitable, but whether it will *significantly interfere with* the exercise of a banking "power specifically authorized by Congress." JA-79.

**National Bank v. Commonwealth.** The next case illustrates the same point. It involved a state law "tax[ing] the shareholders of all banks (including national banks) on their shares of bank stock." *Cantero*, 144 S. Ct. at 1300 (discussing *National Bank v. Commonwealth*). In holding that this law was not preempted, the Court emphasized that national banks generally "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation." *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) at 362. The Court then gave some examples: "All their contracts are governed and construed by State laws," and state law also governs "[t]heir acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts." *Id.* Because the tax at issue produced "no greater interference with functions of the bank" than any of these other laws, there was no significant interference and no preemption. *Id.* at 362–63.

**McClellan.** The Court reaffirmed these principles in *McClellan*, the last case discussed in *Barnett Bank* and *Cantero*. There, a state statute "forbid the taking of real estate … for an antecedent debt" in certain scenarios, and the question was whether that statute was preempted by a federal statute that expressly granted national banks the power "to take real estate for given purposes." *McClellan*, 164 U.S. at 357–59.

The Court held that it was not. Although the state statute restricted national banks' power to engage in real-estate transactions, that was not itself enough to preempt the law. If it were, states would not be able to apply their general contract law to national banks, because "any limitation by a state on the making of contracts is a restraint upon the power of a national bank within the state to make such contracts." *Id.* at 359; *see* 12 U.S.C. § 24 Third (express power "[t]o make contracts"); *see also Cuomo v. Clearing Hous. Ass'n*, 557 U.S. 519, 532–33 (2009) (making same point). The question is instead a matter of degree. *See McClellan*, 164 U.S. at 359 (explaining that, although states may limit the exercise of a national banking power in some cases, they may not "forbid [its exercise] in all cases"). The Court concluded that there was no "undue state interference" because the state law did not "frustrate the purpose for which the national banks were created[] or impair their efficiency to discharge the duties imposed upon them by the law of the United States." *Id.* at 357.

This case calls for the same conclusion. Requiring mortgage lenders to pay a minimum interest rate on escrow account balances does not unduly interfere with national banks' "power to create and fund escrow accounts." *Cantero*, 49 F.4th at 134.

### C. The text, structure, and history of Dodd-Frank further confirm that New York's law is not preempted.

Because any interference here is "more akin" to the interference in *Anderson*, *National Bank v. Commonwealth*, and *McClellan*, New York's law "is not preempted."

*Cantero*, 144 S. Ct. at 1300–01. That is clear from "the text and structure of the laws, comparison to [Supreme Court] precents, and common sense." *See id.* at 1301 n.3.

It is also confirmed by Dodd-Frank. Section 25b, which codifies the significant-interference standard, sets forth a carefully reticulated set of interlocking preemption provisions, 12 U.S.C. § 25b—provisions that Congress enacted into law to "undo[] broader standards adopted by … the OCC in 2004," S. Rep. No. 111-176, at 175 (2010); *see generally* Roderick M. Hills, Jr., *Exorcising McCulloch: The Conflict Ridden History of American Banking Nationalism and Dodd-Frank Preemption*, 161 U. Pa. L. Rev. 1235 (2013).

Section 25b, in its text, structure, and purpose, is as much an anti-preemption clause as it is a preemption clause. It says that "State consumer financial laws" are preempted "only if" one of three conditions is met, the second of which is when the law "prevents or significantly interferes with" a banking power. 12 U.S.C. § 25b(b)(1). The word "only" is important. It is tantamount to saying: "State consumer financial laws are *not* preempted *unless*" an exception applies. The statute's definition of "State consumer financial law" then reinforces this anti-preemption framing. It defines the term to include only state laws that "directly and specifically regulate[]" activity that national banks are "authorized … to engage in," *id.* § 25b(a)(2)—a clear repudiation of the OCC's 2004 preemption rule, which had found *all* such laws to be preempted. *See Bank Activities and Operations; Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904, 1912 (Jan. 13, 2004). The definition also excludes the very state laws most likely to be

16

preempted—those that "directly or indirectly discriminate against national banks"—a puzzling exclusion if section 25b were just an ordinary preemption clause. 12 U.S.C. § 25b(a)(2). The statute's strong anti-preemption framing thus provides additional confirmation that New York's law is not preempted (at least not as a matter of law). *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (explaining that "the whole-text canon" requires consideration of "the entire text, in view of its structure and of the physical and logical relation of its many parts").[1]

A separate provision of Dodd-Frank reinforces Congress's view that laws like New York's do not significantly interfere with any powers that are "necessary to carry on the business of banking." *See* 12 U.S.C. § 24 Seventh. Section 1639d requires the use of escrow accounts for many subprime mortgages and provides that, "if prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." 15 U.S.C. § 1639d(a), (b), (g)(3). This provision—which mandates compliance

---

[1] A second statute, passed in 1994, provides another textual clue that Congress intended for national banks generally to comply with consumer-protection laws like New York's interest-on-escrow law. This statute requires national bank branches to comply with state "consumer protection" and "fair lending" laws that apply equally to state bank branches, except "when Federal law preempts the application of such State laws to a national bank." 12 U.S.C. § 36(f)(1)(A). This provision would serve little purpose if state consumer-protection and fair-lending laws were generally preempted as applied to national banks. And Bank of America has conceded that fair-lending laws (but not consumer-protection laws) are generally applicable to national banks.

with state interest-on-escrow laws as a matter of federal law for covered mortgages—uses the mandatory "shall" and applies to each "creditor," with no exception for national banks (or state banks). *Id.* § 1602(g). The provision would make no sense if Congress believed that state interest-on-escrow laws, including New York's law, significantly interfered with the business of banking or were categorically preempted as applied to national banks. *See Kivett*, 2024 WL 3901188 at *2 ("[N]o legal authority establishe[s] that [interest-on-escrow] laws significantly interfere[] with national bank powers, and [] the text of Dodd-Frank also reflect[s] Congress's view that such laws do not.").[2]

### D. If Bank of America believes it can substantiate its claim of significant interference, it is free to try to build a record and make that showing as the case proceeds to discovery.

This Court should hold that New York's law is not preempted "based on the text and structure of the [relevant] laws, comparison to [Supreme Court] precents, and common sense." *Cantero*, 144 S. Ct. at 1301 n.3. But, even if this Court were unsure as to the degree of interference caused by New York's law, Bank of America still would not be entitled to prevail on its affirmative preemption defense and to have

---

[2] Dodd-Frank applies to Mr. Cantero's claim. His mortgage was executed on August 3, 2010. JA-33. Dodd-Frank provides that section 25b "shall not be construed to alter or affect the applicability" of OCC's preemption rules for "any contract entered into on or before [Dodd-Frank's] date of enactment" (July 21, 2010). 12 U.S.C. § 5553. Because Mr. Cantero's mortgage was executed after Dodd-Frank's enactment date (but before its effective date of July 21, 2011), he may rely on Dodd-Frank for the relief that he seeks for Bank of America's failure to pay him interest after July 21, 2011.

this case dismissed on the pleadings. As the First Circuit has observed, in some cases, "courts are going to have to make judgment calls about the extent to which [state] laws hinder" banking powers "as a factual matter," which "will often be better made on an evidentiary record." *Bowler v. Hawke*, 320 F.3d 59, 64 (1st Cir. 2003).

Congress itself understood that preemption would often (or at least sometimes) turn on factual questions concerning the practical effects of the state law. Section 25b's text leaves no doubt on this score. It provides that the OCC, when it makes a preemption determination, must examine the "impact of a particular State consumer financial law on any national bank that is subject to that law." 12 U.S.C. § 25b(b)(1)(B), (3)(A). A court may then give effect to that OCC preemption determination only if "substantial evidence, made on the record of the proceeding, supports the specific finding [of] preemption … in accordance with … *Barnett Bank*." *Id.* § 25b(c). "'[S]ubstantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). By requiring OCC factfinding, then, Congress recognized that answering the question of significant interference will sometimes require factual development. And sensibly so: After all, before a court can decide whether the practical effects of a state law significantly interfere with a national banking power, it will have to know what those effects *are*. In some cases, that will entail some degree of factfinding.

Here, as discussed, all the available evidence strongly indicates that interest-on-escrow laws have had no material effect on the ability of national banks to "create and fund escrow accounts" (the relevant power previously identified by this Court, *see Cantero*, 49 F.4th at 134). As does "common sense." *Cantero*, 144 S. Ct. at 1301 n.3; *see Cantero* Tr. 56–57 (counsel for the United States explaining that "state banks have been complying with [this law], apparently, without material impairment," and expressing "skeptic[ism]" that there could be significant interference).

But if that's all wrong, and Bank of America has evidence that compliance with New York's law would significantly affect national banks' ability to create and fund escrow accounts, it is free to attempt to make that evidentiary showing as the case proceeds. Having not yet done so, the company "has failed to demonstrate," "on the record before" the Court, that it is entitled to prevail on its "demanding defense" of preemption. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (cleaned up).

## II.   This Court should affirm the decision below rather than remand.

In its briefing order, the Court asked the parties to "address the propriety of remand to the district court." Order, at 2 (June 25, 2024).

Remand is unnecessary. The district court below correctly understood that applying the *Barrett Bank* standard requires an inquiry into the practical effects of the state law. It asks, as the court put it, "whether the power specifically authorized by Congress may be exercised relatively unimpaired and unhampered by the state law,"

even if compliance "will cost the Bank money." JA-79. The district court also engaged in exactly the kind of "close[] examination of precedent" that the Supreme Court mandated. JA-76. The court specifically "[c]ompared" the "degree of interference" caused by New York's law to the degree of interference in "*Barnett Bank* and *Franklin*," and found that any interference here is "minimal." JA-77–78. The court also carefully reviewed *Anderson* and cases involving generally applicable state laws, like *McClellan*, while also comparing the degree of interference caused by New York's law to the degree of interference caused by non-preempted state laws like foreclosure laws. JA-76–77. And when the inquiry was done, the court was convinced that the nature and degree of interference here was "more akin to" *Anderson* and *McClellan* (to use the Supreme Court's words, *Cantero*, 144 S. Ct. at 1300) than *Barnett Bank* and *Franklin*.

In short: The district court applied the right analysis and reached the right conclusion. Little would be gained by asking the court to do so again on remand. But should the Court have any doubts about that, it could, in the alternative, remand the case to the district court to apply the Supreme Court's opinion in the first instance.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Jonathan Taylor*
DEEPAK GUPTA
JONATHAN TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*jon@guptawessler.com*

HASSAN ZAVAREEI
ANNA C. HAAC
TYCKO & ZAVAREEI LLP
1828 L Street, NW
Suite 100
Washington, DC 20036
(202) 973-0900

JONATHAN M. STREISFELD
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
1 West Las Olas Boulevard
Ft. Lauderdale, Fl 33301
(954) 525-4100

TODD S. GARBER
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
1 North Broadway
Suite 900
White Plains, NY 10601
(914) 298-3283

August 26, 2024                    *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because this brief contains 5,760 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

August 26, 2024

*/s/ Jonathan Taylor*
Jonathan Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jonathan Taylor*
Jonathan Taylor