# 21-400-cv

## United States Court of Appeals
### *for the*
## Second Circuit

ALEX CANTERO, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

— v. —

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* CONFERENCE OF STATE BANK SUPERVISORS AND AMERICAN ASSOCIATION OF RESIDENTIAL MORTGAGE REGULATORS

MATTHEW LAMBERT
  *Deputy General Counsel*
CONFERENCE OF STATE BANK
  SUPERVISORS
1300 I Street NW, Suite 700 East
Washington, DC 20005
(202) 296-2840
mlambert@csbs.org

ARTHUR E. WILMARTH, JR.
  *Professor Emeritus of Law*
GEORGE WASHINGTON UNIVERSITY
  LAW SCHOOL
2000 H Street, NW
Washington, DC 20052
(202) 994-6386
awilmarth@law.gwu.edu

STEFAN L. JOURET
JOURET LLC
265 Franklin Street, Suite 1702
Boston, Massachusetts 02110
(617) 523-0133
jouret@jouretllc.com

*Attorneys for Amici Curiae*

CP COUNSEL PRESS   (800) 4-APPEAL • (130406)

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* Conference of State Bank Supervisors and American Association of Residential Mortgage Regulators state that they are nonprofit corporations without any parent corporations and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* .............................................................. 1

ARGUMENT .................................................................................... 2

    I.    This Court Should Hold That NYGOL § 5-601 Applies to National Banks ...................................... 2

        A.    The Supreme Court's Decision Requires this Court to Apply *Barnett Bank*'s Preemption Standard by Comparing § 5-601 with the State Laws Evaluated in Seven Key Supreme Court Decisions ........................................................ 2

        B.    NYGOL § 5-601 Is a Valid State Consumer Protection Law That Has a Relatively Minor Impact on National Banks ............................. 4

            1.    Section 5-601 Protects Consumers by Requiring Mortgage Lenders to Pay Reasonable Interest on Mortgage Escrow Balances ................................................. 4

            2.    Section 5-601 Has a Relatively Minor Impact on National Banks ..................................... 7

        C.    Section 5-601 Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers ........................................................ 10

    II.    A Decision to Preempt NYGOL § 5-601 Would Greatly Weaken the States' Authority to Charter and Regulate Financial Institutions and Protect Consumers ................................................................ 17

CONCLUSION ................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson Nat'l Bank v. Luckett,*
321 U.S. 233 (1944) .................................................. 8, 9, 13, 14, 16

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) .................................................... 3, 4, 10, 11, 14

*Cantero v. Bank of Am., N.A.,*
49 F.4th 121 (2d Cir. 2022) ....................................... 3, 5

*Cantero v. Bank of Am., N.A.,*
144 S. Ct. 1290 (2024) ......................................... 3, 4, 5, 16

*Federal Nat'l Mortgage Ass'n v. Lefkowitz,*
390 F. Supp. 1364 (S.D.N.Y. 1975) ................................... 5, 7, 8, 10

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982) .............................................. 10, 13, 14

*First Nat'l Bank of San Jose v. California,*
262 U.S. 366 (1923) .............................................. 10, 12, 13, 14

*Franklin Nat'l Bank v. New York,*
347 U.S. 373 (1954) .............................................. 10, 11, 12, 14

*General Motors Corp. v. Abrams,*
897 F.2d 34 (2d Cir. 1990) ............................................. 6

*Hymes v. Bank of America, N.A.,*
408 F. Supp. 3d 171 (E.D.N.Y. 2019), *rev'd sub nom.*
*Cantero v. Bank of America, N.A.,* 49 F.4th 121 (2d Cir.
2022), *vacated and remanded*, 144 S. Ct. 1290 (2024) ...... 5, 6, 9, 14

*Jamaica Sav. Bank v. Lefkowitz,*
390 F. Supp. 1357 (E.D.N.Y.), *aff'd without opinion*, 423
U.S. 802 (1975) ................................................ 5, 7, 8, 10

*Lusnak v. Bank of Am., N.A.,*
883 F.3d 1185 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018) .......... 7

*McClellan v. Chipman,*
    164 U.S. 347 (1896) ......................................................... 14, 15, 16

*Nat'l Bank v. Commonwealth,*
    76 U.S. (9 Wall.) 353 (1870) ........................................... 14, 15, 16

*New York State Telecommunications Ass'n v. James,*
    101 F.4th 135 (2d Cir. 2024) ......................................................... 6

*People v. Franklin Nat'l Bank,*
    200 Misc. 557, 105 N.Y.S.2d 81 (1951), *rev'd*, 281 App. Div.
    757, 118 N.Y.S.2d 210, *aff'd*, 305 N.Y. 453, 113 N.E.2d 796
    (1953), *rev'd*, 347 U.S. 373 (1954) ......................................... 11


**Statutes & Other Authorities:**

12 U.S.C. § 25b(b)(1)(B) ............................................................... 3, 6

12 U.S.C. § 92 ................................................................................ 11

15 U.S.C. § 1639d(b) ....................................................................... 7

15 U.S.C. § 1639d(g)(3) ............................................................... 6, 7

12 C.F.R. § 34.4(a) ........................................................................ 18

Fed. R. App. P. 29(a)(2) .................................................................. 1

New York General Obligation Law (NYGOL) § 5-601 .................. *passim*

Brief in Behalf of Anderson Nat'l Bank in *Anderson Nat'l Bank
    v. Reeves*, 1944 WL 42454 (U.S., Jan. 18, 1944) ........................... 14

Conference of State Banking Supervisors, *Reengineering
    Nonbank Supervision*, "Chapter Three: Overview of
    Nonbank Mortgage" (Sept. 2019) ................................................ 17

*Inside Mortgage Finance*, "Top 50 Firms in Owned Mortgage
    Servicing: 2Q24," https://www.insidemortgagefinance.com/
    (2024) ............................................................................................. 18

"Why Lenders Are Purchasing More MSRs in 2022," PRIVOCORP
    (2022) ............................................................................................... 5

Arthur E. Wilmarth, Jr., *Policy Brief: On Remand in Cantero, the Second Circuit Should Uphold New York's Interest-on-Escrow Law and Reject Bank of America's Preemption Claim* (Geo. Wash. Leg. Stud. Res. Paper No. 2024-53, July 31, 2024) .................................................. 10, 11, 13, 14, 16, 19

# Interest of *Amici Curiae*

*Amici* Conference of State Bank Supervisors ("CSBS") and American Association of Residential Mortgage Regulators ("AARMR") are national associations of state officials responsible for regulating state-chartered banks and state-licensed nonbank financial institutions (including mortgage lenders and mortgage servicers) in all 50 States, American Samoa, the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands.[1]

CSBS plays a leading role in defending our nation's dual system for regulating banks and other financial service providers. CSBS represents its members at the federal level and promotes collaboration among its members and federal agencies. AARMR fosters effective supervision and regulation of the residential mortgage industry by its members, thereby serving the needs of local communities and protecting the rights of consumers.

---

[1] No counsel for a party or person other than *amici curiae*, their members, and their counsel authored any part of this brief or made any monetary contribution intended to fund the preparation or submission of the brief. Under FRAP 29(a)(2), each party to this action, by counsel, has consented to the filing of this brief.

CSBS and AARMR have a compelling interest in this case. On remand from the Supreme Court, the Second Circuit will determine whether New York General Obligation Law (NYGOL) § 5-601 is preempted by federal law. A decision to preempt § 5-601 would give national banks an unwarranted competitive advantage over state-chartered and state-licensed mortgage lenders and would seriously impair the States' authority to regulate financial institutions and protect consumers.

## Argument

I. **This Court Should Hold That NYGOL § 5-601 Applies to National Banks.**

A. **The Supreme Court's Decision Requires this Court to Apply *Barnett Bank*'s Preemption Standard by Comparing § 5-601 with the State Laws Evaluated in Seven Key Supreme Court Decisions.**

In its initial decision, this Court held that the National Bank Act (NBA) preempted NYGOL § 5-601. This Court decided that the New York statute was preempted because it "would exert control over a banking power granted by the federal government, so it would impermissibly interfere with national banks' exercise of that power."

*Cantero v. Bank of Am., N.A.,* 49 F.4th 121, 125 (2d Cir. 2022), *vacated and remanded*, 144 S. Ct. 1290 (2024).

The Supreme Court vacated and remanded this Court's initial decision because it did not conform to "the controlling legal standard" for determining whether § 5-601 "is preempted with respect to national banks." *Cantero*, 144 S. Ct. at 1296-97, 1301. The Supreme Court held that the "controlling legal standard" for deciding cases like *Cantero* is the "prevents or significantly interferes" preemption standard, which the Supreme Court established in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), and Congress codified in the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), at 12 U.S.C. § 25b(b)(1)(B). *Cantero*, 144 S. Ct. at 1296-97. The Supreme Court rejected the "categorical test" for preemption applied in this Court's initial decision because that test would "preempt virtually all state laws that regulate national banks, at least other than generally applicable state laws such as contract or property laws." *Id.* at 1301.

The Supreme Court held that the "*Barnett Bank* standard" mandates "a practical assessment of the nature and degree of the interference caused by a state law . . . with the national bank's exercise

of its powers." *Id.* at 1300.  In addition, the *Barnett Bank* standard

requires a "nuanced comparative analysis" of the challenged state law

consistent with the Supreme Court's assessments of state laws that

were held to be preempted, or not preempted, in *Barnett Bank* and six

other Supreme Court precedents identified in *Cantero*.  *Id.* at 1300-01.

As shown below in Part I.C., a "nuanced comparative analysis" of § 5-

601 with those state laws establishes that § 5-601 does not prevent or

significantly interfere with the exercise of national bank powers.

**B. NYGOL § 5-601 Is a Valid State Consumer Protection Law That Has a Relatively Minor Impact on National Banks.**

**1. Section 5-601 Protects Consumers by Requiring Mortgage Lenders to Pay Reasonable Interest on Mortgage Escrow Balances.**

Plaintiffs' mortgages with Bank of America, N.A. (BofA) "required

[Plaintiffs] to make monthly deposits into escrow accounts, which

[BofA] used to pay [Plaintiffs'] property taxes and insurance premiums

when those taxes and premiums came due." *Cantero*, 144 S. Ct. at

1296.  Plaintiffs' mortgage escrow accounts function as mandatory

savings accounts requiring Plaintiffs to make monthly deposits to

prefund BofA's future payments of real estate taxes and property

insurance premiums.  Mortgage escrow accounts provide significant

benefits to BofA because they (i) protect BofA's security interests in mortgaged properties by ensuring timely payment of taxes and property insurance premiums, and (ii) allow BofA to earn profits by investing escrow account funds deposited by borrowers.[2]

In 1974, the New York legislature adopted NYGOL § 5-601, which requires "mortgage lending institutions [to] share with their mortgagors the profits which are realized from the investment of monies held by the institutions." *Jamaica Sav. Bank v. Lefkowitz*, 390 F. Supp. 1357, 1363 (E.D.N.Y.) (*JSB*) (three-judge court), *aff'd without opinion*, 423 U.S. 802 (1975). The New York legislature determined that "mortgage lenders could 'well afford to pay' at least two percent interest on escrow accounts." *Id.* Section 5-601 protects consumers

---

[2] *Cantero*, 144 S. Ct. at 1295; *see also Hymes v. Bank of America, N.A.*, 408 F. Supp. 3d 171, 176 (E.D.N.Y. 2019) (A mortgage lender may use a borrower's money held in a mortgage escrow account "to generate interest and income for itself, but the borrower has no access to it") [hereinafter *Hymes*], *rev'd sub nom. Cantero v. Bank of America, N.A.*, 49 F.4th 121 (2d Cir. 2022), *vacated and remanded*, 144 S. Ct. 1290 (2024); "Why Lenders Are Purchasing More MSRs in 2022," PRIVOCORP (2022) (Mortgage servicing agreements allow mortgage lenders to earn fees and generate "float earnings" on funds held in mortgage escrow accounts), https://privocorp.com/blog/why-lenders-are-purchasing-more-msrs-in-2022/.

from exploitation[3] by requiring mortgage lenders to pay reasonable interest on funds deposited by borrowers in mortgage escrow accounts.

"[C]onsumer protection law is a field traditionally regulated by the states, [and] compelling evidence of an intention to preempt [by Congress] is required in this area." *New York State Telecommunications Ass'n v. James*, 101 F.4th 135, 148 (2d Cir. 2024) (quoting *General Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990)). The Dodd-Frank Act expresses a strong federal policy in favor of applying state consumer protection laws to national banks. Under 12 U.S.C. § 25b(b)(1)(B), a state consumer financial law is preempted "only if" a court or the Office of the Comptroller of the Currency (OCC) determines that the state law "prevents or significantly interferes with the exercise by the national bank of its powers."

Section 5-601 is also consistent with 15 U.S.C. § 1639d(g)(3), which Dodd-Frank amended. Under § 1639d(g)(3), lenders must pay

_____

[3] *See Hymes*, 408 F. Supp. 3d at 176 ("By the 1970s, some lenders had begun to exploit . . . mortgage escrow accounts by requiring borrowers to deposit vastly more money than their tax and insurance liabilities demanded. . . . In 1974, Congress and the State of New York responded with consumer protection legislation aimed at curbing different aspects [of] this practice.").

interest on borrowers' funds in mortgage escrow accounts in accordance with "applicable" state laws for certain types of mortgages specified in 15 U.S.C. § 1639d(b).  While § 1639d(g)(3) does not apply to Plaintiffs' mortgages, the statute reflects Congress's judgment that "creditors, including large corporate banks like Bank of America, can comply with state escrow interest laws without any significant interference with their banking powers."  *Lusnak v. Bank of Am., N.A.,* 883 F.3d 1185, 1196 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018).

### 2. Section 5-601 Has a Relatively Minor Impact on National Banks.

In 1975, two district courts upheld the constitutionality of § 5-601 in *JSB* and *Federal Nat'l Mortgage Ass'n. v. Lefkowitz*, 390 F. Supp. 1364 (S.D.N.Y. 1975) (*FNMA*) (three-judge court).  After determining that § 5-601 served a valid purpose by ensuring fair treatment for borrowers, the district court in *JSB* rejected the plaintiff savings bank's challenges under the Contract Clause and the Fourteenth Amendment's Due Process and Equal Protection Clauses.  *Id.* at 1362-63.  As the court emphasized, the plaintiff savings bank failed to show that it would

suffer any net loss on its mortgage escrow accounts after complying with § 5-601.[4]

In *FNMA*, the district court adopted the reasoning of *JSB* in dismissing FNMA's similar constitutional challenges to § 5-601. *FNMA*, 390 F. Supp. at 1367. The district court also rejected FNMA's Supremacy Clause claim. *Id.* at 1367-71. The court found that the "closest analogy" to FNMA's Supremacy Clause claim was the preemption claim rejected by the Supreme Court in *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944). *Id.* at 1368.

The district court determined that, "[a]s in *Anderson*, the state law at issue here does not discriminate against FNMA as a federal mortgage lending institution" and did not conflict with any federal statute. *Id.* at 1369. The court held that the "insignificant" burdens imposed by § 5-601 did not violate the Supremacy Clause. As the court explained, § 5-601 "does not regulate how FNMA must keep or invest the funds in its possession," and the statute did not "interfere directly

---

[4] *JSB*, 390 F. Supp. at 1363 ("The fact that the plaintiff might currently be losing money on its mortgage loans as a whole sheds no light on the escrow account problem. We are concerned only with the profits and losses realized specifically from the investment of escrow funds. We find that no such showing [of losses] has been made.").

with [FNMA's] internal management." *Id.* Additionally, § 5-601 "in no way impairs" the purpose of mortgage escrow accounts "to protect [FNMA's] interest in the mortgaged property." *Id.*

The district court concluded that "although the burden [on FNMA] may be somewhat greater than that found in *Anderson*, [§ 5-601] is not so burdensome as to violate the Supremacy Clause." *Id.* In fact, as shown in Part I.C., § 5-601's relatively minor impact on national banks is much less substantial than the burden imposed by the Kentucky statute in *Anderson*.

In *Hymes*, the district court determined that § 5-601's "degree of interference" with BofA's power to administer mortgage escrow accounts is "minimal." 408 F. Supp. 3d at 195. As the court explained, § 5-601 "does not bar the creation of mortgage escrow accounts, or subject them to state visitorial control, or otherwise limit the terms of their use." *Id.* While § 5-601 requires BofA to pay a "modest" interest rate on funds held in mortgage escrow accounts, § 5-601 allows BofA to administer mortgage escrow accounts in a manner that is "relatively unimpaired and unhampered by the state law." *Id.* at 185-86, 195-96.

Like the plaintiff savings bank in *JSB*, 390 F. Supp. at 1363, BofA

has not shown that § 5-601 would cause national banks to suffer net

losses on mortgage escrow accounts. The average yields on earning

assets produced by FDIC-insured depository institutions have been well

above § 5-601's required 2% annual interest payments during the entire

period since Plaintiffs' mortgages were originated in 2010 and 2016.[5]

Thus, national banks would be highly unlikely to incur net losses from

administering mortgage escrow accounts in compliance with § 5-601.

## C. Section 5-601 Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers.

Section 5-601's relatively minor impact on national banks is

clearly insignificant compared to the severe burdens imposed by the

state laws preempted in *Barnett Bank*, *Franklin Nat'l Bank v. New

York*, 347 U.S. 373 (1954), *First Nat'l Bank of San Jose v. California*,

262 U.S. 366 (1923), and *Fidelity Fed. Sav. & Loan Ass'n v. de la

Cuesta*, 458 U.S. 141 (1982). In *Barnett Bank*, the preempted Florida

---

[5] *See* Arthur E. Wilmarth, Jr., *Policy Brief: On Remand in Cantero, the Second Circuit Should Uphold New York's Interest-on-Escrow Law and Reject Bank of America's Preemption Claim*, at 25 (Geo. Wash. Leg. Stud. Res. Paper No. 2024-53, July 31, 2024), [hereinafter Wilmarth, *Policy Brief*], https://ssrn.com/abstract=4920523.

law prohibited national banks from selling insurance if they were subsidiaries of bank holding companies. Over 75% of U.S. banks were subsidiaries of bank holding companies when the Supreme Court decided *Barnett Bank*, and Florida's statute therefore prevented most national banks from exercising their power to sell insurance from small-town offices in Florida under 12 U.S.C. § 92.[6]

In *Franklin*, the preempted New York statute forbade national banks from using the terms "saving" or "savings" in advertising for savings deposits. The New York trial court determined that New York's statute imposed a "crippling obstruction" on a "necessary part" of the "banking business" of a national bank by "*restrict[ing]* it 'tremendously' . . . in obtaining 'savings deposits'."[7] The Supreme Court recognized that national banks "depend upon their success in attracting private deposits," and the Court found that New York's statute created "a clear

---

[6] *Barnett Bank*, 517 U.S. at 28-35; *see also* Wilmarth, *Policy Brief*, *supra* note 5, at 11-12 (discussing *Barnett Bank*).
[7] *People v. Franklin Nat'l Bank*, 200 Misc. 557, 568-71, 105 N.Y.S.2d 81, 92-95 (1951), *rev'd*, 281 App. Div. 757, 118 N.Y.S.2d 210, *aff'd*, 305 N.Y. 453, 113 N.E.2d 796 (1953), *rev'd*, 347 U.S. 373 (1954); *see also* Wilmarth, *Policy Brief*, *supra* note 5, at 12-14 (discussing *Franklin*).

conflict" with federal statutes authorizing national banks to accept savings deposits. *Franklin*, 347 U.S. at 375-78.

The Supreme Court also pointed out that federal statutes granting deposit-taking powers to national banks reflected a federal policy to ensure that national banks were "at no disadvantage in competition with state-created institutions." *Id.* at 375. New York's law undermined that federal policy by permitting only New York state-chartered savings institutions to use the terms "saving" or "savings" in advertising their savings accounts. *Id.* at 374, 374-75 n.1. The Supreme Court held that national banks "must be deemed to have the right to advertise [their savings deposits] by using the commonly understood description which Congress has specifically selected." *Id.* at 378.

In *San Jose*, 262 U.S. at 369-70, the Supreme Court held that California's escheat law "directly impair[ed]" and "interfere[d]" with the "plainly granted powers" of national banks to accept deposits. California's law required deposits to be escheated to the state upon "mere proof of dormancy" for over twenty years, "without any

determination of abandonment in fact."[8]  The Supreme Court explained
that the NBA preempted California's law because it "alter[ed] the
contracts of deposit in a manner considered so unusual and so harsh in
its application to depositors as to deter them from placing or keeping
their funds in national banks."[9]

In *Fidelity*, 458 U.S. at 154-59, 159 n.14, the Supreme Court held
that a valid regulation issued by the Federal Home Loan Bank Board
(FHLBB) preempted a California judicial rule.  The FHLBB's regulation
gave federal savings associations "unrestricted" authority to enforce
due-on-sale clauses in their mortgages.  *Id.* at 146-47, 169 n.22.  In
contrast, California's rule allowed the enforcement of due-on-sale
clauses only in "cases where the lender's security is impaired," thereby
"limiting the availability of an option the [FHLBB] considers essential
to the economic soundness of the thrift industry."  *Id.* at 155-56.
California's rule was preempted because it undermined the FHLBB's
delegated authority "to ensure the financial stability" of federal savings

---

[8] *Anderson*, 321 U.S. at 250-51 (discussing *San Jose*).
[9] *Id.* at 250 (same); *see also* Wilmarth, *Policy Brief*, *supra* note 5, at 14-15 (same).

associations.[10]

Section 5-601's relatively minor impact on national banks is plainly insignificant compared to the severe burdens imposed by the state laws preempted in *Barnett Bank*, *Franklin*, *San Jose*, and *Fidelity*.[11] Additionally, § 5-601's impact on national banks is much less substantial than the burdens created by the state laws upheld in *Anderson, McClellan v. Chipman*, 164 U.S. 347 (1896), and *Nat'l Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1870).

In *Anderson*, 321 U.S. at 236-47, a national bank argued that a Kentucky statute injured national banks by requiring them to transfer long-dormant deposits to state authorities. While Kentucky's statute did not escheat long-dormant deposits to the state without proof of abandonment, the statute prevented national banks from retaining those deposits and earning profits by investing them.[12] In contrast,

---

[10] *Fidelity*, 458 U.S. at 154-56, 168-70; *see also* Wilmarth, *Policy Brief*, *supra* note 5, at 15-17 (discussing *Fidelity*).

[11] *See Hymes*, 408 F. Supp. 3d at 194-96 (comparing § 5-601 to the state laws preempted in *Barnett Bank* and *Franklin*).

[12] Brief in Behalf of Anderson Nat'l Bank in *Anderson Nat'l Bank v. Reeves*, 1944 WL 42454, at *18 (U.S., Jan. 18, 1944).

NYGOL § 5-601 allows lenders to retain and invest escrow balances and to earn profits that exceed the required interest payments.

In *McClellan*, a national bank challenged a Massachusetts law, which prohibited national banks from accepting preferential transfers of real property from insolvent debtors to satisfy or secure antecedent debts. The national bank claimed that the Massachusetts law undermined the "stability" of national banks by impairing their ability to "tak[e] security" through transfers of real property "whenever necessary for the protection of their property and assets."[13]

In *Commonwealth*, 76 U.S. at 358-63, a national bank challenged a Kentucky law that required national banks to pay the state's bank shares tax on behalf of their shareholders. The national bank contended that Kentucky's law forced it to undertake the "burdensome duty" of collecting Kentucky's bank shares tax from its shareholders "[w]ithout remuneration."[14]

---

[13] *McClellan*, 164 U.S. at 352-53, 358-59 (summarizing the national bank's argument).

[14] *Commonwealth*, 76 U.S. at 358 (summarizing the national bank's argument).

The Supreme Court rejected the national banks' preemption claims in *Anderson*, *McClellan*, and *Commonwealth* after determining that the challenged state laws did not discriminate against national banks and did not conflict with federal banking laws. The Court upheld the challenged state statutes as reasonable laws designed to accomplish legitimate state purposes – protecting long-dormant deposits in *Anderson*, preventing insolvent debtors from making preferential transfers to favored creditors in *McClellan*, and collecting a lawful state tax in *Commonwealth*.[15] Similarly, NYGOL § 5-601 does not discriminate against national banks, does not conflict with any federal banking statute, and is a valid state consumer protection law.

Thus, a "nuanced comparative analysis" of § 5-601 with the state laws evaluated in the seven Supreme Court decisions identified in *Cantero* confirms that the "nature and degree of [§ 5-601's] interference" with the "exercise" of national bank "powers" is much less substantial than any of the state laws assessed in those decisions. *Cantero*, 144 S. Ct. at 1300-01. Accordingly, this Court should reject BofA's preemption

---

[15] *See* Wilmarth, *Policy Brief*, *supra* note 5, at 18-22 (explaining why the Supreme Court rejected the national banks' preemption claims in *Anderson*, *McClellan*, and *Commonwealth*).

claim and hold that § 5-601 applies to national banks because § 5-601 does not "prevent or significantly interfere" with the "exercise" of national bank "powers."

## II. A Decision to Preempt NYGOL § 5-601 Would Greatly Weaken the States' Authority to Charter and Regulate Financial Institutions and Protect Consumers.

A decision to preempt NYGOL § 5-601 would severely undermine the dual banking system by devaluing state bank charters and state licensing of nonbank mortgage servicers. Such a decision would give national banks an unwarranted competitive advantage in mortgage servicing by preempting over a dozen state laws requiring mortgage lenders to pay interest on borrowers' balances in mortgage escrow accounts.

Mortgage servicing is a complex business activity conducted by state banks, national banks, federal and state credit unions, and state-licensed nonbank mortgage lenders and servicers.[16] Among the nation's top 50 mortgage servicers, state-licensed nonbank providers held a

---

[16] *See* Conference of State Banking Supervisors, *Reengineering Nonbank Supervision*, "Chapter Three: Overview of Nonbank Mortgage," at 27 – 35 (Sept. 2019), https://www.csbs.org/sites/default/files/other-files/Chapter%20Three%20-%20Overview%20of%20Nonbank%20Mortgage_updated.pdf.

significantly larger share of the servicing market in June 2024 than national banks did, as shown below.

**Market Share of 50 Largest Mortgage Servicers**

|                          | Servicing Market Share | Number of Institutions |
|--------------------------|------------------------|------------------------|
| National Banks           | 34.7%                  | 13                     |
| State Licensed Nonbanks  | 57.1%                  | 26                     |
| State Banks              | 6.7%                   | 8                      |
| Federal Credit Unions    | 1.2%                   | 2                      |
| Housing Finance Agencies | 0.3%                   | 1                      |

*Inside Mortgage Finance*, "Top 50 Firms in Owned Mortgage Servicing: 2Q24," https://www.insidemortgagefinance.com/ (2024). Used with permission.

A decision to preempt NYGOL § 5-601 would give national banks an unjustified competitive edge over their state-chartered and state-licensed competitors. Additionally, BofA has asserted that § 5-601 is preempted by an OCC regulation, 12 C.F.R. § 34.4(a). That unlawful regulation exempts national banks from complying with fourteen broad categories of state consumer financial laws across the nation. A decision to preempt § 5-601 would bolster the OCC's invalid preemption rule, thereby providing further unfair competitive advantages to

national banks and severely weakening the States' ability to protect consumers.[17]

## Conclusion

This Court should hold that NYGOL § 5-601 applies to national banks.

MATTHEW LAMBERT
Deputy General Counsel
CONFERENCE OF STATE BANK
SUPERVISORS
1300 I St. NW, Suite 700 East
Washington, DC 20005

ARTHUR E. WILMARTH, JR.
Professor Emeritus of Law
GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL
2000 H Street, N.W.
Washington, DC 20052

/s/ Stefan  L.  Jouret
STEFAN L. JOURET
JOURET LLC
265 Franklin Street
Suite 1702
Boston, MA 02110
(617) 523-0133
jouret@jouretllc.com
*Counsel for Amici Curiae*

---

[17] Wilmarth, *Policy Brief*, *supra* note 5, at 28-33 (explaining why the OCC's regulation is invalid and not entitled to any judicial deference).

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 3466 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Century Schoolbook.

Dated: New York, New York
      September 3, 2024

<br>

                                 /s/ Stefan  L.  Jouret
                                 Stefan L. Jouret

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated: New York, New York
      September 3, 2024

                            /s/ Stefan L. Jouret
                            Stefan L. Jouret