# 21-400

## United States Court of Appeals for the Second Circuit

ALEX CANTERO, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

v.

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of New York

**BRIEF FOR THE STATES OF NEW YORK, IOWA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, IDAHO, ILLINOIS, INDIANA, MAINE, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEBRASKA, NEVADA, NEW JERSEY, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH DAKOTA, UTAH, VERMONT, VIRGINIA, WASHINGTON, AND WYOMING, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF APPELLEE**

BRENNA BIRD
  *Attorney General*
  *State of Iowa*
ERIC H. WESSAN
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164

(*Counsel listing continues on signature pages.*)

LETITIA JAMES
  *Attorney General, State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8407
Dated: September 3, 2024

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES....................................................................ii

INTEREST OF AMICI CURIAE AND PRELIMINARY
    STATEMENT............................................................................ 1

ARGUMENT ......................................................................................... 3

  POINT I

  GOL § 5-601 DOES NOT SIGNIFICANTLY INTERFERE WITH BANK OF
  AMERICA'S EXERCISE OF ITS POWERS ..................................................... 3

      A.   Comparison to *Barnett Bank* and Other Precedents
           Demonstrates That GOL § 5-601 Does Not Significantly
           Interfere with Bank of America's Exercise of Its Powers. ....... 4

      B.   Common Sense Confirms That GOL § 5-601 Does Not
           Significantly Interfere with Bank of America's Exercise
           of Its Powers.......................................................................... 12

  POINT II ............................................................................................ 15

  THE 2018 ORDER ISSUED BY THE NEW YORK DEPARTMENT OF
  FINANCIAL SERVICES DID NOT FIND THAT GOL § 5-601 HAD BEEN
  PREEMPTED ........................................................................................ 15

CONCLUSION ...................................................................................... 19

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Anderson National Bank v. Luckett,*
321 U.S. 233 (1944) ............................................................... 7

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) ........................................................ 2, 3, 5

*Cantero v. Bank of Am., N.A.,*
144 S. Ct. 1290 (2024) ............................................... 2, 4, 10

*Cantero v. Bank of Am., N.A.,*
49 F.4th 121 (2022) .................................................... 15, 18

*Cuomo v. Clearing House Ass'n, L.L.C.,*
557 U.S. 519 (2009) .............................................................. 1

*Fed. Nat'l Mortg. Ass'n v. Lefkowitz,*
390 F. Supp. 1364 (S.D.N.Y. 1975) ............................... 10, 11

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982) .............................................................. 5

*First National Bank of San Jose v. California,*
262 U.S. 366 (1923) .............................................................. 7

*Franklin National Bank of Franklin Square v. New York,*
347 U.S. 373 (1954) .............................................................. 6

*Hymes v. Bank of America, N.A.,*
408 F. Supp. 3d 171 (E.D.N.Y. 2019) .................................. 4

*Madden v. Midland Funding, LLC,*
786 F.3d 246 (2d Cir. 2015) ............................................... 10

*McClellan v. Chipman,*
164 U.S. 347 (1896) .............................................................. 8

*Mohassel v. Fenwick,*
5 N.Y.3d 44 (2005) ............................................................. 12

**Cases**                                                    **Page(s)**

*National Bank v. Commonwealth,*
    76 U.S. (9 Wall.) 353 (1869) ...................................................... 8

*Pac. Capital Bank, N.A. v. Connecticut,*
    542 F.3d 341 (2d Cir. 2008) ........................................... 9, 12

*Peoples Westchester Sav. Bank v. F.D.I.C.,*
    961 F.2d 327 (2d Cir. 1992) .............................................. 12

**Federal Statutes**

Pub. L. No. 111-203, 124 Stat. 1376, subtitle D, § 1044 (2010) ............... 2

12 U.S.C.
    § 25b(b)(1)(B).......................................................... 2, 3
    § 24 ...................................................................... 3
    § 371 ..................................................................... 3

**State Statutes**

Cal. Fin. Code
    § 50202 ................................................................... 13

Conn. Gen. Stat.
    § 49-2a .................................................................... 13

Iowa Code
    § 524.905 ................................................................. 13

Mass. Gen. Laws
    ch. 183, § 61.............................................................. 13

Md. Code Ann., Com. Law
    § 12-109 .................................................................. 13

Me. Stat.
    tit. 9-b, § 429 ............................................................ 13

Minn. Stat.
    § 47.2 .................................................................... 13

**State Statutes**                                    **Page(s)**

N.H. Rev. Stat. Ann.
  § 397-a:9 ................................................................ 13

N.Y. Banking Law
  § 12-a .................................................................... 15
  § 12-a(6) ............................................................... 17

N.Y. Gen. Obligations Law
  § 5-601 ............................................................ *passim*
  § 7-101 .................................................................. 14

N.Y. Lien Law
  § 71-a(3) ............................................................... 14

N.Y. Pub. Health Law
  § 4610(1) .............................................................. 14

Or. Rev. Stat.
  § 86.245 ............................................................... 13

19 R.I. Gen. Laws
  § 19-9-2 ............................................................... 13

Utah Code Ann.
  § 7-17-3 ............................................................... 13

Vt. Stat. Ann.
  tit. 8, § 10404 .................................................... 13

Wis. Stat.
  § 138.052 ............................................................. 13

**Federal Regulations**

12 C.F.R.
  § 34.4(a)(6) ........................................................ 16

**Miscellaneous Authorities**                                    **Page(s)**

Foote, Bruce, Cong. Rsch. Serv., 98-979E, *Mortgage Escrow*
    *Accounts: An Analysis of the Issues* (1998) ......................................... 11

Letter from 48 Attorneys General to John Walsh, Acting
    Comptroller, Off. of the Comptroller of the Currency (June
    27, 2011), *available at*
    https://www.regulations.gov/comment/
    OCC-2011-0006-0018 ........................................................................... 16

Nat'l Consumer L. Ctr., *Consumer Credit Regulation* § 3.7.1
    (3d ed. 2020) ........................................................................................ 15

Vullo, Maria T., Superintendent of Fin. Servs., *Order Issued*
    *Under Section 12-a of the New York Banking Law* (Jan.
    19, 2018), *available at*
    https://www.dfs.ny.gov/system/files/
    documents/2020/03/wild_20180119_mortgage-
    escrow_order.pdf ................................................................................. 17

## INTEREST OF AMICI CURIAE AND
## PRELIMINARY STATEMENT

States have "enforced their banking-related laws against national banks for at least 85 years," *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 534 (2009), and amici curiae States of New York, Iowa, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Maine, Maryland, Michigan, Minnesota, Montana, Nebraska, Nevada, New Jersey, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah, Vermont, Virginia, Washington, and Wyoming, and the District of Columbia have a strong interest in continuing to do so for the benefit of consumers. They thus have an interest in ensuring that courts properly assess the governing federal preemption standard, which directly affects their ability to enforce their banking-related laws against national banks. These laws include the statute at issue here, New York General Obligations Law (GOL) § 5-601 ("Section 5-601"), which requires mortgage lenders to pay interest of at least 2% on sums held in mortgage-escrow accounts.

The preemption standard was enacted by Congress in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. In a section titled "Preservation of State Law," Congress provided that state

consumer financial laws (such as Section 5-601) are preempted by federal law "only if," as relevant here, the state law "prevents or significantly interferes with the exercise by the national bank of its powers," in accordance with the test set forth in the Supreme Court's decision in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). 12 U.S.C. § 25b(b)(1)(B); Pub. L. No. 111-203, 124 Stat. 1376, subtitle D, § 1044 (2010).

On a writ of certiorari to this Court, the Supreme Court recently instructed that this preemption standard requires courts to "make a practical assessment of the nature and degree of the interference caused by a state law." *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1300 (2024). That assessment, in turn, may be based on a "comparison to other precedents" cited in *Barnett Bank*, as well as "common sense." *Id.* at 1301 n.3.

Amici States and the District of Columbia submit this brief to explain why both factors support the conclusion that Section 5-601 does not significantly interfere with Bank of America's exercise of its power to use mortgage-escrow accounts in connection with real-estate loans, and is therefore not preempted. Furthermore, New York has never taken the

position that its law *is* preempted. Notwithstanding this Court's contrary observation, a 2018 order from the New York Department of Financial Services did not purport to opine otherwise.

## ARGUMENT

## POINT I

### GOL § 5-601 DOES NOT SIGNIFICANTLY INTERFERE WITH BANK OF AMERICA'S EXERCISE OF ITS POWERS

The Dodd-Frank Act provides that state consumer financial laws, such as Section 5-601, are preempted by federal law "only if," as relevant here, the state law "prevents or significantly interferes with the exercise by the national bank of its powers," in accordance with the test set forth in *Barnett Bank*, 517 U.S. at 25. 12 U.S.C. § 25b(b)(1)(B). Bank of America, like all national banks, has statutory power to make real-estate loans. 12 U.S.C. § 371. It also has general incidental powers, *id.* § 24 (Seventh), including the power to use mortgage-escrow accounts. The question is whether Section 5-601 significantly interferes with Bank of

America's incidental power to use mortgage-escrow accounts when it makes real-estate loans.[1]

The Supreme Court has now explained that the preemption inquiry requires courts to "make a practical assessment of the nature and degree of the interference caused by a state law." *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1300 (2024). That assessment, in turn, may be based on a "comparison to other precedents" cited in *Barnett Bank*, as well as "common sense." *Id.* at 1301 n.3. Both factors support the conclusion that Section 5-601 does not significantly interfere with Bank of America's exercise of its power to use mortgage-escrow accounts.

### A. Comparison to *Barnett Bank* and Other Precedents Demonstrates That GOL § 5-601 Does Not Significantly Interfere with Bank of America's Exercise of Its Powers.

The Supreme Court identified at least seven precedents that guide the preemption inquiry. As discussed below, two of these cases are distinguishable because the state laws did not just significantly interfere with the exercise of national powers—they wholly prevented the exercise

---

[1] Bank of America has not argued that Section 5-601 *prevents* it from exercising this power. *See, e.g.*, *Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 194 (E.D.N.Y. 2019).

of those powers. From the five remaining cases, a common thread emerges: state laws significantly interfere with the exercise of a national bank power, and are thus preempted, when they frustrate the purpose of that power. Because Section 5-601 does not frustrate the purpose of any national banking power, it is not preempted.

More particularly, two of the cases the Supreme Court identified—*Barnett Bank* itself and *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)—provide little guidance in answering the significant-interference question, because they are cases of outright prevention, not significant interference. In *Barnett Bank*, a Florida statute was held preempted because it altogether prohibited national banks from engaging in an activity (selling insurance in small towns) that federal law expressly permitted. 517 U.S. at 31. And in *Fidelity*, a federal regulation and its preamble expressly provided that a federal savings and loan association could use due-on-sale clauses in mortgage contracts "at its option," and that "[f]ederal associations shall not be bound by or subject to any conflicting State law which imposes different due-on-sale requirements." 458 U.S. at 147, 158. The Court held that, because California courts had limited the circumstances under which

due-on-sale clauses could be enforced and had thus "forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option'"—as explicitly allowed under the federal regulation—California common law was preempted. *Id.* at 155. Thus, in both cases, application of state law prevented national banks from exercising a power altogether.

Because the question here is only whether Section 5-601 *significantly interferes* with Bank of America's exercise of its national powers, not whether it *prevents* such exercise, the remaining five cases identified by the Court provide the most helpful guides.

Turning first to the two cases that found a state law preempted, in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), the Court addressed a New York statute that prohibited banks, other than its own chartered savings institutions, from using the word "savings" in advertisements, even though federal law expressly authorized national banks to receive "savings deposits." *Id.* at 374. Although the New York law did not forbid national banks from receiving such deposits, it significantly interfered with such banks' ability to do so. Without the "right to let the public know" that they could indeed receive savings deposits, national banks could not reasonably compete for

savings deposits. *Id.* at 377-78. The New York law thus undermined national banks' ability "to enter into or remain in that type of business," as permitted under federal law. *Id.* at 377.

And in *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), the Court analyzed a California statute under which deposits that went untouched for more than 20 years escheated to the State, even without any proof of abandonment. The Court held that this interference in national banks' customer agreements was "incompatible with the purpose" of banks' power "freely to accept deposits." *Id.* at 369-70. That was because commercial banks' success "depends upon their ability to obtain loans from depositors," and depositors "might well hesitate" to deposit their funds in banks if their funds could be confiscated simply for remaining dormant, without an intent to abandon them. *Id.* at 370.

The Supreme Court distinguished *San Jose* in *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), where the Court held that Kentucky's escheat statute was *not* preempted. The difference was that, under Kentucky's law, deposits escheated to the State not for mere dormancy, but only if they were proved to have been abandoned. *Id.* at 251. This treatment of abandoned property was "as old as the common

law itself" and, unlike in *San Jose*, produced no "unusual alteration of depositors' accounts." *Id.* at 251. Thus, the law could not be said to deter depositors from placing funds in national banks, and accordingly lacked any "effect on the national banking system [that] would be incompatible with the statutory purpose of establishing a system of national banks." *Id.*

*McClellan v. Chipman*, 164 U.S. 347 (1896), similarly found no preemption where application to national banks of a Massachusetts law would not "frustrate the purpose for which the national banks were created." *Id.* at 357. The subject law prohibited creditors from receiving preferential transfers of assets from insolvent debtors. The Court reasoned that "[n]o function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the state are subjected." *Id.* at 358.

Finally, in *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1869), the Court upheld a Kentucky law requiring banks to pay the State's tax on bank shares on behalf of shareholders. That requirement "in no manner hinder[ed]" the national bank's banking operations and

produced "no greater interference with the functions of the bank" than any other law governing businesses. *Id.* at 362-63.

As the foregoing cases demonstrate, a state law significantly interferes with a bank's exercise of a national banking power when it frustrates the purpose of a federal statute or the purpose of the federal banking power itself—such as by rendering a federal power ineffectual (as in *Franklin*), or by creating an obstacle to achieving the power's purpose (as in *San Jose*). Conversely, where a state law does not produce any effects that undermine a federal purpose (as in *Anderson*), it does not significantly interfere with a national bank's exercise of its powers and is thus not preempted.

Second Circuit precedent since *Barnett Bank* is consistent. The Court has held that state laws are preempted when they would render a federal power ineffectual by "pos[ing] a significant obstacle to the offering" of a federally sanctioned product, or prohibiting a particular activity that is "clearly essential to the efficient operation" of a federally sanctioned activity. *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 354 (2d Cir. 2008) (internal quotation marks omitted). And the Court has held that state laws are *not* preempted when compliance with those laws

does not render ineffectual a particular banking power (specifically, the power to sell consumer debt to a third party) but merely entails a financial burden. *Madden v. Midland Funding, LLC*, 786 F.3d 246, 251 (2d Cir. 2015).

In any case, Bank of America has not argued that the specific interest rate required under Section 5-601 is so financially burdensome as to significantly interfere with the exercise of its federal banking powers. Rather, its position is that *any* law that intrudes upon its sole prerogative to set the terms of its escrow accounts significantly interferes with its federal banking powers. But Section 5-601 does not render ineffectual the power to use mortgage-escrow accounts; nor does it frustrate the purpose of using those accounts. The purpose of using escrow accounts in connection with real-estate loans "is not to provide [the bank] with income but rather to protect the mortgagees' interest in the mortgaged property." *Fed. Nat'l Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1369 (S.D.N.Y. 1975) (three-judge panel); *see also Cantero,* 144 S. Ct. at 1295 (explaining that escrow accounts are designed to protect the bank, by protecting its collateral, and the borrower, by simplifying payments). Without an escrow account, a lender has no guarantee that a

borrower will pay her property taxes or insurance premiums. A borrower's failure to pay those bills could result in a forced sale of the property, and the portion of the proceeds that the lender receives from that sale may not satisfy the debt in full. Escrow accounts enable lenders to pay property taxes and insurance premiums directly (typically on an annual or semi-annual basis) from funds deposited as part of the borrower's monthly payment, and thereby protect the value of the collateral. *See* Bruce Foote, Cong. Rsch. Serv., 98-979E, *Mortgage Escrow Accounts: An Analysis of the Issues* 1-2 (1998).

As a three-judge district-court panel has already concluded, Section 5-601's requirement that banks pay a modest interest rate on sums held in mortgage-escrow accounts "in no way impairs this purpose" of protecting loans' collateral. *Fed. Nat'l Mortg. Ass'n*, 390 F. Supp. at 1369. Nor does it render the power to use escrow accounts ineffectual. To the contrary, escrow accounts' purpose of protecting the value of the collateral is unaffected by the requirement of paying of interest. That requirement therefore does not significantly interfere with a national banking power and is not preempted.

### B. Common Sense Confirms That GOL § 5-601 Does Not Significantly Interfere with Bank of America's Exercise of Its Powers.

Common sense supports the conclusion that Section 5-601 does not significantly interfere with the exercise of national banking powers. The statute merely requires banks to pay consumers a modest interest rate to compensate them for the opportunity cost of putting their cash into escrow before their bills come due—cash that could provide capital to banks to make profitable loans and other investments.

The interest that Section 5-601 requires, like all forms of interest, "represents the cost of having the use of another person's money for a specified period of time." *Mohassel v. Fenwick*, 5 N.Y.3d 44, 51 (2005) (internal quotation marks omitted). This is not a foreign concept for banks. Indeed, it is a "basic premise" that "a depositor receives interest in return for loaning money to a bank so that the bank may use the funds for its own investments." *Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 331 (2d Cir. 1992). It defies common sense to say that applying this age-old practice to funds held in escrow would, as a matter of law, "pose a significant obstacle to the offering" of mortgage-escrow accounts. *Pac. Capital Bank*, 542 F.3d at 354.

Indeed, we know that it does not. The underlying complaint discloses that at least one other national bank (Wells Fargo) currently offers mortgage-escrow accounts while also paying interest on the money held in them in compliance with Section 5-601. (*Hymes* Joint Appendix 19.) And some thirteen other States have laws similar to the New York escrow-interest law challenged here.[2] Yet, as plaintiffs note in their supplemental brief (at 8-9), state-chartered financial institutions in those States commonly use mortgage-escrow accounts, while complying with those laws without difficulty.

The fact that numerous banks are able to both offer mortgage-escrow accounts and comply with Section 5-601 and other similar laws confirms that the law does not significantly interfere with the ability to offer such accounts. To the contrary, the law reflects a common-sense policy judgment: that, as a matter of basic fairness, consumers should not be required to give banks interest-free loans. In this respect, New York's

---

[2] *See* Cal. Fin. Code § 50202; Conn. Gen. Stat. § 49-2a; Iowa Code § 524.905; Me. Stat. tit. 9-b, § 429; Md. Code Ann., Com. Law § 12-109; Mass. Gen. Laws ch. 183, § 61; Minn. Stat. § 47.2; N.H. Rev. Stat. Ann. § 397-a:9; Or. Rev. Stat. § 86.245; 19 R.I. Gen. Laws § 19-9-2; Utah Code Ann. § 7-17-3; Vt. Stat. Ann. tit. 8, § 10404; Wis. Stat. § 138.052.

treatment of funds placed in mortgage-escrow account is consistent with the State's treatment of other types of advance payments. For example, security deposits for apartment rentals, deposits paid to builders constructing new homes, and entrance fees and deposits paid on "life care community" contracts, among others, all must be deposited into interest-bearing escrow accounts, with interest credited to the consumer. *See* N.Y. Gen. Obligations Law § 7-101; N.Y. Lien Law § 71-a(3); N.Y. Pub. Health Law § 4610(1). While only Section 5-601 regulates banks directly, these statutes all reflect the judgment that consumers should be compensated for the opportunity cost of making advance payments. The statutes impose modest obligations on the beneficiaries of those payments to accomplish that goal.

In sum, a comparison to relevant Supreme Court precedents as well as basic common sense demonstrate that applying Section 5-601 to national banks does not significantly interfere with the exercise of their powers. That conclusion may be reached based on the pleadings. This Court should therefore affirm the district court's holding on the significant-interference question and its denial of Bank of America's motion to dismiss.

## POINT II

**THE 2018 ORDER ISSUED BY THE NEW YORK DEPARTMENT OF FINANCIAL SERVICES DID NOT FIND THAT GOL § 5-601 HAD BEEN PREEMPTED**

This Court found additional support for its initial decision in a 2018 order (2018 Order) issued by the New York Department of Financial Services (DFS), which the Court mistakenly treated as establishing that regulators "agreed" that Section 5-601 is preempted.[3] *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 135 (2022). But the 2018 Order did not take any position on the preemption question one way or another.[4]

DFS promulgated the 2018 Order pursuant to its authority under the "wild-card" statute of New York Banking Law § 12-a. Wild-card statutes—which have been enacted in some form in all 50 States[5]—enable state banking regulators to grant state banks a particular

---

[3] New York did not participate in the first round of litigation before this Court.

[4] The Court's initial understanding of the 2018 Order is not binding here, however, even though the Supreme Court did not discuss it in vacating this Court's judgment. This Court had not rendered a legal conclusion regarding the 2018 Order, but rather simply assumed (mistakenly) that the order reflected a position that supported the Court's conclusion on the preemption issue.

[5] *See* Nat'l Consumer L. Ctr., *Consumer Credit Regulation* § 3.7.1 n.672 (3d ed. 2020) (citing statutes).

banking power enjoyed by national banks in order to maintain parity between the two. These statutes thus give States administrative authority to grant privileges to state banks within their jurisdictions, providing States with a flexible method of amending the powers of state-chartered banks in response to new federal initiatives, and thereby enabling States to preserve the competitiveness of state-chartered banks charters vis-à-vis national banks.

DFS promulgated the 2018 Order to address the application to New York–chartered banks of Section 5-601 in light of a regulation of the federal Office of the Comptroller of the Currency providing that national banks may make real-estate loans "without regard" to state laws concerning "[e]scrow accounts." 12 C.F.R. § 34.4(a)(6). While New York, 46 other States, and the District of Columbia objected to OCC's assertion that the covered state laws were preempted as applied to national banks,[6] DFS exercised its wild-card authority while the OCC regulation remained in place to maintain parity between New York and national

---

[6] *See* Letter from 48 Attorneys General to John Walsh, Acting Comptroller, Off. of. the Comptroller of the Currency (June 27, 2011), *available at* https://www.regulations.gov/comment/OCC-2011-0006-0018.

banks at a time when interest rates were historically low. The resulting 2018 Order thus set forth an alternative minimum interest rate to be paid by New York banks on escrow accounts.[7] *See* Maria T. Vullo, Superintendent of Fin. Servs., *Order Issued Under Section 12-a of the New York Banking Law* (Jan. 19, 2018), *available at* https://www.dfs.ny.gov/system/files/documents/2020/03/wild_20180119_ mortgage-escrow_order.pdf.

The 2018 Order is effective only for as long as the underlying OCC regulation is extant. If the OCC regulation ceases to exist, the 2018 Order will be revoked, either expressly or by operation of law. *See* N.Y. Banking Law § 12-a(6).

DFS was not purporting to determine whether Section 5-601 is preempted by federal law when it issued the 2018 Order. As discussed above, the relevant preemption standard requires an inquiry into the effect of the state law on *national* banks. The 2018 Order, which granted certain privileges to *state* banks, did not address that inquiry. Indeed, in

---

[7] That rate, adjusted quarterly, is the lesser of (i) 2% or (ii) the six-month yield on U.S. Treasury securities on the last business day of the immediately preceding calendar quarter.

issuing the 2018 Order, DFS did not make any findings at all concerning the effect of Section 5-601 on national banks. It merely recognized the reality that the OCC regulation, while it remained in effect, advantaged national banks over state banks and, accordingly, set an alternative minimum interest rate for state banks in order to maintain parity. Contrary to this Court's statement, then, the 2018 Order did not "stat[e] that Section 5-601 *did not apply* to national banks." *Cantero*, 49 F.4th at 135. The 2018 Order simply made no determination one way or another about the application of state law to national banks.

**CONCLUSION**

The Court should affirm the district court's denial of the motion to dismiss.

Dated:  Buffalo, New York
        September 3, 2024

                                    Respectfully submitted,

BRENNA BIRD                         LETITIA JAMES
 *Attorney General*                  *Attorney General*
 *State of Iowa*                     *State of New York*
ERIC H. WESSAN                      BARBARA D. UNDERWOOD
 *Solicitor General*                 *Solicitor General*
                                    ANDREA OSER
*(Counsel listing continues on the next page.)*   *Deputy Solicitor General*
                                    SARAH L. ROSENBLUTH
                                     *Assistant Solicitor General*

                          By:    /s/ Sarah L. Rosenbluth
                                SARAH L. ROSENBLUTH
                                Assistant Solicitor General

                                350 Main Street, Suite 300A
                                Buffalo, New York 14202
                                (716) 853-8407

19

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, California 95814

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, Colorado 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, Delaware 19801

ASHLEY MOODY
  *Attorney General*
  *State of Florida*
PL-01, The Capitol
Tallahassee, Florida 32399

CHRISTOPHER M. CARR
  *Attorney General*
  *State of Georgia*
40 Capitol Square SW
Atlanta, Georgia 30334

RAÚL R. LABRADOR
  *Attorney General*
  *State of Idaho*
700 W. Jefferson Street, Suite 210
P.O. Box 83720
Boise, Idaho 83720

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 S. LaSalle Street
Chicago, Illinois 60603

THEODORE E. ROKITA
  *Attorney General*
  *State of Indiana*
302 W. Washington Street
Indianapolis, Indiana 46204

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, Maine 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  Attorney General
  State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King,
  Jr. Boulevard
St. Paul, Minnesota 55155

AUSTIN KNUDSEN
  Attorney General
  State of Montana
215 North Sanders
P.O. Box 201401
Helena, Montana 59620

MICHAEL T. HILGERS
  Attorney General
  State of Nebraska
2115 State Capitol
Lincoln, Nebraska 68509

AARON D. FORD
  Attorney General
  State of Nevada
100 N. Carson Street
Carson City, Nevada 89701

MATTHEW J. PLATKIN
  Attorney General
  State of New Jersey
Richard J. Hughes Justice
  Complex
25 Market Street
Trenton, New Jersey 08625

GENTNER DRUMMOND
  Attorney General
  State of Oklahoma
313 NE 21st Street
Oklahoma City, Oklahoma 73105

ELLEN F. ROSENBLUM
  Attorney General
  State of Oregon
1162 Court Street NE
Salem, Oregon 97301

MICHELLE A. HENRY
  Attorney General
  Commonwealth of Pennsylvania
Strawberry Square, 16th Floor
Harrisburg, Pennsylvania 17120

PETER F. NERONHA
  Attorney General
  State of Rhode Island
150 S. Main Street
Providence, Rhode Island 02903

MARTY J. JACKLEY
  Attorney General
  State of South Dakota
1302 E. Highway 14
Pierre, South Dakota 57501

SEAN D. REYES
  *Attorney General*
  *State of Utah*
350 N. State Street
P.O. Box 142320
Salt Lake City, Utah 84114

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

JASON S. MIYARES
  *Attorney General*
  *Commonwealth of Virginia*
202 N. 9th Street
Richmond, Virginia 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, Washington 98504

BRIDGET HILL
  *Attorney General*
  *State of Wyoming*
109 State Capitol
Cheyenne, Wyoming 82002

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Sarah L. Rosenbluth, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word-processing program used to prepare this brief, the brief contains 3,499 words and complies with the typeface requirements and length limits of Rule 29(a).

_/s/ Sarah L. Rosenbluth_____
SARAH L. ROSENBLUTH