LAW OFFICES

# WILLIAMS & CONNOLLY LLP®

LISA S. BLATT
(202) 434-5050
lblatt@wc.com

680 MAINE AVENUE SW

WASHINGTON, DC 20024

202.434.5000

WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 20, 2026

**VIA ELECTRONIC FILING**

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

> Re: *Cantero v. Bank of America, N.A.*, Case No. 21-400; *Hymes v. Bank of America, N.A.*, Case No. 21-403

Dear Ms. Wolfe:

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellant Bank of America, N.A., writes to inform this Court of an opinion issued in *Illinois Bankers Association v. Raoul*, No. 24-CV-7307 (N.D. Ill. Feb. 10, 2026) (enclosed). Bank of America cited the Office of Comptroller of the Currency's (OCC) amicus brief in *Illinois Bankers* at pages 14, 17, and 22 of its supplemental brief and alerted this Court to the district court's preliminary-injunction order in a Rule 28(j) letter in December 2024. The district court has since permanently enjoined part of the Illinois Interchange Fee Prohibition Act (IFPA) as to national banks and federal savings associations.

The district court permanently enjoined enforcement of the IFPA's provision constraining use of electronic-payment data, because that provision constrained the national-bank power to process data. Op. *28-30. The court, however, declined to permanently enjoin enforcement of the provision restricting interchange fees associated with credit-card transactions. The court determined that the provision did not directly regulate national banks because interchange fees were set by non-bank entities—a fact not known to the court at the preliminary-injunction stage. Op. *13, *20-21.

While discussing the interchange-fee provision, the court observed that "[i]f the IFPA directly interfered with fees the banks directly charged, this would be a far simpler case." Op. *20. That hypothetical law is akin to New York's interest-on-escrow law, which

directly sets the price of national banks' mortgage-escrow accounts. Moreover, the court rejected the idea that an express conflict is required for National Bank Act (NBA) preemption, noting "[t]he Supreme Court has explicitly highlighted that express conflict is not a requirement for NBA preemption to apply." Op. *23.

But the court's opinion also repeats mistakes that the First Circuit made in *Conti v. Citizens Bank, N.A.*, 157 F.4th 10 (1st Cir. 2025). *See* Bank of Am. *Conti* Rule 28(j) Letter (Sept. 23, 2025). "As the First Circuit did in *Conti*," the court "broadly dispose[d]" of two bank-preemption precedents that *Cantero* directed lower courts to analyze. Op. *21 n.5. That violates *Cantero*'s demand for a "nuanced comparative analysis" of seven bank-preemption cases. 602 U.S. 205, 220 (2024).

Respectfully submitted,

/s/ *Lisa S. Blatt*

Lisa S. Blatt

cc:     counsel of record (via ECF)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION et al. | ) ) ) | |
| | ) | No. 24 7307 |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Chief Judge Virginia M. Kendall |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) ) ) | |
| | ) | |
| *Defendant.* | ) | |

### MEMORANDUM OPINION & ORDER

In its 2024 spring session, the Illinois General Assembly passed what is broadly credited as a first-of-its-kind intervention into payment card transactions: the Illinois Interchange Fee Prohibition Act ("IFPA"). 815 ILCS 151/150-1 *et seq*. In doing so, it also set off a chain of extensive litigation about the scope of a State's ability to regulate national banking entities. Currently before the Court are the parties' cross-motions for summary judgment. *See generally* Plaintiffs' Motion for Summary Judgment (Dkt. 123); Attorney General's Cross-Motion for Summary Judgment (Dkt. 136). Oral argument took place October 22, 2025. (Dkt. 173). Upon careful consideration of the parties' submissions, the Court grants both Motions in part.

### BACKGROUND

### I.     The Global Payment Card Ecosystem

Early humans' first venture into barter and economic exchange set off millennia of societal development; not to be outdone, the modern swipe of a credit card triggers its own complex set of events equal parts miraculous and mundane. When a consumer uses a card to pay a business—be it a burger or a bill—the transaction typically involves five actors, not just the two physically present: the Consumer, the Merchant, the Acquirers, the Issuers, and the Payment Card Networks.

1

("Attorney General's Response to Plaintiffs' Statement of Material Facts," Dkt. 137 at ¶¶ 18–32, all admitted unless otherwise indicated). Acquirers are the financial institutions that claim the Merchants and their associated payment transactions, setting the prices Merchants pay for card acceptance and underwriting the delivery of goods and service. In some circumstances, Acquirers may also work with a separate entity, such as Global Payments or Paysafe, to do the actual work of providing transaction processing and settlement, though the service can also be done in-house. (*Id.* at ¶ 22). Issuers are the 9,000 nationwide financial institutions that issue payment cards to Consumers and other entities, assessing cardholder risk and providing customer-facing services. Payment Card Networks connect Acquirers and Issuers, enabling electronic payment authorization, clearing, and settlement. American Express, Discover, Mastercard, and Visa dominate the Payment Card Networks market for credit card transactions, though there are additional competitors in the debit card market. The Payment Card Networks are responsible for setting the rules that govern the payment card transactions on those networks, including many aspects of the flow of funds. (*Id.* at ¶ 29).

In other words, the swipe sets off an elaborate dance. The Merchant sends information about the Card, the Merchant, and the total purchase amount to the Merchant's Acquirer, who in turn conveys it to the Payment Card Network, which then requests authorization of the transaction from the Issuer (e.g., to determine whether a cardholder has enough money or credit available to cover the purchase, or if there are any indicia of fraud). (*Id.* at ¶¶ 35–36). The Issuer then applies its policies to determine whether to authorize the transaction, a determination that flows back to the Card Network, to the Acquirer, and then to the Merchant, allowing the Consumer to walk away with the goods and services within a matter of seconds. (*Id.* at ¶¶ 36–37). After transactions are

authorized, approved, and posted, the Payment Card Networks facilitate the flow of funds between Consumers (via Issuers) and Merchants (via Acquirers) to settle the transactions. (*Id.* at ¶ 38).

If all goes as planned, the Consumer experiences this convenience without cost. But free, it is not. Payment Card Networks establish fee schedules for transactions that utilize the network based on factors such as card and merchant type—a transfer payment from the Acquirer to the Issuer for every individual transaction. (*Id.* at ¶ 39). Barring separately negotiated rates, these defaults rates apply in all transactions. (*Id.* at ¶ 41). Interchange fees typically comprise both a fixed fee and a percentage of the transaction amount (including tax and gratuity, if any). (*Id.* at ¶ 40). Though the Payment Card Networks set the default interchange fees, they do so on behalf of the other entities; Payment Card Networks' revenue primarily comes from charging a fee to both the acquirer and to the Issuer for the transactions. (*Id.* at ¶ 44). Instead, Acquirers collect merchant discount fees to fund the interchange fee, then pass the cost on to Issuers through the Payment Card Networks' settlement mechanisms. (*Id.* at ¶ 42). Issuers then use the interchange that they receive on credit and debit transactions to pay for operating expenses associated with their card programs (including processing transactions, monitoring for fraud, administering



*Figure 1: Plaintiffs' Illustration (Simplified)*

accounts, funding customer service and so forth), and to fund services and benefits that they offer cardholders, including rewards programs and checking accounts. (*Id.* at ¶ 43).

This complicated system is a dominant one. In 2022, there were 89.1 billion debit card transactions worth $4.0 trillion, 55.3 billion credit card transactions worth $5.4 trillion, and 9.0 billion prepaid card transactions worth $0.4 trillion. (Dkt. 137 at ¶ 20). In 2023, 99 percent of U.S. consumers had a credit card and/or a debit card and/or a prepaid card. (*Id.* at ¶ 19). The question of the IFPA's validity, thus, more broadly also asks if and how a State can impose on a digital financial web that exists far beyond its borders.

## II.     The Statute

Back to the concrete: the IFPA has two key provisions. The Interchange Fee Provision bans Issuers, Payment Card Networks, Acquirers, and any other transaction processors from receiving from or charging Merchants any interchange fees on the portion of a transaction made up of state and local taxes and gratuities. 815 ILCS 151/150-10. The onus is on the Merchant to identify this portion and transmit the relevant data to avoid being charged interchange fees on the tax or gratuity amount of an electronic payment transaction. *Id.* The statute directs Merchants to transmit this information as part of the transaction; however, the Merchant can submit the relevant documentation up to 180 days after the date of the transaction, which in turn triggers a 30-day window in which the Issuer must credit the Merchant for the excess interchange fees. *Id.* The Interchange Fee Provision expressly excludes Payment Card Networks from liability for the accuracy of the Merchant's data reporting. *Id.* Nonetheless, any relevant entity, including Payment Card Networks, is subject to a civil penalty of $1,000 per electronic payment transaction if they have received the data and still violate the requirements. 815 ILCS 151/150-15(a).

The Interchange Fee Provision, then, seeks to limit the base sum upon which the interchange fee could be calculated, keeping state and local taxes and gratuities out of the picture. Plaintiffs note that the average combined state and local sales tax in Illinois is nearly 9 percent, and in Chicago, 10.25 percent—separate from the impact of any gratuities. (Dkt. 146 at 8). The Attorney General, for his part, emphasizes that "9 percent of anything is still a small share of the whole." (Dkt. 154 at 5). To oversimplify: before the IFPA, a 3 percent interchange fee rate on top of a $100 base transaction would be $3; after the IFPA, it would be 3 percent of the eligible non-state-and-local-tax sum of $91: $3 becomes $2.73.



*Figure 2: Plaintiffs' Illustration (Simplified)*

The Plaintiffs insist that the loss of the interchange fees, paired with compliance costs, will drive some financial institutions out of the market entirely and force the ones that remain to raise consumer prices and cut down on helpful services such as fraud monitoring. (*See* Dkt. 125 at 1). In their telling, the IFPA is "drastic and "draconian" in its commitment to "force Issuers to forgo a portion of the revenue that compensates them for taking on credit risk, monitoring for fraud,

providing benefits to cardholders, and otherwise greasing the wheels of the state and national economy." (*Id.*)

The Attorney General, meanwhile, contends that the Plaintiffs already force consumers to eat the costs of interchange fees through higher prices as a standard practice, and that a marginal reduction in the baseline sum upon which the fees are calculated is a manageable hit to the entities' revenue that pales in comparison to the State's interest in enforcing the IFPA. (*See* Dkt. 138). The Attorney General broadly rejects Plaintiffs' factual claims that financial institutions will be pushed out of the market if forced to comply with the IFPA, though many of the objections are technical and based on an alleged lack of compliance with the Northern District's local rules for summary judgment statements of material fact. (Dkt. 137 at ¶¶ 48–50).

The intertwined nature of the global payment card ecosystem is also of great significance to this litigation. Both parties admit that under the current system, if the Issuer associated with a transaction is exempt from the IFPA with respect to a transaction, then—to give effect to the Issuer's exemption—other participants in the payment card ecosystem would need relief from the requirements of the IFPA for purposes of that transaction, though the Attorney General notes that said result may not be necessary were the global payment card ecosystem structured a different way. (Dkt. 137 at ¶ 45). Thus, in addition to duking it out over whether financial institutions such as banks and credit unions are exempt from the IFPA, the parties also dispute whether a potential exemption would extend to the other entities as a matter of law, functionality, or equity.

The IFPA also contains a Data Usage Limitation provision. This section requires all entities in the transaction—other than Merchants—to "not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). Violations are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*

In two separate rulings, this Court granted Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. (Dkts. 104, 115).[1] Specifically, in its merits analysis, this Court found that the National Bank Act and the Home Owners' Loan Act likely preempted the IFPA's application to national banks and federal savings associations, while the Riegle–Neal Interstate Banking and Branching Efficiency Act likely preempted the IFPA's application to out-of-state State banks. (Dkt. 104 at 15–24; Dkt. 115 at 7). This Court rejected the injunctive relief as to federal credit unions under the preemptive standard accorded to the Federal Credit Union Act, as well as to debit card transactions after analyzing the preemptive effect of the Durbin Amendment to the Dodd-Frank Act. (Dkt. 104 at 28–30; Dkt. 115 at 3–7). Nor did the Court agree with Illinois Bankers' arguments as to extending preemptive effect to other entities such as Payment Card Networks, or the Plaintiffs' Dormant Commerce Clause dance as to out-of-state State financial institutions (beyond banks, addressed above). (Dkt. 104 at 30–31; Dkt. 115 at 7–8). Illinois Bankers' state law claims were dismissed under sovereign immunity. (Dkt. 104 at 14). Thus, by February 2025, the IFPA was set to go into effect only as to a handful of the financial actors lawmakers initially set out to regulate.

---

[1] The Court assumes familiarity with those Orders, including its analysis as to the private right of action question not raised by the Parties. (Dkt. 115 at 2).

In turn, the Illinois General Assembly extended the effective date of the IFPA from July 1, 2025, to July 1, 2026, likely to account for compliance considerations ahead of this Court's final determination on the merits (and Parties' indication that one or the other or both would inevitably appeal). With that, the Court turns to the development of that determination.

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The existence of cross-motions for summary judgment does not "imply that there are no genuine issues of material fact;" rather, the Court must "tak[e] the facts in the light most favorable to the non-movant, first for one side and then for the other," with different legal theories determining which facts are material. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003). A material fact is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

At this stage, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Summary judgment should be denied when "a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted[.]" *White*, 829 F.3d at 841. In this case, however, the clashes are broadly legal and not factual in nature.

Plaintiffs seek a permanent injunction against the Illinois Attorney General to prevent enforcement of the IFPA against various federal and state financial institutions, as well as the various other participants in the "tightly intertwined payment system," such as card issuers and acquirers. (Dkt. 125 at 3). "Permanent injunctive relief is appropriate if the party seeking the injunction demonstrates (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Vaughn v. Walthall*, 968 F.3d 814, 824 (7th Cir. 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)) (citation modified). Whereas a preliminary injunction requires a probability of success on the merits, permanent relief requires actual success. *Vaughn*, 968 F.3d at 824–25.

### DISCUSSION

### I.      Justiciability

Neither party returned to the drawing board since arguments took place on justiciability at the preliminary injunction stage, when the Court rejected the State's arguments regarding standing and sovereign immunity. (December 20, 2024, Order, Dkt. 104). This Opinion incorporates that analysis in full. (*Id.* at 6–14). At bottom, the State's argument that the Illinois Attorney General lacks the authority to enforce the Interchange Fee Provision sits uncomfortably alongside the Office's longstanding common law authority. (*Id.* at 7–11). While that common law authority does not include the ability to direct the enforcement priorities of States' Attorneys, the redressability prong is nonetheless satisfied when the relief sought would "reduce the probability" of injury."

(*Id.* citing *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023)). Thus, Plaintiffs' claims are legitimately before the Court regarding the Interchange Fee Limitation.

The State next contends that the Data Usage Limitation's carve-out for data usage practices that "facilitate or process the electronic payment transaction" sufficiently covers Plaintiffs' conduct and thus invalidates their claims of Article III injury as to that provision of the IFPA. (Dkt. 138 at 6). It is true that it is a threshold requirement in a preenforcement challenge is that the statute "actually cover[s] . . . the desired conduct." *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023). But this Court already determined that Illinois Bankers had sufficiently demonstrated injury for the purposes of standing, and the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (internal citations omitted). And the State offers nothing more concrete than the bare assertion that Plaintiffs' activities—such as data usage for rewards programs, fraud protection, and anti-money laundering monitoring—are "probably [] not forbidden" under the statute. (Dkt. 138 at 6; *see also* Transcript of Summary Judgment Oral Argument, Dkt. 174 at 42:6–11). In short: the record on this point remains unchanged since the December 20, 2024, determination.

Of course, given that the IFPA is not yet in effect, Illinois' enforcement track record offers no insights as to the scope of the exception to the Data Usage Limitation, nor has any Illinois court interpreted the statute as a matter of state law. Yet, the Illinois Supreme Court has emphasized the basic principle of interpretation that the "language of the statute must be given its plain and ordinary meaning," *People v. Pullen*, 733 N.E.2d 1235, 1238 (Ill. 2000), considering "the legislature's apparent objective" and presuming it "did not intend to create absurd, inconvenient

10

or unjust results." *People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008). Here, the Illinois General Assembly chose not to limit the IFPA to the Interchange Fee Provision, and instead added the Data Usage Limitation. While the Data Usage Limitation does not apply where necessary to "facilitate or process" the transaction itself, a reading that conceives of all of Plaintiffs' conduct as fitting neatly within the exception—as the State suggests—would render the Limitation meaningless. *See Michigan Ave. Nat. Bank v. Cnty. of Cook*, 732 N.E.2d 528, 535 (Ill. 2000); *People v. Jones*, 861 N.E.2d 967, 982 (Ill. 2006). The State's inability to identify where this line would be underscores the unbounded and illogical nature of such an interpretation. The existence of the Data Usage Limitation suggests that the Illinois General Assembly was indeed interested in reigning in financial data usage outside of conduct formally necessary to facilitate a transaction from Point A to Point B. The same conclusion brings Plaintiffs over the finish line with regard to standing.

Finally, the Attorney General maintains that Plaintiffs have not satisfied the "narrow" *Ex parte Young* exception to sovereign immunity. (Dkt. 138 at 4). This Court stands behind the analysis offered in its December 20, 2024, Order. (Dkt. 104 at 13–14). Because the Attorney General has the power to enforce the IFPA, sovereign immunity does not bar Illinois' Bankers federal claims. Illinois Bankers' state law claims, to which sovereign immunity was not waived, were properly dismissed. (*Id.*)

## II. Merits

This is a close case. That is true in part because the law it addresses is novel. The Parties have indicated that no other State has an equivalent to the IFPA, and thus no precedent sits directly on point. That, of course, is a familiar challenge in the judicial system—analogizing from case-to-

case sits at the heart of what we do. But what truly makes this case complicated is that the IFPA—specifically the Interchange Fee Provision—does not directly regulate banks.

Of course, the law does say that Issuers and Acquirers "may not receive or charge a [M]erchant any interchange fee" on the portion of a transaction made up of state and local taxes and gratuity. 815 ILCS 151/150-10. As described above, though, all Parties agree that the Issuers and Acquirers do not set those fees; the Payment Card Networks do. And the IFPA puts the onus on Merchants to transmit information about exactly what portion of the transaction that is. *Id.* Further, the statute protects Payment Card Networks—the actual determiners of the fees—from liability based on the Merchants' actions. *Id.* The banks are undoubtedly necessary to the transaction—which, without the banks, could not take place at all—and the interchange fees ostensibly compensate those operations. But the banks do not set those fees.

The heady nature of this case compelled the Court's granting of Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. Compliance with the IFPA will be costly, with declarations indicating potentially business-ending consequences for some members of the market; additionally, Illinois Bankers fairly demonstrated the risk of non-recoverable costs due to State immunity. (Dkt. 104 at 33–34). Public interest considerations weighed on the side of letting a full factual record develop before the IFPA could take effect in the interests of fairness and justice. *Id.* at 35.

At the preliminary injunction stage, the Court's merits analysis favored the Plaintiffs, though it did not grant the injunction as to the requested entities subject to different legal frameworks than national banks, federal savings institutions, and out-of-state State banks. This

determination reflected the clear downstream impact of the IFPA on national banks and related entities, and erred on the side of honoring Congress' clear intent that whatever State regulation national banks be subjected to not include those that amount to impermissible intrusions. *See Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15 (1978) (discussing Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)).

That full factual record has arrived. It makes clear that the facts of this case are unlike any of the key Supreme Court precedents, discussed below, that govern the interplay between State regulation and national financial entities because those cases broadly involve direct interventions into banking operations. Here, the IFPA impacts fees that banks benefit from, but do not set. This fact is underscored by Plaintiffs' own admission that even if national banks *were* exempt from the IFPA, they still would not receive the exempt fee unless every other participant in the transaction, down to completely private entities like Visa and Mastercard, were also exempted from the IFPA's impact. (Dkt. 137 at ¶ 45) (emphasis added). This point is driven home further in Plaintiffs' arguments regarding the portion of the Dodd-Frank Act that states that "[n]o provision of [the NBA] shall be construed as "preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). That argument is reproduced here:

> Nor are Card Networks such as Visa and Mastercard agents of national banks. "An agent is a person authorized by another, the principal, to act for him or in his place." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011). The Card Networks are the ones that establish rules for their payments systems; they do not carry out the directives of national banks. SOUF ¶¶ 29-30.

(Dkt. 125 at 36).

13

There is no doubt that the IFPA presents complicated compliance challenges. Illinois Bankers submitted numerous declarations from various stakeholders who claim that preparing for the deadline on July 1, 2025, (the original IFPA effective date, now extended one year) is extraordinarily expensive and will drive institutions out of the market. (*See* Dkt. 137 at ¶ 48; *see also* Dkt. 24-2 at 59; Dkt. 24-4 at 5; Dkt. 24-10 at 5; Dkt. 24-15 at 6). Other financial institutions have expressed concerns that compliance costs associated with the 30-day "manual processing" piece of the Interchange Fee Prohibition provision will also be particularly onerous. (Dkt. 24-7 at 4; Exhibit 7, Declaration of Hoyne Savings Bank's CFO); (Dkt. 24-10 at 4) (Exhibit 10, Declaration of Raju Sitaula, Head of Business Execution and Networks at Citibank). If a particular system does not identify a cardholder's account number, for example, a given financial institution may not be able to begin the manual interchange reimbursement process. (Dkt. 24-10 at 4). There are difficult questions of staffing, resources, implementation timelines, enforcement, and practicality. While declarations from Visa and Mastercard executives indicate compliance could theoretically be possible, they suggest it might take months if not years to achieve, be extraordinarily expensive, and require system-wide modifications. (*See generally* Dkt. 24-13, Exhibit 13, Declaration of Visa Senior Vice President; Dkt. 24-12, Exhibit 12, Declaration of Mastercard Co-President, United States). It is an open question whether the transaction process could adapt to the impact of the IFPA in time.

Ultimately, though, that is not the question in front of this Court. Instead, the question is whether or not federal law preempts the IFPA, to what entities, and to what extent. Addressing

Plaintiffs' request for permanent injunction, the Court broadly grants the request as to the Data Usage Provision, while denying the request as to the Interchange Fee Provision.

> a. *Applicability of the Interchange Fee Provision to Nationally Charted Banks and Federal Savings Institutions*

The bulk of this dispute rises and falls with one question: whether the National Bank Act, 12 U.S.C. § 1 *et seq.*—and the legal standard for preemption it carries—protects nationally chartered banks from IFPA enforcement.[2] A bank that obtains a federal charter under the National Bank Act gains express powers that include the power to "make contracts," to "sue and be sued," and to "elect or appoint" a "board of directors; it also gains "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24.

Under the NBA, Congress created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 530 (2009). While once upon a time the Court indicated that the NBA functionally indicated field preemption, *see Easton v. Iowa*, 188 U.S. 220, 230 (1903) ("Such being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by state legislation"), the case law has evolved to permit some State control over federally chartered banks. *See, e.g.*, *Van Allen v. Assessors*, 70 U.S. (3 Wall.) 573, 589

---

[2] Dodd-Frank also placed federal savings associations on equal footing with national banks with respect to preemption by providing that any determination regarding the preemption of state law by the Home Owners' Loan Act must "be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." 12 U.S.C. § 1465. As noted in the Court's earlier rulings, the parties agree that the preemption standard governing the NBA and HOLA is the same, *see* 12 U.S.C. § 1465(a), and that HOLA gives federal savings associations comparable powers to those the NBA grants national banks. (Dkt. 24 at 28; Dkt. 76 at 19). Thus, the fate of federal savings associations is tied to that of national banks.

(1865); *Anderson Nat. Bank v. Luckett,* 321 U.S. 233, 247–252 (1944); *Franklin Nat. Bank of Franklin Square v. New York,* 347 U.S. 373, 375–379 (1954).

Then, after the 2008 financial crisis, Congress and President Obama enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, one provision of which established the applicable preemption standard for when a "State consumer financial law" is preempted as to national banks. *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 210 (2024) (addressing 12 U.S.C. § 25b). The statute explicitly ruled out field preemption. § 25b(b)(4). Rather, Congress stated that the National Bank Act preempts a state law "'only if the state law (i) discriminates against national banks as compared to state banks; or (ii) 'prevents or significantly interferes with the exercise by the national bank of its powers,' " in accordance with the *Barnett Bank* standard. *Cantero*, 602 U.S. at 213–14. While "national banks are not wholly withdrawn from the operation of State legislation," they are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" that federal law authorizes them to perform." *Cantero*, 602 U.S. at 219 (cleaned up).

*Cantero* itself came about in light of a circuit split over how exactly to implement the Dodd-Frank *Barnett Bank* directive. The Supreme Court granted certiorari after the Second Circuit conceived of the test as "whether enforcement of the law at issue would exert control over a banking power—and thus, if taken to its extreme, threaten to 'destroy' the grant made by the federal government." *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 132 (2d Cir. 2022). While the Court did not specifically combine its review of *Cantero* with any other case, the Second Circuit's approach stood in stark contrast to analysis coming out of the Ninth Circuit, which focused on the economic impact of State intervention, suggesting in one case that a state law setting certain rates must be "punitively high" to not comply with *Barnett Bank*. *See Kivett v. Flagstar Bank, FSB,*

16

2022 WL 1553266, at *1 (9th Cir. May 17, 2022), *cert. granted, judgment vacated sub nom. Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024); *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1195 n.7 (9th Cir. 2018). Both the New York law and the California law at issue in those cases dealt with interest-on-escrow laws that required banks and other mortgage lenders to pay a minimum annual interest on borrowers' deposited funds. The Second Circuit determined the New York law preempted under NBA *Barnett Bank* analysis, whereas the Ninth Circuit found the California law amounted to acceptable State interference.

The Supreme Court in *Cantero* rejected the Second Circuit's brightline approach as too favorable to national banks, deeming it a "categorical test that would preempt virtually all state laws," while simultaneously holding that the petitioners' position "would yank the preemption standard to the opposite extreme and would preempt virtually no non-discriminatory state laws." *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 220–21 (2024). Beyond that direction, though, the Court did not specifically answer the preemption question with regard to the New York law. Instead, the Court instructed that courts must make "a practical assessment of the nature and degree of the interference caused by a state law" in light of the preemption cases relied on in *Barnett Bank. Id.* at 219–21. These cases, totaling seven, provided four examples of preempted interference: *Franklin National Bank of Franklin Square v. New York,* 347 U.S. 373 (1954); *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982); *First National Bank of San Jose v. California*, 262 U.S. 366 (1923); as well as *Barnett Bank* itself. The second category consists of cases of acceptable interference: *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944); *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1869); and *McClellan v.*

17

*Chipman*, 164 U.S. 347 (1896). *Id.* at 220. *Cantero* further detailed the interplay between these precedents:

> In *Barnett Bank* and each of the earlier precedents, the Court reached its conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense. *See, e.g.*, *Barnett Bank of Marion Cty., N. A. v. Nelson*, 517 U.S. 25, 33–35 (1996) (comparing Florida law at issue to New York law in *Franklin*); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373, 378 (1954) (concluding that New York law interfered with ability to use "a particular label" that federal law "specifically selected"); *First National Bank of San Jose v. California*, 262 U.S. 366, 370 (1923) (reasoning that customers "might well hesitate" to subject their deposits to "unusual" California law); *Anderson National Bank v. Luckett*, 321 U.S. 233, 247–248 (1944) (determining that no "word in the national banking laws ... expressly or by implication conflicts with the provisions of the Kentucky statutes"); *id.*, at 249–252, (comparing the likely effect of the Kentucky law to the likely effect of the California law in *First National Bank of San Jose*).

*Id.* at 220 n.3.

The Court remanded *Cantero* to the Second Circuit to conduct this "nuanced comparative analysis." *Id.* It also vacated the Ninth Circuit's decision in *Flagstar* and remanded "for further consideration in light of *Cantero*[.]" *Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024). The Second Circuit heard oral argument on March 3, 2025, with its ruling apparently forthcoming as of writing.[3] The Ninth Circuit, similarly, has not revisited the merits of its decision in *Flagstar* in light of *Cantero*.[4] Indeed, at this Court's preliminary injunction determination, it was one of the first courts in the country to apply *Cantero*.

This September, the First Circuit became the first Court of Appeals to dive into the meat of a *Barnett Bank* analysis post-*Cantero*. *Conti v. Citizens Bank, N.A.*,

---

[3] Oral Argument, *Cantero v. Bank of Am., N.A.; Hymes v. Bank of Am., N.A.*, Nos. 21-400, 21-403 (2d Cir. Mar. 3, 2025), audio and transcript available at https://www.courtlistener.com/audio/97514/cantero-v-bank-of-america-na-hymes-v-bank-of-america-na/.

[4] Subsequent developments in this case involve technicalities related to Ninth Circuit precedential procedures and are thus not particularly informative for the present matter. On initial remand, the Ninth Circuit affirmed its decision in *Flagstar* because *Flagstar* was governed by *Lusnak*, and *Lusnak* was not "clearly irreconcilable" with intervening higher authority. *Kivett v. Flagstar Bank, FSB*, 154 F.4th 640, 644 (9th Cir. 2025). In October 2025, a Ninth Circuit

157 F.4th 10, 13 (1st Cir. 2025). Like *Flagstar* and *Cantero*, *Conti* dealt with an interest-on-escrow State law, this one out of Rhode Island. There, the district court had granted Citizens Bank's motion to dismiss a breach of contract suit for violating the Rhode Island ground, determining—pre-*Cantero*—that the state law failed on preemption grounds. The First Circuit noted that that in *Barnett Bank* and *Fidelity*, the Supreme Court's preemption inquiry turned on an express conflict between federal and state law, whereas Citizens Bank's argument required an intent-by-silence analysis—that Congress's silence reflected a "deliberate choice" to exempt national banks from State interest-on-escrow laws. *Conti*, 157 F.4th at 20–21. The First Circuit found that not only did the intent-by-silence argument have no parallel in the precedents, but that neither had Citizens established that Rhode Island's statute was out of step with the federal statutory scheme in the mold of *First National Bank of San Jose* and *Franklin*. The First Circuit further noted that Citizens incorrectly characterized NBA preemption as applying "whenever a state law dictates the terms of banking product in a manner that limits a national bank's flexibility and efficiency," instead highlighting the practical analysis at play in *First National Bank of San Jose, Anderson*, and *Franklin*. *Id.* at 26, 28.

Turning then back to the IFPA: Illinois Bankers identify two key powers with which the IFPA's Interchange Fee Provision interferes. First, a "national bank may charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). Second, Plaintiffs argue that the Interchange Fee Prohibition prevents or significantly interferes with the powers to process card transactions, receive deposits, and make loans through credit cards,

---

panel determined on rehearing that the "clearly irreconcilable" question was properly decided, holding that "*Cantero* is not clearly irreconcilable either with the reasoning or the result in *Lusnak*." *Id.* at 645. Thus, the panel could not address the preemptive question anew, noting that "We do not hold that *Lusnak* was correctly decided, only that we have no authority to overrule it. Correction in this court, if any is warranted, is only appropriate through our en banc procedures." *Id.*

powers incidental to the business of banking under the NBA. 12 C.F.R. § 7.1000(d)(1); *see also* OCC Inter. Ltr. 689, 1995 WL 604271, at *1 (Aug. 9, 1995). This Court found that Plaintiffs made the necessary "strong showing" of preemption due to a conflict between the IFPA's Interchange Fee Provision and these powers in its December 20, 2024, Order. (Dkt. 104 at 16). That holding was necessary in order to let a full record develop, now in front of the Court today.

If the IFPA directly interfered with fees the banks directly charged, this would be a far simpler case. That hypothetical looks far more like cases out of the Ninth and Eleventh Circuits that executed preemptive analyses on 12 C.F.R. § 7.4002(a) and found in favor of the financial institutions. The Ninth Circuit found municipal ordinances prohibiting ATM fees on non-depositors preempted under the NBA because federal law made "no distinction between depositors and non-depositors with respect to a national bank's authority to collect fees for provision of authorized services." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002). Similarly, the Eleventh Circuit found NBA preemption applied where a Florida law banned banks from imposing check cashing fees on those without accounts at the bank because 12 C.F.R. § 7.4002 had the "significant objective [of allowing] national banks to charge fees and [allowing] banks latitude to decide how to charge them." *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011).

But in both *Baptista* and *San Francisco*, the regulations directly restricted banks' ability to charge fees for their direct services—the exact power that the federal regulation protects. But banks do not set, or arguably charge, interchange fees; rather, they receive them. Further, the laws that the Ninth and Eleventh Circuits analyzed functionally required the national banks to provide their services for free to a wide swath of the populace, serving as the "effective deterrent to depositors"

20

that the Supreme Court has repeatedly emphasized as a factor indicating NBA preemption, *see infra*. The IFPA, by contrast, does not impact a customer's decision of whether or not to use a bank's services, because all financial entities are subject to the law. Thus, *Baptista* and *San Francisco* are helpful, but not all that compelling in that the regulated entity in those cases was the bank itself.

The *Conti* decision deemed *Barnett Bank* and *Fidelity* "generally inapposite" in that those cases dealt with express conflicts between federal and state law. *Conti*, 157 F.4th at 20.[5] *Franklin* also contained clear textual conflict, though the Court also relied on "the overall federal scheme established by Congress." *Id.* at 23. This is where the IFPA and the Rhode Island law in *Conti* start to diverge.

As noted above, the Court's earlier order found express conflicts between the aforementioned powers and the NBA. As the Attorney General has since pointed out, however, the conflict is not so black-and-white. The parties all agree that the interchange fees are set and calculated by Payment Card Networks like Visa and Mastercard, not by national banks themselves. Plaintiffs' best argument is that payment networks set rates so that national banks can "charge [their] customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). It is a fair contention. On one hand, it would be illogical for a national bank to lose its fee-related powers in any activity that inherently involves interaction with third-party actors such as Payment Card Networks. But on the other: by that reasoning, national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party entities like the credit card companies.

---

[5] As the First Circuit did in *Conti*, this Court can broadly dispose of the *McClellan* and *Commonwealth* precedents, as each dealt with generally applicable state laws and not those that specifically sought to regulate banks.

And it is these companies that are doing the calculations on behalf of the banks, which only have a passive role in the rate-setting. As Plaintiffs' expert detailed:

> Networks develop fee schedules that establish the applicable interchange rate for transactions that utilize the network, based on various factors such as the card type and merchant type. Interchange fees are a function of various considerations, including the card product (credit, debit, prepaid), card type (premium rewards card vs. standard, etc.), issuer (financial institutions covered by the Durbin Amendment vs. those that are exempt), merchant category (grocery store, restaurant, etc.), and use method (card-present vs. card-not-present), among other considerations. Interchange fees vary across card brands, card products, card types, and authorization methods. Interchange fees typically comprise both a fixed fee and a percentage of the transaction amount, where the transaction amount represents the entire amount of a given transaction (including tax and gratuity, if any).

(Exhibit A, Plaintiffs' Expert Report of Tony Hayes; Dkt. 124 at 14).

It is undeniable that State intervention into national bank fee arrangements should be subject to legitimate scrutiny. After all, it involves an express power, and the decisions in *Baptista* and *San Francisco* offer further insight into the necessity of ensuring national banks can operate at their full, congressionally authorized scope. But while that argument definitively protects national banks from intrusion into the fees they charge on their ATMs and savings account services, it is hard to square with a state law that impacts a fee that those same banks do not set and that are not keyed to their particular services. 12 C.F.R. § 7.4002(b) specifically directs that the "establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." That is hard to square with a system where Visa and Mastercard do the actual work of fee-setting all for the banks to collect a check. It is even

harder to say that type of fee-setting is such a cornerstone of national banking power as to preempt all State intervention.

In fact, if the IFPA is not a viable legislative choice, it is hard to see *any* route by which a State could impact a national bank's fees. That is not a matter for this Court as an issue of policy, but in a world where Congress explicitly ruled out field preemption by adopting the *Barnett Bank* standard, it is a note worthy of consideration. Thus, the Court is left with the conclusion that the IFPA's Interchange Fee Provision does not directly conflict with NBA powers—but nor is that the end of the road. The Supreme Court has explicitly highlighted that express conflict is not a requirement for NBA preemption to apply. *See Cantero*, 602 U.S. at 220 n.3 (identifying other relevant considerations as "the text and structure of the laws, comparison to other precedents, and common sense").

The Court's analysis turns next to the seminal case for which NBA preemption is named. The conflict present in *Barnett Bank* itself dealt with a Florida state law stating that "banks cannot sell insurance in Florida—except that an *unaffiliated* small town bank (*i.e.,* a bank that is not affiliated with a bank holding company) may sell insurance in a small town," which the Court found to be in direct conflict with "a federal statute that sa[id] that certain national banks "may" sell insurance in small towns." *Barnett Bank of Marion Cnty., N.A.*, 517 U.S. at 28–29.

In *Fidelity*, California law "limited a federal [financial] association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security," which the Court deemed a conflict with federal regulation that "plainly provide[d] that a federal savings and loan 'continues to have the power' to include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option.' " *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 154–55. Finally, in *Franklin*—which *Cantero* deemed the "paradigmatic example of

significant interference"—the Court found that a New York law prohibiting banks from using the words "savings" or "savings" in their advertising and business operations conflicted with federal law authorizing national banks to receive savings deposits. *Franklin*, 347 U.S. at 374.

*Fidelity* was an earlier case, but notably, the relevant conflict was not as extreme as the California law at issue in *Barnett Bank*. The Court noted that "compliance [with both] may not be a 'physical impossibility' " but noted that the California law deprived the federal financial institutions of the flexibility provided by federal law. *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 155. It also noted that the federal regulators had recently "reiterated [a] long-standing policy of authorizing federal savings and loan associations to enforce due-on-sale clauses subject only to express limitations imposed by the Board." *Id.* (cleaned up). Similarly, in *Franklin*, the New York law did not actually impede national banks' ability to take savings deposits, it just impacted the advertising and business operations around them. *Franklin*, 347 U.S. at 378. Nevertheless, the Supreme Court found significant interference, noting that advertising is "one of the most usual and useful of weapons" in business and that "[i]t would require some affirmative indication [from Congress] to justify an interpretation that would permit a national bank to engage in a business but g[i]ve no right to let the public know about it." *Id*. at 377–78.

The conflict at issue in *Barnett Bank* itself involved a ban on most national banks from selling insurance in places that federal law permitted them to do so, whereas the Interchange Fee Provision does not ban national banks from charging fees. Neither does it ban them from utilizing their powers to process card transactions, receive deposits, and make loans through credit cards. Thus, the facts of the case itself do not offer a particularly helpful parallel. Instead, *Franklin* and

24

*Fidelity* are more analogous. In both cases, the State law impeded, but did not ban, exercise of a federal power.

Looking first to *Fidelity*: just as the State law there restricted the circumstances in which a federal financial institution could exercise a specific federal power, the Interchange Fee Provision restricts banks from charging these fees on the portion of a transaction that includes state and local taxes and gratuities. This Court noted in its December 20, 2024, Opinion that this part of the IFPA deprives banks of flexibility as in *Fidelity*, but as the First Circuit also observed, that alone cannot be sufficient grounds for preemption, for it "would obviate the need for an inquiry into whether a state law's interference with federal-banking powers was significant." *Conti*, 157 F.4th at 25.

It is also relevant that under the IFPA, the bank can still charge the fee as it would in any other state, which might fairly distinguish the IFPA from the intervention in *Fidelity*. Yet it is also true that the *Fidelity* Court highlighted the federal regulatory agency's observation that the elimination of the due-on-sale clause would "have an adverse effect on the earning power and financial stability of Federal associations," *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 168, a note that might suggest *any* impact on the earning power of national banks would be sufficient to find preemption. But that can't be right, as the *Cantero* Court identified multiple examples of acceptable State intervention that would inherently impact national bank revenues, nor do courts maintain the same deference toward agency assertions as in decades past. *Compare Fid. Fed. Sav. & Loan Ass'n* at 169–70 ("As judges, it is neither our function, nor within our expertise, to evaluate the economic soundness of the Board's approach) *with Loper Bright Enters. v. Raimondo*, 603 U.S.

369, 386 (2024) ("The views of the Executive Branch could inform the judgment of the Judiciary, but did not supersede it.").

That leaves *Franklin*, which is best put into conversation with the State laws addressed in *First National Bank of San Jose* and *Anderson.* In *First National Bank of San Jose*, California law required deposits unclaimed for over twenty years to escheat to the state. 262 U.S. at 366. The Court found the law preempted, noting that the law would "directly impair" national banks' deposit collection, and reasoning that "[t]he success of almost all commercial banks depends upon their ability to obtain loans from depositors, and [banks] might well hesitate to subject their funds to possible confiscation." *Id.* at 369–370. But unlike the California law, the Kentucky law in *Anderson* required the state to produce proof that seized accounts had been abandoned. *Anderson*, 321 U.S. at 250. While the California law allowed a "confiscation"—"so unusual and so harsh" that it would serve as an "an effective deterrent to depositors"—the law in *Anderson* was "nothing more than performance of a duty by the bank" that is "as old as the common law itself," one that would not run the risk of deterring customers from placing funds in national banks. *Id.* at 250–252. The New York law in *Franklin*, by comparison, functionally deterred depositors, in the sense that without the word "savings," they might not know to what type of accounts the national banks provided access.

*Franklin*, as well as the commentary from *First National Bank of San Jose* and *Anderson*, ultimately sways this Court. The New York law at issue in *Franklin* did not impede national banks' powers directly, but proved so disruptive to the advertising and business practices around those powers that the Court found NBA preemption applied anyway. The Interchange Fee Provision is indisputably disruptive, requiring additional investments, hires, and new procedures to replace the current process for authorizing and settling debit and credit card transactions. But those procedural

26

changes are the product of an ecosystem built by Payment Card Networks and financial institutions to facilitate consumer transactions. And these entities understand the onus of IFPA compliance is on them. The Mastercard Co-President, for instance, noted that Mastercard faces millions of dollars in technical compliance costs to create new data fields and processes to distinguish the tax and gratuity amounts from the base transaction, a process that would be "largely fruitless" if not matched by Merchants' investments of their own. (Dkt. 24-12 at 9–10).

The statutory scheme does put national banks directly in the spotlight in the manual provision of merchant reimbursement. Recall, merchants have six months to submit tax documentation if they do not automatically provide it as part of the initial process (a technical capacity that the Mastercard and Visa Declarations indicate does not currently exist, but could possibly exist through additional investment). If Merchants opt into the manual option, they must submit tax documentation to the Acquirer bank or its designee. 815 ILCS 151/150-10(b). This triggers a monthlong window for the Issuers to credit the Merchant the amount of interchange fees charged on the tax or gratuity amount of the transaction. *Id.* But the statute does not indicate how the two entities transmit the information to one another.

These compliance costs, among others, are undeniable. But State (and federal) laws will always require some kind of compliance cost, no matter who bears it. And these costs, however staggering, do not speak to the core snag in Plaintiffs' case—third parties set the fees. That is fundamentally different from banks' procedures relating to *Franklin*'s savings accounts that Congress explicitly authorized them to offer to the public.

The Payment Card Networks built this ecosystem, and the Payment Card Networks set these fees. To claim that the IFPA Interchange Fee Provision impermissibly interferes with the powers set out in 12 C.F.R. § 7.4002—which "should be arrived at by each bank on a competitive

27

basis and not on the basis of any agreement" —does not add up in the face of that reality. The thrust of 12 C.F.R. § 7.4002 is not to protect fees centrally established by a third-party company. The Office of the Comptroller of the Currency labeled the IFPA "bad policy." (Amicus Brief, Dkt. 61-1 at 1). That may well be true. But even the Office of the Comptroller does not meaningfully contest that the third parties set the fees, instead highlighting that national banks' incidental powers to include the settlement of credit and debit card payment transactions by banks for Merchants through various card associations. (*Id.* at 7).

Accordingly, Illinois Bankers request for a permanent injunction finding that the IFPA's Interchange Fee Limitation violates the federal rights of national banks under the *Barnett Bank* standard—and therefore also federal savings associations—is denied.

    b. *Applicability of the Data Usage Limitation Provision to Nationally Chartered Banks and Federal Savings Institutions*

Illinois Bankers also seek to make permanent this Court's determination at the preliminary injunction stage that the NBA preempts the IFPA's Data Usage Limitation provision. (Dkt. 104 at 22–24). The Data Usage Limitation makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). Violations are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.* Illinois Bankers argue this part of the IFPA conflicts with national banks' broad power to process data—which includes "anything of value in banking and financial decisions"—as well as the role of data-processing in providing credit and debit card processing services. 12 C.F.R. §§ 7.5006; 7.1000(d)(1). (As described above, the preemptive analysis for federal savings institutions mirrors that of the NBA under HOLA. Federal savings

associations enjoy the power to engage in "data processing" that is "generally finance-related." 12 C.F.R. § 5.59(f)(2)(vi). Therefore, the below analysis applies to both types of federal institutions.)

The IFPA's Data Usage Limitation provision directly constrains these powers. The state law makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). The IFPA's Data Usage Limitation would not only limit the federal institution's power, but, in many respects, wholly eliminate it. For example, according to the American Bankers Association, which includes over 1,100 banks headquartered in Illinois alone, data from credit card transactions is used for many purposes beyond "facilitate[ing] or process[ing]" electronic payment transactions. (Dkt. 24-2 at 7). These purposes include aggregating transaction data to monitor credit card fraud, address payment disputes, and facilitate cardholder loyalty programs. (Dkt. 24-2 at 7–8).

The Attorney General recycles many of the aforementioned standing arguments about the Data Usage Limitation, claiming that Plaintiffs cannot demonstrate any interference where they have not shown that the limitation covers their conduct. (Dkt. 138 at 13). But the federal power to use data is express, and it permits the processing and use of data whether or not it comes from particular transactions. Unlike the prior provision, the scope of the conflict is not a close call.

The Illinois General Assembly may have fair questions about the privacy and usage of its citizens' data. Those questions are well within policymakers' purview. But the answers need be confined within the bounds set out by the Supremacy Clause and downstream doctrines, including federal preemption. That mark was not met here. Thus, Illinois Bankers have demonstrated as a matter of law that the IFPA's Data Usage Limitation violates the federal rights of national banks—

29

and therefore also federal savings associations—and is preempted by the NBA under the *Barnett Bank* standard. The permanent injunction as to the Data Usage Limitation is granted.

### c. Out-of-State State Banks

Illinois Bankers also assert that part of the Riegle–Neal Interstate Banking and Branching Efficiency Act's statutory framework—codified at 12 U.S.C. § 1831a(j)(1)—preempts the IFPA with respect to out-of-state State banks to the extent it is preempted to national banks. (Dkt. 24 at 9).

The federal statute states:

> The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch.

12 U.S.C. § 1831a(j)(1).

The statute's plain language clearly suggests that § 1831a(j)(1) is meant to ensure that out-of-state State banks can compete with nationally chartered banks. This means that any injunctive relief the Court grants with respect to nationally chartered banks, excluding out-of-state State banks from that relief would run afoul of § 1831a(j)(1).

Additionally, other courts have applied the statute similarly. In *Pereira v. Regions Bank*, the Eleventh Circuit concluded that § 1831a(j) preempted a Florida statute as to out-of-state State banks, after it previously determined that the state law was preempted with respect to nationally chartered banks. 752 F.3d 1354, 1356 (2014). Like in *Pereira*, here, the Court previously concluded that the NBA likely preempts a state statute, (Dkt. 104 at 37), and therefore, it follows that § 1831a(j) preempts the law as to out-of-state State banks. Indeed, even the State concedes

that § 1831a(j)(1) is applicable if the Court finds that the NBA preempts IFPA—which the Court did in its December 2024 Order. (Dkt. 76 at 35, n. 15; Dkt. 104 at 16–22).

Because the Court found that the NBA preempts the IFPA's Data Usage Limitation with respect to federal banks, applying § 1831a(j)(1), this portion of the IFPA is also preempted with respect to out-of-state State banks. As with national banks, the request for an injunction as to the IFPA's Interchange Fee Provision is denied.

### d. Federal Credit Unions

Illinois Bankers also seek an injunction as to federal credit unions. The FCUA authorizes federal credit unions to make contracts and loans and to issue lines of credit to its members. 12 U.S.C. §§ 1757(1), (5); 12 C.F.R. § 701.21. The Act "preempts any state law purporting to limit or affect" certain aspects of "Federal credit union loans and lines of credit (including credit cards) to members." 12 C.F.R. § 701.21(b). Illinois Bankers claim that FCUA preempts the IFPA because the federal statute gives (i) the National Credit Union Administration (NCUA) "exclusive authority [...] to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members" and (ii) the "incidental power" to engage in data processing. 12 C.F.R. §§ 701.21(a)–(e); *see also Nat'l Ass'n of State Credit Union Sup'rs v. Nat'l Credit Union Admin.*, 188 F.3d 228 (4th Cir. 1999) (affirming district court decision, which explained that the NCUA can promulgate preemptive regulations).

As previously noted, the Court's preliminary injunction as to both provisions of the IFPA did not apply to federal credit unions under the preemptive standard accorded to the Federal Credit Union Act ("FCUA"). The Court's decision rested on ordinary principles of conflict preemption in accordance with Illinois Bankers' contentions. (Dkt. 24 at 30–31). The Court found that neither

31

provision of the IFPA conflicted with Plaintiffs' proposed express and incidental federal credit union powers to such an extent that the State law could not still stand.

Now, Illinois Bankers present a new argument: that the FCUA is not governed by ordinary preemption principles but instead is subject to the *Barnett Bank* standard despite the lack of textual reference in the governing statute. Plaintiffs suggest that the express preemption provisions in the NBA and HOLA codify longstanding preemption principles for federal instrumentalities, of which federal credit unions also benefit. But Plaintiffs' main citation for the claim that courts "routinely extend" NBA preemption to other federal instrumentalities is *Fidelity*, which itself dealt with the predecessor of the federal savings associations that the HOLA governs, and dealt with circumstances more akin to express preemption. (Dkt. 125 at 24). At the same time, Illinois Bankers espouse the view that the express preemption provision in HOLA is a limiting statute, not an expansion statute, because federal savings associations had been receiving a broader preemptive deference than national banks. (Dkt. 174 at 35). The two concepts do not cleanly align—if there was a consistent understanding that all federal financial instrumentalities received *Barnett Bank* preemption, then there would have been no need to limit the historic preemption status of federal savings associations.

Other circuits have fairly held that federal credit unions are federal instrumentalities. *See TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 935 (1st Cir. 1995) (addressing the bankruptcy context); *United States v. Michigan*, 851 F.2d 803, 807 (6th Cir. 1988) (addressing the Supremacy Clause context). But that leaves a gap between federal instrumentality status, and whether some special preemption applies. This is where Illinois Bankers fall short. They ask the Court to read—in the absence of specific Congressional designation—the full strength of NBA preemption into the FCUA based on vague gestures at other federal entities. Yet Congress could have explicitly

32

given federal credit unions comparable treatment to national banks and federal savings associations and chose not to do so. The omission is all the more glaring in the context of the Supreme Court's 2007 decision in *Watters v. Wachovia*, which for the first time extended the preemptive reach of the NBA to a subsidiary of a national bank when engaged in the "business of banking." 550 U.S. 1, 21 (2007).

In the Dodd-Frank Act of 2010, Congress reached past *Watters* to pull the *Barnett Bank* standard back to the statutory forefront of the NBA for State consumer protection laws, while also specifically including that the express preemption clause must not "be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). It would be quite the stretch to assume that Congress was incorrectly specific in determining which entities received the NBA preemption standard, and no court has held that the *Barnett Bank* preemption standard applies to federal credit unions in the face of this statutory absence. This Court declines to be the first. *See also Fed. Nat. Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1371 (S.D.N.Y. 1975) (holding that the state statute at issue "does not impose such a burden on the performance of [Fannie Mae's] function as to invalidate the statute," an analysis that reads like conflict preemption analysis, despite Plaintiffs' contentions to the contrary).

The Court's conflict preemption analysis at the preliminary injunction stage remains its final assessment of the IFPA's Interchange Fee Provision as it applies to federal credit unions. (Dkt. 115 at 3–7). As the Court previously found, the FCUA's preemption clause for state laws addressing "[c]losing costs, application, origination, or other fees" does not appear to implicate the substance of the Interchange Fee Provision. 12 C.F.R. § 701.21(b)(1)(i)(C). Illinois Bankers highlight that this preemptive effect includes state laws "purporting to limit or affect . . . "[r]ates

33

of interest and amounts of finance charges," "[c]losing costs, application, origination, or other fees," and "[c]onditions related to … [t]he amount of the loan or line of credit." *Id.* § 701.21(b)(1)(i)(A), (i)(C), (iii)(A). But not unlike the downfalls for the NBA analysis, laid out above, the Interchange Fee Provision does not so intrude on the FCUA powers as to justify a finding of preemption. (*See also* Dkt. 115 at 3–7).

Upon further review of the Data Usage Limitation preemption analysis, however, this Court finds that the FCUA's grant of incidental power to federal credit unions does, in fact, preempt this part of the IFPA's application. Illinois Bankers point to named powers such as the power to engage in "[e]lectronic financial services," including "account aggregation services" and "data processing," activities that Plaintiff utilize for fraud detection and developing reward programs. 12 C.F.R. § 721.3(d), (e).

Conflict preemption occurs when "state law . . . constitutes an 'obstacle' to satisfying the purposes and objectives of Congress." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019). Here, the Data Usage Limitation disrupts federal credit unions' ability to proceed in those named powers in a meaningful way. And Illinois Bankers have shown that applying the statute would "do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020); (*see* Dkt. 125 at 28).

e. *Debit Card Transactions*

Illinois Bankers also seek an injunction against the IFPA Interchange Fee Prohibition as applied to debit card transactions. At the preliminary injunction stage, the Court determined there was no conflict between the Dodd Frank Act's Durbin Amendment and the Interchange Fee Prohibition because the federal regulation creates only a "maximum permissible" interchange fee. (Dkt. 104 at 30). Illinois Bankers maintain their argument for appeal that this is a fixed standard

with which the IFPA conflicts. (Dkt. 125 at 38). Finding no reason to stray from its prior determination, this Court adopts its preliminary analysis on this point in full. (Dkt. 104 at 28–30).

> f. *Out-of-State State Financial Institutions (Beyond Out-of State State Banks, addressed in Subsection C)*

Since the National Banking Act's enactment in 1893, the United States has been home to a dual banking system. In line with this tradition, nearly every State has enacted what are termed "wildcard" or parity statutes—state laws that "generally grant state-chartered banks the same powers given to national banks and treat state banks like national banks in other ways." U.S. GOV'T ACCOUNTABILITY OFF., GAO-06-387, OCC PREEMPTION RULES: OCC SHOULD FURTHER CLARIFY THE APPLICABILITY OF STATE CONSUMER PROTECTION LAWS TO NATIONAL BANKS (2008). Illinois is one such state, with State law giving in-state State banks, savings and loan associations, and credit unions powers coterminous with the powers of their national counterparts. *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11); 205 ILCS 305/65. Both parties agree on this. (Dkt. 174 at 17, 73). Illinois Bankers contend, however, that these Illinois parity statutes amount to a violation of the Dormant Commerce Clause when paired with the IFPA. (Dkt. 125 at 21). In their view, the parity statutes extend the preemptive effect of the NBA to in-state Illinois financial institutions, thus exempting them from the Data Usage Provision alongside their national counterparts. This, in turn, leaves out-of-state State financial institutions—other than those exempted via Riegle–Neal at 12 U.S.C. § 1831a(j)(1)—out in the cold. Illinois Bankers deems this "blatant discrimination" unconstitutional. (Dkt. 125 at 21).

Congress has the power to "regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. But the Commerce Clause has long been understood to include a negative command, one that prohibits states from passing laws that "unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). The dormant

Commerce Clause's existence is mostly uncontroversial; its boundaries are not. This case is no exception.

For its part, the Attorney General insists that Illinois Bankers' interpretation of the parity statutes involves the state law claims that this Court previously dismissed on sovereign immunity grounds, barring this Court's adjudication of the issue in its entirety. (Dkt. 138 at 31). Alternatively, the State contends that if the Court does reach the issue, Illinois statutory interpretation principles would lead the severability clause of the IFPA to override the parity statutes and equally subject in-state Illinois financial institutions and out-of-state State counterparts to the law's applicability. (Dkt. 174 at 78). The Attorney General's office did not meaningfully attempt to defend against the Dormant Commerce Clause arguments in briefing nor on the record at oral argument. (*See id.* at 72–75).

The problem with the Dormant Commerce Clause argument, though, is that Plaintiffs effectively allege discrimination in a State's inability to legislate nationally. That makes no sense. The Illinois General Assembly cannot bestow powers upon Iowa and Kentucky banks any more than the Texas legislature can direct California banks on how to run their savings accounts. Indeed, the very existence of the Riegle–Neal protections at 12 U.S.C. § 1831a(j)(1) indicate that Congress wanted to offer out-of-state State banks the same parity principles that states would offer their in-state banks through parity statutes; Congress' lack of comparable statutes for credit unions and savings associations does not override that logic.

A handful of outlier states, such as Michigan, go beyond parity with the federal government in their statutes to include the powers granted by "any state or political subdivision," but this is still inapposite of what Plaintiffs suggest—the Michigan legislature is not attempting to grant powers to other states' financial entities, only mirroring those powers in its own state. MICH. COMP.

LAWS ANN. § 487.14101(2)(b) (West 1998 & Supp. 2001). And it's not that the IFPA itself discriminates against any out-of-state State financial institutions—indeed, the law imposes the same burdens on in-state and out-of-state entities. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 (2023) ("Even under our received dormant Commerce Clause case law, petitioners begin in a tough spot. They do not allege that California's law seeks to advantage in-state firms or disadvantage out-of-state rivals."). So Illinois Bankers instead attempt to shoehorn this argument through the parity statutes. Neither party presented, nor did this Court independently find, any prior attempt to construe state parity statutes as unconstitutional under the dormant Commerce Clause in any other litigation.

Illinois Bankers point to the seminal decision in *West Lynn Creamery* as illustrative of the type of discriminatory statute that the Illinois parity statutes represent. (Dkt. 125 at 21). But in *West Lynn Creamery*, the Supreme Court struck down a Massachusetts legislative scheme that collected taxes on all milk sold in-state, from in- and out-of-state farmers alike, because Massachusetts then distributed all of the funds back to in-state dairy farmers—a subsidy that came at the cost of endangering the national market through tariff-like barriers. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 197 (1994). In comparison, the Illinois statute involves no downstream workaround to advantage in-state financial institutions over their out-of-state counterparts.

The *West Lynn* petitioners attempted to save their program by dissecting it into two separate constitutional means: a nondiscriminatory tax and a local subsidy. *Id*. at 201. Illinois Bankers do not acknowledge a version of the Illinois law as neutral or nondiscriminatory, instead continuously characterizing it as facially discriminatory. (Dkt. 174 at 20). Even if they had, however, it would still fall short of the type of State intervention at issue in *West Lynn*. To follow that logic would be

to impede any State's ability to put its own financial institutions on comparable footing to their federal counterparts, which is not what the Commerce Clause—dormant or not—demands.

Returning to *Ross*: faced with a law that did not implicate the dormant Commerce Clause's anti-discrimination principle, petitioners sought to pursue first an "extraterritoriality" theory,[6] and then a *Pike* balancing theory of discriminatory practical effects, both of which the Supreme Court rejected. *Nat'l Pork Producers Council*, 598 U.S. at 378. Under *Pike*, a facially neutral state law that serves a legitimate local interest may nonetheless violate the dormant Commerce Clause if the burden it imposes on out-of-state commerce is "clearly excessive in relation to the putative local benefit." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Asked on the record at oral argument whether they would like to argue a comparable theory, Illinois Bankers declined, again resting on the facial discrimination argument. (Dkt. 174 at 21).

This Court is unpersuaded by the primary contentions of both parties. Illinois Bankers' dormant Commerce Clause argument is underdeveloped and strains against existing case law. And the Attorney General's suggestion that this Court cannot interpret state law because related claims can only proceed in state court is at odds with the longstanding tradition of federal court jurisdiction. The question in front of the Court is not the specific state law issues barred by sovereign immunity but rather the downstream consequences of those issues for out-of-state State financial entities. Thus, the Court turns to the Attorney General's second contention: whether or not the parity statutes must be interpreted as Illinois Bankers suggests in the first place.

As determined above, the IFPA's Data Usage Limitation is preempted as to federal financial institutions. The IFPA contains a severability clause. *See* 815 ILCS 151/150-95. Under

---

[6] In separate litigation, this Court found that recent Supreme Court jurisprudence, including *Ross*, severely undercuts the continuing viability of the extraterritoriality theory. That case is currently pending on appeal at the Seventh Circuit. *See Ass'n for Accessible Medicines v. Raoul*, 2025 WL 2764558, at *5 (N.D. Ill. Sept. 26, 2025).

the Attorney General's view, the severability clause's existence means that the Illinois General Assembly sought to apply the Data Usage Limitation to in-state state financial institutions regardless of the parity statutes' existence. Illinois Bankers argues that the parity statutes trump the severability clause—teeing up their dubious dormant Commerce Clause argument.

The relevant statutes for Illinois-chartered banks and savings associations include prefatory clauses declaring the parity power to the tune of "notwithstanding any other provisions of this Act or any other law." *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11). The parity provision for Illinois-chartered credit unions does not contain similar language; instead, it carves out from parity with the Federal Credit Union Act only those national powers that would conflict with any provision of the Illinois Credit Union Act (ICUA) specifically. 205 ILCS 305/65. The Attorney General deems this omission conclusive in that no part of the statute "purports to override the IFPA's severability clause;" Illinois Bankers does the same but for the opposite conclusion, suggesting that the specific exception for the ICUA proves that the parity statute overrides the applicability of the IFPA. (Dkt. 138 at 33; Dkt. 146 at 18).

The Supreme Court has warned that "premature adjudication of constitutional questions bear[s] heightened attention when a federal court is asked to invalidate a State's law." *McKesson v. Doe*, 592 U.S. 1, 6 (2020) (citations omitted). That caution is especially justified where a challenging party seeks to construe a not-yet-in-effect State law in a way that creates a conflict with federal law. *See Arizona v. United States*, 567 U.S. 387, 415 (2012) (*citing Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960) ("To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal

39

regulation where none clearly exists")). While this Court heeds that warning, it also cannot ignore the clear interpretation principles of Illinois state law.

The Illinois Supreme Court has adopted the position that "the use of a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *People v. Molina*, 266 N.E.3d 1031, 1040 (Ill. 2024) (citation omitted). But because "where possible, [Illinois] courts are to interpret statutes and ordinances in such manner as to avoid raising serious constitutional questions," *Villegas v. Bd. of Fire & Police Comm'rs of Vill. of Downers Grove*, 656 N.E.2d 1074, 1082 (Ill. 1995), the Attorney General makes three statutory interpretation arguments in support of the argument that the IFPA Data Usage Provision applies to in-state financial institutions despite the parity statutes. First, "more-specific statutes control over general acts;" second, "later-enacted statutes control over earlier statutes;" and third, "it is axiomatic that one legislature cannot bind a future legislature." (Dkt. 138 at 33) (citing *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1268 (Ill. 2022) and *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 957 N.E.2d 876, 884 (Ill. 2011)).

But these principles all come into play where statutory text is less than clear—and the Illinois Supreme Court has been explicit in determining that a "notwithstanding" clause clearly means the accompanying "Act prevails over any conflicting "provision of law.' " *See Molina*, 266 N.E.3d at 1040. With that guidance in hand, the Court finds that the plain terms of the parity statutes would result in the preemption of the IFPA's Data Usage Limitation as to Illinois-chartered financial institutions. That case is for Illinois state courts to decide, but for present purposes, it

does lead to a confusing conundrum: out-of-state State-chartered institutions are left, functionally, as the only relevant entities subject to the Data Usage Limitation.[7]

Illinois Bankers have not raised a cognizable challenge to that conundrum in their depictions of the parity statutes as facially discriminatory—not in a world where Congress has consistently and extensively legislated around the dual banking system that parity statutes inherently uphold. And while the Supreme Court has historically struck down neutral laws that impermissibly controlled commerce beyond a State's borders, *see, e.g.*, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), the *Ross* Court clarified that these cases did not prohibit extraterritorial legislation writ large, but only legislation with a "*specific* impermissible extraterritorial effect" tracing directly back to the antidiscrimination principle. *Ross*, 598 U.S. at 374. The law in *Baldwin*, for example, was plainly designed to protect an in-state industry.

The parity statutes are, in one viewing, designed to protect Illinois financial institutions—but not at the cost of out-of-state interests. The law dictates the relationship between Illinois entities and their federal counterparts. The inclusion of the IFPA's Data Usage Limitation complicates this story. But the Act in no way discourages consumers from engaging with merchants across state lines. *See N.J. Staffing Alliance v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) ("[T]he dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach absent protectionist intent or effect."). The "specific impermissible extraterritorial effect" *Ross* observed of the state laws at issue in the *Baldwin* line of cases was that each "deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." *Ross*, 598 U.S. at 374, 143 S.Ct.

---

[7] That is, other than those banks impacted by the analysis under the Riegle–Neal Interstate Banking and Branching Efficiency Act's statutory framework—codified at 12 U.S.C. § 1831a(j)(1).

41

1142 (citation omitted). In other words, they were discriminatory and protectionist, to an extent that is not present here.

But if the IFPA is unconstitutional for some other reason—such as failing *Pike* balancing, violating the Due Process Clause, or running afoul of horizontal separation of powers—the Parties still have to raise it. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 681 (4th Cir. 2018) (Wynn, J., dissenting) (noting the "the availability of potentially more appropriate constitutional provisions, like the Due Process Clause, to ensure that States do not unduly extend their regulatory authority beyond their borders"); *see also Ross*, 598 at 376 n.1 ("Some have questioned whether the state law at issue in [the Supreme Court's 1982 plurality decision on an extraterritoriality issue] posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers."). The same goes for any potential argument that these institutions are saved by their own states' respective parity statutes. As it stands, the Court cannot—on the present arguments—invalidate the Data Usage Limitation of the IFPA as to out-of-state State-chartered financial institutions beyond those separately exempted under Riegle–Neal. 12 U.S.C. § 1831a(j)(1).

g. *Extension of Preemptive Effect to Other Participants*

Finally, Illinois Bankers argues that in order to effectuate federal preemption, the IFPA cannot be applied to Card Networks or others involved in the payment process. (Dkt. 125 at 32). Because the Court has determined only the Data Usage Provision has been preempted, the question becomes whether the preemption extends to other entities involved in processing transactions. Illinois Bankers contend that any determination that a State law would significantly interfere with a national bank's exercise of its federally granted powers may necessitate expanding the scope of the NBA's preemptive effect to include other participants in credit and debit card transactions. As

42

an alternative to the statutory argument, Illinois Bankers argue that equitable principles would compel the same result in order to afford complete relief to the impacted parties.

The Court rejected this argument at the preliminary injunction stage. As noted then, Congress specifically addressed other participants in the national banking system and explicitly did not extend preemptive effect to non-national bank entities:

> No provision of title 62 of the Revised Statutes or section 371 of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).

28 12 U.S.C. § 25b(h)(2).

Plaintiffs continue to argue that § 25b(h)(2) is best read as narrowly overruling the categorical approach to preemption espoused in *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 18 (2007). And they are correct that Section 25b(h)(2) did not purport to alter the scope of NBA preemption for national banks, which remain protected against state laws that "significantly impair" their own activities by targeting third parties. (Dkt. 125 at 35). But the IFPA does not pursue national banks via Payment Card Networks, or vice versa. It seeks to regulate all of those actors of their own accord. The Data Usage Provision dictates that "an entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151.150-15(b).

Even so: this Court found that the IFPA's Interchange Fee Provision was not preempted in large part because it was the Payment Card Networks, and not the banks, doing the actual work of

43

fee setting and charging. That distinguishes these entities from those acknowledged in § 25b(h)(2). *See Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011) ("An agent is a person authorized by another, the principal, to act for him or in his place."). And "[i]t is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chicago v. Barr*, 961 F.3d 882, 920–21 (7th Cir. 2020).

On this record, Illinois Bankers have successfully demonstrated that the Data Usage Limitation is so tied up in the federal entities' powers that the preemptive effect must run to the Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief. *See Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 48 (E.D.N.Y. 2020) ("subjecting [non-national-bank] Defendants to interest rate limits imposed by New York law would significantly interfere with [national bank's] exercise of its powers as a national bank"). That does not mean that the Data Usage Limitation is preempted as to these entities of their own accord; the law still applies to the extent relevant to their independent, third-party usage. But in keeping with longstanding principles of equity, this Court extends relief to other participants in the payment system when they facilitate the preempted institutions' powers implicated by the Data Usage Limitation.

### III. Injunction

With the merits resolved, the Court turns to Illinois Bankers' request for a permanent injunction. Accounting for the conclusions of the substantive analysis above, Illinois Bankers request a permanent injunction preventing Illinois from enforcing the IFPA's Data Usage Limitation against (1) national banks; (2) banks chartered by states other than Illinois that are subject to Riegle–Neal. 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit

unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation.[8]

Illinois Bankers is entitled to a permanent injunction if it shows that: (1) it has suffered an irreparable injury; (2) legal remedies, such as monetary damages, cannot adequately compensate for that injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) a permanent injunction would not harm the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019). The third and fourth criteria "merge" when the enjoined party is the Government. *See Stevens v. United States Dep't of Health & Hum. Servs.*, 666 F. Supp. 3d 734, 748 (N.D. Ill. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Illinois Bankers have satisfied each factor.

Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id.* A mere possibility of irreparable harm will not suffice. *Nken*, 556 U.S. at 434–35 (2009). As laid out in the Background section, Illinois Bankers have sufficiently demonstrated the enormous compliance costs associated with the IFPA. Key among these are the declarations, submitted by Illinois Bankers, in which financial institutions and business owners claim that the money they would have to spend to come into compliance with the IFPA would be so devastating to their business that it may drive them from the market altogether.

---

[8] The analysis did not result in injunctive relief for credit unions, savings associations, or savings banks chartered by states other than Illinois. The statute's applicability to those entities chartered by Illinois is not in front of this Court.

Even if compliance costs did not drive any financial institutions out of the market, Illinois Bankers would likely still be able to establish irreparable harm because their costs are non-recoverable. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that evidence of non-recoverable compliance costs was sufficient to show irreparable harm). This is because if the Court did not issue an injunction, but Illinois Bankers nonetheless prevailed in their ligation at a later stage, Illinois Bankers likely would be unable to recoup their costs because the State would be immune from suit. *James v. Madigan*, 373 F. App'x 619, 621 (7th Cir. 2010) ("[s]overeign immunity prevents a federal court from awarding damages against a state or one of its employees"); *Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (finding that, with a pre-enforcement challenge, because State is immune from suit, plaintiffs established irreparable injury by showing "costs of complying").

Next, the balance of hardships and public interest considerations favor the entry of a permanent injunction. The present result, based on the arguments presented, leaves a complicated legacy, with the IFPA's Data Usage Limitation enjoined as to most, but not all, entities. Further, while the Court has previously granted some entities preliminary injunctive relief as to the Interchange Fee Provision, its ultimate determination does require compliance with the law, which now goes into effect July 1, 2026. Compliance with the remaining provision of the law may still prove overwhelmingly arduous for the financial institutions, but a full review of the record requires this result. Relief from compliance with the Data Usage Limitation, however, may allow some financial institutions that predicted being driven from the market to, in fact, remain. Defendants do not identify any hardships they would face from the proposed permanent injunction, and the Court is not required to speculate as to the harms Defendants might face or make arguments on their behalf. *See, e.g., Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721

46

(7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them.").

Finally, while there is a strong public interest for the people of Illinois to see their legislative determinations come to fruition, there is a stronger interest still in ensuring the Supremacy Clause is properly effectuated. *Flanagan*, 720 F. Supp. 3d at 642; *Pro. Towing & Recovery Operators of Illinois v. Box*, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) ("the public . . . does not have an interest in the enforcement of state laws that conflict with federal laws"). Consequently, the Court concludes that the balance of equities and public interest considerations weighs in favor of Illinois Bankers.

## CONCLUSION

Illinois Bankers' motion for summary judgment [Dkt. 123] is granted in part, and the Attorney General's cross-motion for summary judgment [Dkt. 136] is granted in part.

_____
Virginia M. Kendall
United States District Judge

Date: February 10, 2026

47